# Exhibit A

# MEMORANDUM OF TERMS
## FOR THE PRIVATE PLACEMENT OF DEBT SECURITIES OF

## ICAP EQUITY, LLC

---

This Memorandum of Terms ("*Memorandum*") summarizes the principal terms of the proposed financing of iCap Equity, LLC (the "*Company*"). This term sheet is for discussion purposes only; there is no obligation on the part of any negotiating party until a definitive Note Purchase Agreement is signed by all parties. This term sheet is subject to the satisfactory completion of due diligence. This term sheet does not constitute either an offer to sell or an offer to purchase securities.

### THIS OFFERING INVOLVES CERTAIN RISKS. <u>See</u> "Risks Factors."

The Notes have not been, nor will they be registered OR QUALIFIED under the Securities Act. They are being offered and sold in the United States only to accredited investors in reliance on Rule 506(b) of Regulation D promulgated under the Securities Act OR UNDER ANY APPLICABLE STATE SECURITIES LAWS. neither the securities and exchange commission nor any state securities commission has approved or disapproved of these securities or determined if this memorandum is truthful or complete; any representation to the contrary is a criminal offense.

The information contained in this Memorandum is confidential. By acceptance of this Memorandum, each recipient agrees (a) not to reproduce or distribute this Memorandum to other persons (except the recipient's professional advisors) without the prior written consent of the Manager; (b) that the recipient and his, her or its professional advisors will keep confidential all information contained herein not already in the public domain; and (c) that the recipient will use this Memorandum for the sole purpose of evaluating a possible investment in the Notes. Each recipient also agrees to return this Memorandum and any other documents or information furnished by the Company to the recipient (and any and all copies thereof) upon request of the Company if the recipient declines to purchase any Notes.

There will be no public market for the Notes and there is no obligation on the part of the Company or any person to register the Notes under the Securities Act or any state securities laws.

This Memorandum includes data and information obtained from independent third party sources. Although the Company does not have any reason to believe that such data and information is not accurate, the Company did not independently verify such data and information and cannot assure the accuracy or completeness of such data and information. Prospective investors must rely upon their own investigations and evaluations with respect to making an investment in the Notes being offered hereby.

Prospective investors will be advised of any material modifications to the terms of the offering or the Notes in writing prior to any sale of Notes to the prospective investors.

Nothing contained in this Memorandum is, or should be relied upon as, a promise or representation as to the Company's future performance. Prospective investors must rely upon their own examination of the Company and the terms of the Offering, including the merits and risks involved.

---

## SUMMARY OF MATERIAL TERMS

The following summarizes a number of the material provisions of the proposed promissory note financing of iCap Equity, LLC, a Delaware limited liability company (the "***Company***"). This Memorandum is qualified in its entirety by the full text of the Note Purchase Agreement and the exhibits attached thereto. Capitalized terms used in this summary not separately defined herein have the meanings assigned to such terms in the Note Purchase Agreement. No person will be permitted to invest in the Notes unless such person has received and reviewed the Note Purchase Agreement, this Memorandum and other offering-related documents. This summary does not constitute an offer to sell, or the solicitation of an offer to buy, the securities referenced herein, and any such offer will be made only to selected persons pursuant to the offering documents prepared and delivered by the Company.

| | |
|---|---|
| **Amount to be Raised** | Up to $10,000,000 in aggregate principal amount of promissory notes (the "***Notes***") or such additional amount as determined by the Manager in its sole discretion. |
| **Investors** | Each investor in the Notes must be an "accredited investor" as defined under Regulation D of the Securities Act (the "***Investors***"). |
| **Minimum Investment** | An investment of at least $50,000, unless a smaller investment is permitted by the Manager in its discretion. |
| **Target Closing Date** | The initial closing is anticipated to occur on or around November 1, 2017, with subsequent closings permitted through March 31, 2018, unless extended up to 180-days by the Manager. |
| **Definitive Agreement** | The Notes will be issued and sold pursuant to a note purchase agreement prepared by the Company's legal counsel and will contain customary representations and warranties of the Company and the Investors (the "***Note Purchase Agreement***") in the form attached as **Exhibit A**. |
| **Maturity Date** | Unless extended by a one-year extension at the discretion of the Manager, principal and unpaid accrued interest will be due and payable three years after the date of the initial investment (the "***Maturity Date***"). The Notes may be prepaid prior to the Maturity Date without penalty. |
| **Interest Rate** | Simple interest will accrue on an annual basis at the rate of 10% per annum based on a 360-day year. Accrued interest will be due and payable monthly in arrears on the 15th day of each month following the closing of the Note. |
| **Security** | The Notes will be unsecured. |
| **Amendments** | Any term of the Notes may be amended or waived with the written consent of the Company and holders of Notes comprising a majority of the outstanding principal balance (the "***Majority Holders***"). Any amendment, waiver or extension approved by the Majority Holders will apply to all holders of the Notes. |
| **Events of Default** | Upon the occurrence of an Event of Default, the Holder may declare the Loan Amount to be due and payable. |
| **Fees and Expenses** | Each party will bear its own fees and expenses incurred in the transactions contemplated by this Memorandum. |
| **Company Contact Information** | iCap Equity, LLC<br>3535 Factoria Blvd. SE, Suite 500<br>Bellevue, WA 980006<br>ATTN: CHRIS CHRISTENSEN<br>OFC: (425) 278-9030; FAX: (425) 278-9025<br>EMAIL: investor@icapequity.com |

137330388.4

## FORWARD-LOOKING STATEMENTS

This Memorandum and its exhibits may contain statements that constitute forward-looking statements, as defined by federal securities laws. Forward- looking statements can be identified by the use of terminology such as "anticipates," "expects," "intends," "opportunity," "plans," "should," "predicts," "potential," "continue," "believes," "seeks," "would," "may," "will be," "likely to become," "estimates" and variations of these words and similar expressions. Forward-looking statements are subject to risks and uncertainties and include statements made regarding events, financial trends, future operating-results, financial position, cash flows and other general information concerning possible or assumed future results of operations of the Company or any project. Investors are cautioned that such statements are only predictions, forecasts or estimates of what may occur and are not guarantees of future performance or of the occurrence of events or other factors used to make such predictions, forecasts or estimates. Actual results may differ materially from the results expressed, implied or inferred from the forward-looking statements and may be worse due to a variety of factors, including changes in laws, adverse changes in real estate prices, adverse changes in interest rates, and adverse changes in the credit and capital markets. These forward-looking statements speak only as of the date on which the statements were made and the Company undertakes no obligation to update or revise any forward-looking statements made in this Memorandum or elsewhere as a result of new information, future events, future developments or otherwise, except as required by law.

## INVESTMENTS

To subscribe for the Notes, you must complete, execute and deliver to the Company the Subscription Documents, in the form attached to this Memorandum as **Exhibit B**. The Note Purchase Agreement requires you to represent, among other things, that you are an accredited investor, are acquiring Notes for your own account for investment and not with a view to resale or distribution, and that you are aware that transfer of the Notes is restricted by the terms of the Note Purchase Agreement and by the absence of a market for the Notes. The Note Purchase Agreement also requires you to acknowledge that you have received and have had an opportunity to read this Memorandum and are aware of the risks associated with an investment in the Notes.

THE COMPANY'S ACCEPTANCE OF YOUR SUBSCRIPTION FOR NOTES DOES NOT CONSTITUTE A DETERMINATION BY THE COMPANY THAT THE INVESTMENT IS SUITABLE FOR YOU. THE FINAL DETERMINATION AS TO THE SUITABILITY OF AN INVESTMENT IN THE NOTES FOR YOU MUST BE MADE BY YOU AND YOUR ADVISORS.

137330388.4

## USE OF PROCEEDS

The following table sets forth the details of the fees and the funds available for use by the Company upon the sale of the Notes:

|  | Minimum Investment | Maximum Offering |
|---|---|---|
| Gross Offering Proceeds | $50,000 | $10,000,000 |
| Offering Expenses[1] | $40,000 | $40,000 |
| Organizational Expenses[2] | $35,000 | $35,000 |
| Amount Available for Company investment | $0 | $9,925,000 |

1  The Company may incur additional offering costs, including brokerage and finders fees of up to 8% of the capital such brokers and finders raise, and other expenses, the aggregate amount of which is not yet known. Such expenses, to the extent incurred, will reduce the net proceeds realized by the Company.

2  Organizational expenses include the cost of forming the Company in Delaware and the cost of preparing this Memorandum and other offering documents.

### Allocation of Offering Proceeds

The proceeds of this offering will be used to fund the expansion plans of the Company as it launches additional investment fund vehicles, makes direct real estate investments, and retires prior Company obligations. The following table is an estimate of the Company's allocation of the available offering proceeds. Given that the offering proceeds will be combined with the Company's existing streams of income, and that the Company is already operating profitably, the table illustrates primarily those items that are in addition to the standard operating expenses of the Company. If less than the maximum Offering amount is raised, the Manager will determine which line items will receive less than the estimated allocation. The Manager has discretion to utilize all proceeds as it deems necessary to accomplish the Company's business purposes.

| Line Item | Estimated Amount | Total |
|---|---|---|
| New Hires and Growth Plans | $100,000 | $100,000 |
| New Company Formation Costs[3] | $50,000 | $150,000 |
| Reserves | $1,000,000 | $1,150,000 |
| Retirement of Debt (Payables)[4] | $3,720,000 | $4,870,000 |
| Taxes and Licenses | $100,000 | $4,970,000 |
| Marketing | $100,000 | $5,070,000 |
| Website and Technology Upgrades | $150,000 | $5,220,000 |
| Real Estate Investments | $4,705,000 | $9,925,000 |

3.  Each time the Company launches a new investment fund vehicle, it advances the initial capital for the organizational and offering expenses, including preparation of the offering documents, entity formation, and marketing expenses. The Company is reimbursed for these expenses when the fund's first closing is held, and the newly formed fund begins generating management fee income for the Company. The Company expects to form at least 2 pooled investment vehicles over the next 4-5 years in addition to the three funds identified in this offering memorandum.

4.  Retirement of debt and payables refers to legacy obligations of the iCap Affiliates, which were incurred as part of the establishment of the Company and its track record.

137330388.4

The following table outlines the principal balances of debt obligations, which may be serviced or paid. Each obligation was a private party arrangement in the form of a loan or payable, with the exception of the Eric Shipley obligation, which was an LLC preferred unit arrangement. The Company may choose to retire some obligations, but not others. All obligations are contained within iCap Enterprises, Inc.

| Item | Amount |
|---|---|
| Claus Mueller – iCap Equity, LLC | $180,000.00 |
| David Straz Jr. – iCap B2, LLC | $1,890,000.00 |
| Bob Walsh – iCap Enterprises, Inc. | $400,000.00 |
| T&L One, LLC – iCap Enterprises, Inc. | $245,000.00 |
| Grogan/Blair – iCap Enterprises, Inc. | $125,000.00 |
| iCapEquity Real Estate Fund I, LLC | $180,000.00 |
| Mike Gould Notes – Oceanaire, LLC | $650,000.00 |
| Eric Shipley – Front Street Townhomes, LLC | $50,000.00 |

137330388.4

## COMPANY OVERVIEW

**The Company**

The Company is a Delaware limited liability company, whose sole member is the Manager. The Manager is wholly owned by Chris Christensen. The Company has recently acquired a number of affiliated entities for the purpose of consolidating operations, income, debt and expenses. This consolidation was made to allow the Company to centralize its operations, intellectual property, and technology.

The Company primarily derives its income from fees generated through subsidiary operations. It will also receive income from real estate investments that it plans to make with the proceeds of this offering. The Company's investment strategy focuses on preferred equity investments in Pacific Northwest real estate projects. The Company's subsidiary funds have primarily made secured, short-term investments in single-family, multi-family, light commercial and land development projects. Most investments involve some element of construction or development.

Although this Memorandum refers to "iCap" and the Company as though each were an entity capable of taking action, prospective investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this affiliated group of companies. By investing in the Company, the Investor will not acquire an interest in any of its affiliated entities, but it may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Company as it conducts its business.

The following chart illustrates the relationship among the various iCap entities.



Members of the management team previously established iCap B1, LLC, and iCap B2, LLC in 2013, which raised a total of $6,915,664 for the purpose of making investments into various real estate projects. These special purpose vehicles made 10 investments and generated a gross IRR to investors of 20%. The management team also issued a total of $93 Million in debentures across two pooled investment funds, iCap Pacific NW Opportunity and Income Fund, LLC, and its follow-on fund, iCap Northwest Opportunity Fund, LLC. As of the date of this Memorandum, iCap has $87 Million in assets under management (including reserves and committed capital for investments), which is invested across 69 projects. Of these 69 projects, 37 have exited and achieved a 33% annualized ROI and 1.43 multiple of invested capital. The financial statements of the Company and its affiliates can be viewed in the Data Room, which is available to all potential Investors upon request.

YOU SHOULD RECOGNIZE THAT BY PURCHASING NOTES IN THE COMPANY YOU WILL NOT THEREBY ACQUIRE ANY OWNERSHIP INTEREST IN ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM

137330388.4

25-80084-WLH    Doc 18-1    Filed 12/16/25    Entered 12/16/25 16:19:32    Pg 7 of 27

SPONSORED BY THE MANAGER OR ITS AFFILIATES. YOU SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE MANAGER AND ITS AFFILIATES IS GIVEN SOLELY TO ALLOW YOU TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. YOU SHOULD NOT ASSUME THAT THE INVESTORS IN THIS OFFERING WILL EXPERIENCE RETURNS, IF ANY, ON THEIR INVESTMENTS SIMILAR TO THOSE EXPERIENCED BY INVESTORS IN THE PRIOR PROGRAMS SPONSORED BY THE MANAGER AND ITS AFFILIATES.

**Investment Structure**

In utilizing the proceeds from this Offering, the Company plans to pursue three primary investment strategies. These strategies include: forming new fund vehicles, investing in financial instruments secured by real property, and acquiring and holding real estate for investment purposes. Initially, the Company will focus its investment in the greater Puget Sound region. The real estate holdings will be limited to single and multi-unit residential properties, light commercial properties, and land acquired for entitlement purposes. It is anticipated that approximately half of the proceeds from this Offering will be dedicated to the furtherance of these three strategies. The Company may directly or indirectly, through subsidiary operations, carry out these forms of investments depending on the opportunity.

**Investment Process**

The Company has developed proven processes and controls to evaluate possible investment opportunities. This process begins with an initial review by a committee consisting of key members of the management team (the "***Investment Committee***"). Specifically, the Investment Committee is comprised of the Company's President, Chief Operating Officer, and Controller. Every investment opportunity is subject to preliminary due diligence performed by the Company's underwriters, who in turn will present investment opportunities to the Investment Committee for its review and approval. The Investment Committee meets weekly to review new opportunities. The Company completes diligence on prospective investments and maintains post-closing procedures that provide for the ongoing supervision of the investments. The investment process has four major areas of focus: analysis and approval, documentation and closing, and post-closing and management.

**Risk Controls**

The Company's entity structure and investment strategy have been designed to mitigate risk and increase the likelihood of success. Each investor will receive a note upon closing, which will provide the investor with a priority return for repayment over equity holders, an ongoing interest rate, and a payoff premium. The Company's subsidiary management entities will then offer a corporate guaranty. Additionally, the Company has devised a three-prong investment strategy to ensure multiple income streams and has assembled an experienced and proven management team to oversee the business. Lastly, the Company has targeted strong markets for its investments in the Pacific Northwest. Recently ranked as the top city for 2018, Seattle, Washington (and the Pacific Northwest by extension) offers the "strongest outlook for investment and development in Industrial and Single Family housing."[1]

**Tightening Lending Criteria**

Although the creation of new jobs in the Pacific Northwest has created an increase in demand for investment in real estate transactions, banks and other real estate lenders have tightened their lending criteria in order to ensure that they remain in a safe position with regard to their loans. Lenders now commonly lend no more than 65% of a project's cost and require the borrower to supply the remainder of the funds to complete a given project. Additionally, most real estate developers and builders have been forced to place their available cash into deposit accounts to meet aggressive liquidity requirements imposed by their banks and direct lenders who provide these loans for their projects. Consequently, real estate developers and builders frequently lack the ability to obtain the remaining funds needed to finance their projects.

As a result of the last financial crisis, banks and other traditional lenders have been forced to tighten their lending criteria for real estate based loans. Their stricter set of rules for mortgage lending programs and products limit their ability to address consumer need. New regulations translate to less flexibility when underwriting mortgages, in addition to higher compliance costs. The ability to lend is substantially constrained and, therefore, banks and other lenders find it harder to meet the

---

[1] PWC, *Emerging Trends in Real Estate*, "The outlook for 2018," https://www.pwc.com/us/en/asset-management/real-estate/emerging-trends-in-real-estate.html

137330388.4

increased demand for loans. This, in turn, frustrates borrowers and banks while slowing economic growth. The resultant funding void creates short-term and long-term investment opportunities.

**Opportunity in the Greater Puget Sound Region**

A fundamental need for capital in real estate projects, coupled with the growth of the Greater Puget Sound regional economy, has resulted in many real estate investment opportunities in the area. As noted below, the Greater Puget Sound regional economy has grown significantly in recent years.

The following are a few characteristics of the Greater Puget Sound Region:

- The region is home to many national companies from a variety of industries
- Hundreds of new companies move into the area annually
- Property sales and rental rates continue to increase
- Job creation has been steady
- Foreign and global investor interest has risen significantly



King, Pierce, Snohomish and Kitsap are the four largest counties in the area. The economy is generating 5,000 new jobs each month in these four counties alone. The annual job growth rate for the region is 3.1%, compared to the 1.8% rate for the rest of the country.[2]

The region is supported by an educated workforce. With regards to higher education, 40% of the regional population has earned a bachelor's degree (57% in Seattle alone) and 14.7% of the population has earned an advanced degree; these figures are higher than countrywide figures of 28.8% for bachelor's degree holders and 10.6% for recipients of an advanced degree.[3] The median annual household income in the region is $75,331, as compared to $55,775 for the country.[4]

The increased job growth has resulted in a housing inventory shortfall in the area, which has produced a supply and demand imbalance. In a balanced market, it is typical to maintain 6 months of housing inventory. As of September 2017, King

---

[2] Source: The United States Census Bureau, as of April 2015

[3] Source: The United States Census Bureau, as of April 2015

[4] Source: Census ACS 1-year Survey, http://www.deptofnumbers.com/income/washington/seattle/#household

137330388.4

25-80084-WLH    Doc 18-1    Filed 12/16/25    Entered 12/16/25 16:19:32    Pg 9 of 27

County, the largest county—by both geography and population—in the region, has a mere 1.13 months of inventory.[5] Given this shortage of housing inventory, builders and developers have been able to take advantage of opportunities to bring new homes to the market and sell them for a profit. The Company's three investment strategies are calculated to address this imbalance.

## Management of the Company

The management and supervision of the Company is vested exclusively in the Manager (including its duly appointed agents), who has full control over the business and affairs of the Company. The Manager has the power on behalf and in the name of the Company to carry out any and all of the objects and purposes of the Company and to perform all acts and enter into and perform all contracts and other undertakings that the Manager, in its sole discretion, deems necessary or advisable or incidental thereto. Investors must rely upon the judgment and experience of the Manager to manage the Company. The sole member of iCap Enterprises, Inc. is Chris Christensen. The managers of iCap Enterprises, Inc. are Chris Christensen and Jim Christensen.

The Manager and its Affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

## Professional Biographies

Chris Christensen, *President*

Chris leads the senior management team and oversees all facets of the organization, with a particular emphasis on business strategy, legal and finance structuring. He is also primarily responsible for tax and accounting decisions. Chris is 41, and prior to forming the Company, he managed affiliated funds, formed and managed operating entities, including Edge Construction, LLC and iCap Enterprises, Inc., and has advised numerous lenders, developers and borrowers with regard to their start-up and operating needs, including financial structuring and asset protection. Chris holds a Juris Doctor degree from Seattle University School of Law, a Master's degree in International Business from Seattle University, and a Bachelor of Arts degree in Economics from the University of Utah. He is the brother of Jim Christensen.

Jim Christensen, *Chief Operating Officer*

Jim is iCap's Chief Operating Officer and assists the President with the day-to-day operations of iCap and its investment funds, including overseeing investment underwriting, project and construction management, project financing, disposition of distressed assets, and management of the various strategic relationships involving iCap and its affiliates. In addition, he is responsible for the technology-related underpinnings of iCap. This includes electronic document storage, electronic process automation, and software management. Jim has managed all aspects of construction, development, finance and risk control of multifamily and single family residential and commercial real estate projects throughout Washington State for iCap Enterprises, Inc. Jim directly managed over $30 million in development projects and also consulted property owners on the strategy, finance and execution of the development of their properties. As an investment manager, he has been responsible for the oversight of over $260 million of projects. Jim has experience dealing with jurisdictional issues relating to site development and vertical construction, as well as budget preparation, project underwriting and legal structuring. Jim is 33, and he holds a Master of Business Administration degree and a Bachelor of Arts degree in Economics from the University of Washington. Jim is the brother of Chris Christensen.

---

[5] Source: Northwest Multiple Listing Service, Market Update, http://www.northwestmls.com/library/content/statistics/PRTables_Sept17.pdf

137330388.4

Trace ("TD") Croshaw, *Controller*

As Controller, TD is responsible for managing financial controls and accounting procedures of the Company and its investments. TD provides forecasts, budgets and other financial analysis of the Company and its investments, assists with investor reports and communications, manages cash flows and cash flow projections, and establishes and ensures adherence to internal control policies and procedures within the Company. TD also supervises iCap's accounting personnel, and manages the Company's third-party audit, tax and accounting firms, PwC and Huber, Erickson & Bowman, LLC, to complete annual audit and tax returns. TD is 39 and a licensed CPA. Prior to joining iCap, TD had 15 years of experience as an audit manager at an accounting firm performing financial audits for businesses. TD holds a Bachelor of Arts degree in Accounting from the University of Utah, and a Master of Business Administration degree from the University of Phoenix, and he is a member of the AICPA.

Levi Rowse, *Director, Construction and Development*

Levi is responsible for overseeing all development and construction efforts for projects that are actively managed by iCap, as well as monitoring projects controlled by Project Sponsors in which the Company invests. Levi also assists with pro forma preparation, budget analysis and due diligence review of proposed Company investments. Furthermore, Levi manages relationships with numerous third parties imperative to development efforts including contractors, engineers, and other professional service providers, and interfaces with jurisdictional representatives with regards to entitlement, zoning and permitting issues. Levi is 39 and has 21 years of experience in construction, land development and project management. He most recently was a Senior Development Manager for Quadrant Homes, and before that role was an independent appraiser and designated broker, in addition to being a Superintendent for McBride Construction and a Development Manager with Tarragon. Levi holds a Bachelor of Arts degree in Business Administration with a Finance & Real Estate emphasis, is a Certified Residential Appraiser and Designated/Managing Broker, and possesses a LEED AP designation from the U.S. Green Building Council.

Derek Howell, *Director, Underwriting*

Derek directs the underwriting, due diligence review, and closing of Company investments. He evaluates new investment opportunities, performs cashflow analysis, presents potential investments to the Investment Committee, and is the primary point of contact for potential Project Sponsors. Once an investment is approved by the Investment Committee, Derek assists with issuing letters of intent, performing comprehensive due diligence review, negotiating investment documents, and addressing other matters for closing. For existing projects, Derek handles the underwriting relating to project extensions and modifications. Derek also assists with ongoing economic research and market analysis, as well as preparing investor reports and communications. Prior to joining iCap, Derek spent eight years advising hundreds of in-house legal departments at both domestic and multi-national corporations on best practices surrounding implementing cost controls, managing outside counsel, and developing consistent reporting methodologies. Prior to that time, Derek worked in risk management and as in-house counsel for Polygon Northwest and Mosaic Homes, two different Pacific Northwest homebuilders. Derek is 40; he received his Bachelor of Arts degree from Brigham Young University and his Juris Doctor degree from the J. Reuben Clark Law School at Brigham Young University.

**Organizational Growth**

iCap has capacity to accept additional capital and to deploy such proceeds towards real estate projects meeting its investment criteria. iCap intends to grow as an organization with the expected increase in capital under management. With regards to human capital, various support staff will be hired to assist iCap's existing personnel to leverage the systems described above, consistent with iCap's growth plan. Three roles will require additional personnel support: underwriting, transaction closing, and asset management. Based on historical trends, iCap believes it should be able to review up to 20 deals each month and to fully underwrite and close up to five investments per month with its existing personnel. As iCap deploys additional capital raised through the Company, iCap plans to add additional staff members to assist with the increased transaction volume and asset management. iCap also plans to add additional support staff for its in-house accounting and legal departments.

As it pertains to the accounting function, Huber, Erickson & Bowman, LLC, a regional accounting firm, advises iCap on bookkeeping, and PwC, a national accounting firm, completes audits and tax returns. Each of these third-party firms can be relied upon as needed as iCap scales its activity. In addition, iCap relies upon outside legal advisors as necessary.

137330388.4

## POTENTIAL CONFLICTS OF INTEREST

The Manager and its Affiliates will be entitled to certain types of compensation, fees, income, distributions or other payments from the Company or in connection with a Company investment. Such arrangements have not and will not be determined through arm's-length negotiations between such parties and the Company. The Manager has no obligation to advance funds to cover the Company's expenses. However, to the extent that such advances are made, the Company will repay such amounts out of its funds as soon as they are available, whether such funds are from the Company's operating revenues or third-party loans. Below is a summary of these key payment obligations of the Company and potential conflicts of interest that could arise from these obligations.

**Compensation and Other Payments to the Manager**

The Company will not pay a fixed annual management fee to the Manager. However, the Company will pay sums to the Manager as are necessary to allow the Manager to perform those functions that relate to the Company's business purpose, such as payroll, rent, marketing, debt service, and all other such costs.

In addition to the fees set forth above, the Company will reimburse the Manager and its Affiliates for any reasonable expenses paid by either Person that properly should be borne by the Company. Such expenses include costs incurred before and after the formation of the offering, such as organizational and offering expenses; consulting, legal, accounting, and professional fees; and marketing and travel expenses.

The Company must distribute to the Manager, as a member of the Company, in cash the Estimated Tax Amount within 90 days after the close of each fiscal year, unless (a) the Manager determines the tax distribution would render the Company insolvent or would necessitate borrowing by the Company; (b) an Event of Default (as defined in the Notes) has occurred under the Notes or is continuing; or (c) the Manager determines that the tax distribution would otherwise be materially adverse to the Company. The Company is not required to make any distributions to its members prior to dissolution other than tax distributions.

The Manager may authorize non-tax-related distributions of net cash flow as long as the Company is not in default under the terms of any Note. Additionally, after the Company has paid the outstanding principal and annual interest due and payable under the Notes, the Company may distribute any remaining profits to the Manager. The Manager's profit interest in the Company may create an incentive for the Manager to make more speculative investments on behalf of the Company than the Manager otherwise would make in the absence of such profit potential.

**Transactions with the Manager and its Affiliates**

The Company may enter into various transactions with the Manager and its Affiliates, including performance of services for a Project Entity, providing financing, guarantying financing, purchasing or selling property, or participating in an investment in a Project Entity alongside a subsidiary of the Company provided the terms are commercially reasonable. Compensation and fees could be paid with respect to these transactions as described below. To the extent any such transaction may pose a conflict of interest between the Company and the Manager or its Affiliates this conflict must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Company.

In the event the Company enlists the services of any Affiliate of the Manager, the rates of compensation of these Affiliates for the performance of their various services will be at arms-length rates no higher than what the Company could obtain from unaffiliated third parties and all payments will be subject to inspection by auditors upon request.

Additionally, in the event the Manager, or an Affiliate of the Manager, guaranties, whether personally or otherwise, a loan, bond or other obligation of the Company or of any of its subsidiary entities, such Manager or Affiliate will be entitled to an annual fee equal to 1% of the outstanding loan amount, bond amount, or other obligation.

**Fees Payable by the Project Entity**

In some instances, an Affiliate of the Manager may perform services for a Project Entity in order to provide better pricing or efficiency than would otherwise be available from third parties. In these instances, such Affiliates may be paid customary service fees for time, material, or labor.

137330388.4

In some instances, an Affiliate of the Manager may provide lending to a Project Entity in connection with or in lieu of financing from non-affiliated third parties. In such circumstances, the Affiliate may charge customary fees in connection with the issuance of such loans such as interest, origination fees, exit fees, and other fees.

**Acquisition, Transfer, and Divestiture of Investments to or from Affiliates**

The Company may acquire investments previously entered into by Affiliates of the Manager, or may partially or wholly transfer an investment to or from Affiliate entities, subject to underwriting and investment criteria of the Company and the Manager's Affiliates. Any investment acquisition or transfer that occurs may require a determination of the value of the investment, which may pose a conflict of interest between the Company and the Manager or its Affiliates, which must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Company. Notwithstanding the foregoing, the Manager is not obligated to cause the Company or any Affiliate to enter into any such transactions.

**Devotion of Time and Attention**

The Manager will cause each managing principal, for so long as such managing principal is employed by, or an advisor to, the Manager or any of its Affiliates, to devote to the Manager, the Company's investments, and other activities of the Company as much time as may be reasonably necessary for the performance of their respective duties in their capacities as managing principals. Notwithstanding the foregoing, each managing principal may (a) devote such time and effort as s/he deems reasonably necessary to the affairs of any partnership or other entity with an investment objective that is not substantially similar to the Company's investment objectives; (b) devote such time and effort as s/he deems reasonably necessary to the affairs of any successor fund, any pre-existing funds, and any investments of those successor or pre-existing funds; (c) devote such time and effort as s/he deems reasonably necessary to the affairs of any real estate construction or development business in which the managing principal currently participates; (d) serve on boards of directors of public and private companies and retain fees for such services for his/her own account; (e) engage in civic, professional, industry and charitable activities; and (f) conduct and manage personal and family investment activities. Subject to the express limitations set forth in this Agreement, each managing principal may engage independently or with others in other investments or business ventures of any kind.

The Manager and its Affiliates have established, and may establish, other pooled investment funds that have investment objectives identical to those of the Company or its Affiliates, and the principals of the Manager may devote such time and attention as they deem necessary for the success of such funds.

137330388.4

# RISK FACTORS

As with all investments, a purchase of the Notes is speculative and involves a high degree of risk and therefore is suitable only for persons who understand those risks and their consequences and who are able to bear the risk of loss of their investment. In addition to the information set forth elsewhere in this Memorandum, you should consider the following risks before deciding whether to invest.

## Operation and Company Risks

***Control is vested in the Manager; no Investor should purchase the Notes unless the Investor is comfortable with the Manager's judgment and experience in running the Company's affairs.***

Control over all decisions affecting the Company, including decisions regarding the investments that are to be made, will be made by the Manager. Many material decisions, such as the sale of assets, refinancing of Project Entities, whether to make an investment, whether an Affiliate is eligible for an investment, extensions of investments and the incurrence of third-party debt may be made by the Manager without separate concurrence from the Investors. No assurance can be given that sufficient investments will be presented to the Company to deploy all of the capital available for investment.

When you subscribe for Notes that subscription is binding upon you, and you will not have the right to revoke that subscription even if you do not approve of the investments that the Manager subsequently identifies. You should not invest in the Company, unless you are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum.

***Proceeds from Investments will be re-invested during the life of the Company.***

The Manager has the discretion to retain all or a portion of the proceeds from investments to make new investments, and intends to do so over the life of the Company. This will place investment returns at the risk of new investment opportunities and may delay payments of the principal balances.

***The Manager's conflicts of interest may result in transactions unfavorable to the Company.***

The Manager and its Affiliates may provide certain services to, and enter into transactions with, the Company or the Project Entities, provided the terms are commercially reasonable. These measures may not fully protect the Company or the Project Entities against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Investors or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover, the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its Affiliates. In addition, before the Company invests all of its investments, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities that may generate different fees for the Manager or between investment opportunities that may meet the investment criteria of Affiliates of the Company or of the Manager.

***Without obtaining advice from your personal advisors, you may not be aware of the legal, tax or economic consequences of an investment in the Notes.***

The Manager has not arranged for Investors to be separately represented by independent counsel. The legal counsel who has performed services for the Company has performed such services for the Manager and has not acted as if it had been retained by the potential investors or the Members. You are not to construe the contents of this Memorandum or any prior or subsequent communication from the Manager, or its Affiliates or any professional associated with this Offering, as legal or tax advice. You should consult your own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability for you.

Pursuant to the terms of the Note Purchase Agreement, the Notes may be issued with original issue discount (or "OID") for U.S. federal income tax purposes.  As such, if you are a U.S. Holder (as defined herein), you may be required to include OID (taxable as ordinary income) in taxable income each year in excess of the amount of interest payments actually received by you in that year.

***You will not be investing in a fund vehicle. The prior performance data presented should provide you relevant information regarding fund entities overseen by the Company, but should not be construed as an indication of the likely financial performance of the Company.***

137330388.4

By investing in the Company, you will not be a creditor to the Affiliates of the Company nor in any of the prior investments sponsored by its Affiliates. The Company has provided selected information regarding its prior investments because it felt investors might consider those investments to be relevant in assessing the experience and judgment of the Manager or the Company's management team. Investors should not consider the prior performance of those investments to be indicative of the financial performance that may be experienced by the Company. The Company may not perform as favorably as the prior investments. Each investment opportunity is unique and the Company may not be able to replicate the success of prior Affiliated investments, even if the investments assembled for the Company's portfolio are similar to those obtained for prior investments.

> ### *The Company may prepay the principal and interest on the Notes at any time.*

The Company may prepay the principal amount of the Notes, in whole or in part, at any time after one year from the date of investment. The Company may also choose to pay off some of the investor Notes while waiting to pay off the Notes of other investors. After the one-year mark, no prepayment penalty is imposed that would discourage the Company from exercising this right. Accordingly, Investors will not have certainty as to how long their respective Notes may be outstanding.

## Investment Risks

> ### *The Company will have limited or no control over the underlying investments and must instead rely exclusively upon the skill, expertise and background of the persons controlling the investments.*

The Company expects to acquire preferred equity in Project Entities, acquire and hold real estate through Project Entities, or, occasionally, issue debt interests to Project Entities. Accordingly, the Company will not likely have control over such Project Entities (except in certain circumstances relating to the Company enforcing its creditor rights or contractual rights) and will be required to rely on the Project Partners of such Project Entities to use their skill, expertise and background to generate value from the investments.

> ### *Markets in which the Company is anticipated to invest are subject to a high degree of volatility and, therefore, the Company's performance may be volatile.*

The Company's business will involve a high degree of financial risk. Markets in which the Company is anticipated to invest are subject to a high degree of volatility and therefore the Company's performance may be volatile. There can be no assurance that the Company's investment objective will be realized or that Investors will receive a full return of their investment. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

Real estate development projects are subject to a variety of risks that will be outside of the Company's control, including delays in obtaining entitlements, permits, and other governmental approvals. Development projects may also take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, lowering the property's cash flow or other income potential. Strong demand for skilled laborers and contractors may result in labor shortages and contractor unavailability, delaying project schedules and/or increasing costs. The costs of construction have increased dramatically during recent years and may continue to increase. Although the Manager will not undertake such projects without reviewing detailed budgets, such budgets may understate the expenses.

> ### *The Company is subject to a number of risks in the enforcement of its rights relating to investments.*

The Company's real estate investments will typically involve preferred equity investments in Project Entities, secured by a deed of trust in the underlying real property and a pledge of the Project Partner's membership interest in the Project Entity. The Company also has the authority to issue or purchase debt collateralized by real property. These investments are subject to the following risks:

(a)      The Company's investment structure is unique. Although the Company generally requires a Project Entity to grant a deed of trust in the underlying real property owned by the Project Entity to secure the Company's investment and return, and requires the Project Partners to pledge their equity interest in the Project Entity to the Company, there can be no assurance that such interests will be enforceable or that, in the event of non-performance by the Project Partner or a default by the Project Entity, that the real estate will be readily transferred to the Company or that the Company can obtain control of the Project Entity. There is a risk that Project Partners or other third parties may oppose or contest the enforceability or priority of such security.

137330388.4

(b)     During the course of an investment, or in the event the Company exercises its contractual remedies upon non-performance by the Project Partner or a default by the Project Entity, there is a risk that a Project Partner or other third party oppose or contest the enforceability of the Company's investment documentation, or assert claims or defenses against the Company or the Manager, including claims relating to the Company's ability to remove the Project Partner and take over management of a project. Such claims and potential litigation may result in the Company incurring substantial legal fees, and adversely affect the Manager's ability to mitigate losses resulting from a Project Partner's failure to perform.

(c)     There is no assurance that the Company will subsequently acquire title to the collateral property. The Project Partner may cure defaults or arrange for the Company's investment to be refinanced. Even in cases where the property is sold through a foreclosure sale, a third-party may be prepared to outbid the Company to purchase the collateral property.

(d)     A debtor or Project Partner may evoke the protection of the Federal Bankruptcy Code or similar state insolvency laws designed to protect the interests of insolvent debtors. These protections are at the expense of the Company, and may result in staying the Company's foreclosure proceedings, proceedings against the Project Partner, restructuring of the terms of the Company's investment, or otherwise delaying or interfering with the enforcement of the Company's rights under its investment documentation.

***Uninsured losses on the investments could materially reduce investment returns, which may impact the ability to return principal balances under the Note.***

The Project Partner will obtain insurance policies for the Projects that are commercially prudent given the local market and circumstances of the Project (typically, including liability, fire and extended coverage). However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Projects should be partially or totally destroyed, the Company, as an investor in the Project Entity, may suffer a substantial loss of capital as well as profits. Even if the Project Partner's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Project Entity will sustain a substantial uninsured loss as a result of the casualty.

**Private Offering and Liquidity Risks**

***This offering of the Notes is being made in reliance on an exemption from registration requirements and there is no guarantee that it will comply with the regulatory requirements for such exemption.***

This private placement of Notes will not be registered with the Securities and Exchange Commission ("***SEC***"). The Notes are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to Investors meeting the investor suitability criteria set forth in this Memorandum. If the Company should fail to comply with the exemption, Investors may have the right to rescind their purchases of Notes. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Notes will be offered without registration or qualification pursuant to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Company's assets to satisfy the claims of the claimants.

***This is a private offering and as such you will not have the benefit of review of this Memorandum by the SEC or other agency.***

Since this offering is a private placement of securities and, as such, is not registered under federal or state securities laws, you will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

***The Notes will be Illiquid***

The Company expects its investments to be illiquid. Accordingly, the timing of its returns on those investments will be dependent upon various market factors. If the underlying assets in those investments are held for long periods or if any income streams of the Company are delayed or reduced, the Investors will be compelled to wait until the underlying assets are sold or improved, before being in a position to liquidate their investments. The Manager expects most of its real estate

137330388.4

investments to have an investment time frame of 2 years or less. However, the Company may have little or no control over when the underlying properties are liquidated.

You must represent that you are purchasing the Notes for your own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, encumber or otherwise dispose of your Notes unless the Company obtains an opinion or is otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Code or cause the Company's termination under Section 708 of the Code. Accordingly, the Notes may not be readily accepted as collateral for loans and you may not be able to liquidate your investment in the event of emergency or for any other reason, or may be able to liquidate your investment only at a substantial discount.

137330388.4

# U.S. FEDERAL INCOME TAX MATTERS

## Introduction

The following is a general discussion of the material U.S. federal income tax considerations relating to the purchase, ownership and disposition of the Notes.

This discussion is based on currently existing provisions of the Code, existing, temporary and proposed Treasury regulations promulgated thereunder, and administrative and judicial interpretations thereof, all as in effect or proposed on the date hereof and all of which are subject to change, possibly with retroactive effect, or different interpretations. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum. We have not sought and will not seek any rulings from the Internal Revenue Service with respect to the statements made and the conclusions reached in the following summary, and accordingly, there can be no assurance that the Internal Revenue Service will not successfully challenge the tax consequences described below.

This discussion only applies to U.S. Holders (as defined below) and is limited to the tax consequences to U.S. Holders that are original beneficial owners of the Notes, that purchased Notes at their original issue price for cash, and that hold such Notes as capital assets within the meaning of Section 1221 of the Code.

This discussion is for general information only and does not address all of the tax consequences that may be relevant to you in light of your personal circumstances. Furthermore, this summary does not discuss the tax consequences of an investment in Notes by certain investors that are subject to special tax rules, such as U.S. Holders having a functional currency other than the U.S. dollar, persons subject to special rules applicable to former citizens and residents of the U.S., certain financial institutions, persons subject to the alternative minimum tax, grantor trusts, real estate investment trusts, insurance companies, tax-exempt entities, dealers in securities or currencies, persons holding the Notes in connection with a hedging transaction, straddle, conversion transaction or other integrated transaction, pension funds, partners in partnerships or owners of interests in entities treated as partnerships under U.S. federal income tax laws, corporations treated as personal holding companies, or non-U.S. Holders (which include any holders of the Notes, other than a partnership or an entity or arrangement treated as a partnership for U.S. federal income tax purposes, that is not a U.S. Holders). This discussion also does not discuss the effect of any state, local, foreign or other tax laws or any U.S. federal estate, gift or alternative minimum tax considerations.

This summary is of a general nature and is not intended as legal or tax advice to prospective investors. Accordingly, you are urged to consult your own tax advisors as to the particular tax consequences to you of your participation in the offering and your ownership and disposition of the Notes, including the applicability of any U.S. federal tax laws or any state, local or foreign tax laws or any treaty, and any changes (or proposed changes) in applicable tax laws or interpretations thereof.

## Considerations Relating to U.S. Holders of the Notes

As used herein, the term "***U.S. Holder***" means a beneficial owner of a Note that is, for U.S. federal income tax purposes:

- An individual citizen or resident of the U.S.;

- A corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the U.S., any state thereof or the District of Columbia;

- An estate whose income is includible in gross income for U.S. federal income tax purposes, regardless of its source; or

- A trust that either is subject to the supervision of a court within the United States and has one or more U.S. persons with authority to control all of its substantial decisions, or has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership holds Notes, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. A holder of Notes that is a partnership and the partners in such a partnership should consult their tax advisors.

137330388.4

**Classification of the Notes**

Pursuant to the terms of the Note Purchase Agreement, the Company and each holder of Notes will agree to treat the Notes, for U.S. federal income tax purposes, as debt instruments. Holders should be aware, however, that the IRS is not bound by the Company's determination that the Notes constitute debt for U.S. federal income tax purposes. If any portion of the Notes is not treated as indebtedness, the timing and character of income, gain, or loss recognized in respect of a Note could differ from the timing and character of income, gain or loss recognized in respect of the Notes described below. The remainder of this discussion assumes that the Notes will be treated as indebtedness in accordance with that agreement and our determination.

**Interest Income and Original Issue Discount**

Payments of "qualified stated interest" (as defined below) on a Note will be taxable to a U.S. Holder as ordinary income at the time that such payments are accrued or are received (in accordance with the U.S. Holder's method of tax accounting).

It is anticipated that the Notes may be issued at a discount from their stated redemption price at maturity and that such discount will be equal to or greater than the product of on-fourth of one percent (0.25%) of the stated redemption price at maturity multiplied by the number of full years to their maturity.  As such, it is anticipated that the Holders of the Notes may be required to report original issue discount ("*OID*") over the term of the Notes.  U.S. Holders of the Notes should be aware that, as described in greater detail below, they generally must include OID in ordinary gross income for U.S. federal income tax purposes as it accrues, in advance of the receipt of cash attributable to that income.

In general, each U.S. Holder of the Notes, whether such U.S. Holder uses the cash or the accrual method of tax accounting, will be required to include in ordinary gross income the sum of the "daily portions" of OID on the Notes for all days during the taxable year that the U.S. Holder owns the debt security. The daily portions of OID on the Notes are determined by allocating to each day in any accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be any length and may vary in length over the term of an OID debt security, provided that no accrual period is longer than one year and each scheduled payment of principal or interest occurs on either the final day or the first day of an accrual period. In the case of an initial holder, the amount of OID on a Note allocable to each accrual period is determined by (a) multiplying the "adjusted issue price" (as defined below) of the Note at the beginning of the accrual period by the yield to maturity of the Note (appropriately adjusted to reflect the length of the accrual period) and (b) subtracting from that product the amount (if any) of qualified stated interest (as defined below) allocable to that accrual period. The yield to maturity of a Note is the discount rate that causes the present value of all payments on the Note as of its original issue date to equal the issue price of such Note. The "adjusted issue price" of a Note at the beginning of any accrual period generally will be the sum of its issue price and the amount of OID allocable to all prior accrual periods, reduced by the amount of all payments other than payments of qualified stated interest (if any) made with respect to such Note in all prior accrual periods. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of a Note at a single fixed rate of interest or, subject to certain conditions, based on one or more interest indices.

**Sale, retirement or disposition of Notes**

Upon the sale, retirement or other disposition of a Note, an Investor generally will recognize taxable gain or loss equal to the difference between the amount realized on the disposition and the Investor's adjusted tax basis in the Note. A U.S. Holder's adjusted tax basis in a Note generally will be equal to its adjusted issue price (as described above) in the Note. Gain recognized on the disposition of a Note generally will be treated as additional ordinary interest income. Any loss recognized on the disposition of a Note generally will be treated as an ordinary loss to the extent of the excess of previous interest inclusions over the total net negative adjustments previously taken into account as ordinary loss, and thereafter, as capital loss (which will be long-term if, at the time of such disposition, your holding period for the Note is more than one year). The deductibility of capital losses is subject to limitations.

**Backup withholding and information reporting**

Information reporting requirements generally will apply to payments of interest and OID made by the Company on, or the proceeds of the sale or other disposition prior to maturity of, the Notes. Backup withholding tax, currently at a rate of 28%, may apply to such payments if an Investor fails to:

- Furnish his, her or its taxpayer identification number (social security or employer identification number);

- Certify that such number is correct;

- Certify that he, she or it is not subject to backup withholding; or

- Otherwise comply with the applicable requirements of the backup withholding rules.

Certain U.S. Holders are not subject to backup withholding and information reporting requirements. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to Investor generally will be allowed as a credit against Investor's U.S. federal income tax liability and may entitle Investor to a refund, *provided* that the required information is furnished timely to the Internal Revenue Service (the "***IRS***").

ERISA MATTERS

**Benefit Plan Investor Considerations**

The Notes offered in the Offering may be purchased and held by an employee benefit plan subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or an individual retirement account ("***IRA***") or other plan subject to Section 4975 of the Code or by a plan or other arrangement subject to provisions of federal, state, local, or non-U.S. law substantially similar to such provisions of ERISA and the Code "***Similar Law***"). A fiduciary of an employee benefit plan must determine that the purchase and holding of a Note is consistent with its fiduciary duties under ERISA or other applicable law. The fiduciary of an ERISA plan, as well as any other prospective Investor subject to Section 4975 of the Code (including, without limitation, IRAs) or any Similar Law, must also determine that its purchase and holding of Notes offered hereby does not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (including, without limitation, the prohibition against the lending of money or other extension of credit between a plan or IRA that is subject to either such section and a "party in interest" as defined in Section 3(14) of ERISA, or "disqualified person," as defined in Section 4975(e)(7) of the Code) or violate any Similar Law. Each purchaser and transferee of a Note offered hereby who is subject to ERISA or Section 4975 of the Code or any Similar Law will be deemed to have represented by its acquisition and holding of such Note that its acquisition and holding of the Note does not constitute or give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or violate any Similar Law.

137330388.4

## REPORTS TO THE INVESTORS

The Company has adopted a calendar fiscal year ending December 31. For so long as the Holder continues to hold the Note, the Company will provide to the Holder:

        (a)      As soon as practicable after the end of each fiscal year and in any event within one hundred eighty (180) days after each fiscal year, consolidated balance sheets of the Company as of the end of such fiscal year and consolidated statements of income of the Company for such fiscal year, prepared in reasonable detail; and

        (b)      As soon as practicable after the end of each fiscal quarter and in any event within 60 days after the end of each fiscal quarter, unaudited quarterly financial statements.

## GLOSSARY

To understand the rights associated with the Notes, Investor must review carefully the defined terms used in this Memorandum. Some of these definitions are set forth in this "GLOSSARY" and others in the body of this Memorandum. These definitions (some of which have been slightly modified) have been taken from the Note Purchase Agreement, which defines the preferences, privileges, rights, interests and obligations of the Notes. Many of these definitions are technical in nature, involve complicated relationships, and can only be understood by reference to other defined terms and, in some cases, to other provisions of the Note Purchase Agreement. Section references in the definitions refer to sections in the Note Purchase Agreement. Prospective investors should understand that the definitions in the Note Purchase Agreement will, for all purposes, be controlling, notwithstanding any simplification of such definitions in this Memorandum. Moreover, you should bear in mind that this GLOSSARY does not include many of the definitions included in the Note Purchase Agreement.

"*Affiliate*" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, or the corresponding provisions of any succeeding law.

"*Estimated Tax Amount*" means, with respect to each member of the Company, the amount equal to (a) the sum of (i) the greater of the highest statutory marginal ordinary federal income tax rate for individuals or corporations for a given tax year plus (ii) the unearned income Medicare contribution tax rate under Internal Revenue Code Section 1411 for a given year, multiplied by (b) the taxable income allocated to that member for the taxable year.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

78404-0012/137330388.4

# THE OFFERING

The following description of certain matters relating to the Notes does not purport to be complete and is subject in all respects to applicable Washington Law and to the provisions of the Note Purchase Agreement.

**General**

The Offering has not been registered under the Securities Act and is intended by the Company not to involve a public offering within the meaning of the Securities Act and Regulation D promulgated thereunder and, therefore, to be exempt from the registration provisions of the Securities Act. Accordingly, the Offering is being made pursuant to certain conditions which, if satisfied, will qualify the Offering for exemption from registration as provided by the Securities Act and Regulation D. These conditions relate to limitations on the manner of Offering, the nature of the Investors, access to or furnishing information about the issuer, and restrictions on transferability. This Offering is not being offered pursuant to Rule 506(c) of Regulation D.

Subject to the terms of the Note Purchase Agreement, the Company is authorized to raise up to $10,000,000 through the Offering. Investors must make a minimum investment of $50,000, unless a smaller purchase is permitted by the Manager.

The Manager will have an initial closing for the Company as soon as practicable after a sufficient quantity of funds is raised in the Manager's sole determination. To accommodate the admission of additional Investors and permit existing Investors to increase their investment amounts, the Manager may, in its discretion, hold one or more additional closings on or before March 31, 2018, unless extended up to 180 days by the Manager.

**Payment of Investments**

Each payment to the Company will be made in United States dollars by means of a certified or cashier's check payable to "iCap Equity, LLC" or by wire or electronic funds transfer, to a bank account designated by the Company, of immediately available funds through the federal wire transfer system, in the amount that the Holder has agreed to lend to the Company in the Note Purchase Agreement.

**Acceptance of Subscriptions; Eligibility Requirements**

Purchases for the Notes will be accepted on a "first come, first-served" basis. The Manager reserves the right to reject any tendered investment for whatever reason the Manager deems appropriate. If the Manager rejects an investment, the Manager will give notice of such rejection, and return the tendered initial investment payment, no later than 10 business days after the Note Purchase Agreement and the accompanying funds have been received by the Manager.

# TRANSFERABILITY OF THE NOTES

Subject to compliance with the requirements of the Note Purchase Agreement, Investors shall have the right to transfer the Note to any qualifying third party of its choice contingent upon securing the Company's written consent in advance of the proposed transfer. The Company is under no obligation to recognize such Person as a successor Holder, nor shall such Person have any of the rights of a Holder under the Note Purchase Agreement, until the Holder has surrendered the original Note for registration of transfer, duly endorsed, or accompanied by a duly executed written assignment of transfer in a form reasonably satisfactory to the Company. A new Note for a like principal amount and interest will be issued to, and registered in the name of, the transferee, contingent upon the Transferee executing a Note Purchase Agreement, and executing a Certificate of Accredited Investor. Interest and principal are payable only to the registered holder of the Note.

The Holder and any successor Holder agree(s) to provide to the Company a Form W-9 upon request. Until registration of a transfer occurs, the Company shall be entitled to treat the transferring Holder in all respects as the Holder of record, fully entitled to exercise all of the rights, privileges and interest bestowed by the Note Purchase Agreement and the applicable Note.

**State Securities: Blue Sky Laws**

Transfer of the Notes may also be restricted under the securities laws or securities regulations promulgated by various states and foreign jurisdictions, commonly referred to as "Blue Sky" laws. Absent compliance with such individual state laws, the Notes may not be traded in such jurisdictions. Because the securities sold under this Offering have not and will not be registered for resale under the Blue Sky laws of any state, the Holders and any persons who desire to purchase them in any

78404-0012/137330388.4

trading market that might develop in the future, should be aware that there may be significant state Blue Sky law restrictions upon the ability of Investors to resell the Notes and of purchasers to purchase the Notes. Accordingly, Investors should be prepared to hold the Notes until their maturity date as may be extended.

## FINANCIAL INFORMATION

This Memorandum does not include current balance sheets for either the Company or the Manager. The Manager has limited capitalization. As of the date hereof, the Company has incurred certain liabilities in connection with the offering and will incur substantial expenses in connection with the offering and sale of the Notes.

### Legal Representation

The Manager has engaged Perkins Coie LLP as its legal counsel to assist in connection with transactions contemplated by this Memorandum and in preparing the Note Purchase Agreement, this Memorandum and related documents. Perkins Coie LLP, in providing such advice has represented the Manager's interests and did not represent nor purport to represent the interests of any other Investor or potential investor. The Company urges you to engage your own legal counsel and, as necessary, financial consultants for advice regarding the desirability of purchasing the Notes offered pursuant to this Memorandum. Perkins Coie LLP may in the future represent the Company, the Manager or related parties on various matters, subject to complying with applicable legal principles for resolving conflicts of interest.

78404-0012/137330388.4

# NOTICES

The following notices apply in certain states where the Notes, which are referred to below as "securities," may be sold. Compliance with the notice exemption requirements of applicable state securities laws will be undertaken by the Company as needed.

**Notice to Residents of all States:**

THE SECURITIES OFFERED IN THE OFFERING HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE OR JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND OTHER LAWS. THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND OTHER LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE SECURITIES HAVE NOT BEEN RECOMMENDED OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES ACT AND THE SECURITIES LAWS OF CERTAIN JURISDICTIONS GRANT PURCHASERS OF SECURITIES SOLD IN VIOLATION OF THE REGISTRATION OR QUALIFICATION PROVISIONS OF SUCH LAWS THE RIGHT TO RESCIND THEIR PURCHASE OF SUCH SECURITIES AND TO RECEIVE BACK THEIR CONSIDERATION PAID. THE COMPANY BELIEVES THAT THE OFFERING DESCRIBED IN THIS MEMORANDUM IS NOT REQUIRED TO BE REGISTERED OR QUALIFIED. MANY OF THESE LAWS GRANTING THE RIGHT OF RESCISSION ALSO PROVIDE THAT SUITS FOR SUCH VIOLATIONS MUST BE BROUGHT WITHIN A SPECIFIED TIME, USUALLY ONE YEAR FROM DISCOVERY OF FACTS CONSTITUTING SUCH VIOLATION. SHOULD ANY INVESTOR INSTITUTE SUCH AN ACTION ON THE THEORY THAT THE OFFERING CONDUCTED AS DESCRIBED HEREIN WAS REQUIRED TO BE REGISTERED OR QUALIFIED, THE COMPANY WILL CONTEND THAT THE CONTENTS OF THIS MEMORANDUM CONSTITUTED NOTICE OF THE FACTS CONSTITUTING SUCH VIOLATION.

YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED IN THIS MEMORANDUM OR THE DOCUMENTS ATTACHED TO THIS MEMORANDUM. NO ONE HAS BEEN AUTHORIZED TO PROVIDE YOU WITH ANY INFORMATION THAT IS DIFFERENT. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN GIVEN BY THE ISSUER OF THE SECURITIES.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION BY ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH AN OFFER IS NOT QUALIFIED TO DO SO, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE AN OFFER OR SOLICITATION. IN ADDITION, THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF THE NAME OF AN OFFEREE APPEARS IN THE APPROPRIATE SPACE ON THE COVER PAGE AND IS AN OFFER ONLY TO SUCH NAMED OFFEREE.

NEITHER THE INFORMATION CONTAINED HEREIN, NOR ANY PRIOR, CONTEMPORANEOUS OR SUBSEQUENT COMMUNICATION SHOULD BE CONSTRUED BY THE PROSPECTIVE INVESTOR AS FINANCIAL, LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS, HER OR ITS OWN FINANCIAL, LEGAL, AND TAX ADVISORS TO ASCERTAIN THE MERITS AND RISKS OF THE OFFERING AND AN INVESTMENT IN THE COMPANY PRIOR TO SUBSCRIBING TO PURCHASE THE SECURITIES.

78404-0012/137330388.4

**Notice to New York Residents:**

THIS CONFIDENTIAL OFFERING MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THIS CONFIDENTIAL OFFERING MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS AND DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

**Notice to Florida Residents:**

THE SECURITIES OFFERED HEREBY WILL BE SOLD TO, AND ACQUIRED BY, INVESTORS IN A TRANSACTION EXEMPT UNDER §517.061 OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, WHERE SALES OF THE SECURITIES ARE MADE TO FIVE (5) OR MORE PERSONS IN FLORIDA, EACH FLORIDA PURCHASER SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER OF THE SECURITIES OR AN AGENT OF SUCH ISSUER, OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

**Notice to New Hampshire Residents:**

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED, WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

DURING THE COURSE OF THIS OFFERING, EACH PROSPECTIVE INVESTOR MAY OBTAIN ADDITIONAL INFORMATION WHICH SUCH PERSON DEEMS TO BE NECESSARY IN CONNECTION WITH MAKING AN INVESTMENT DECISION IN ORDER TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM (TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE). IN CONNECTION WITH SUCH INQUIRY, ANY DOCUMENTS WHICH ANY PROSPECTIVE INVESTOR WISHES TO REVIEW WILL BE MADE AVAILABLE FOR INSPECTION AND COPYING OR FURNISHED, UPON REQUEST, SUBJECT TO THE PROSPECTIVE INVESTOR'S AGREEMENT TO MAINTAIN SUCH INFORMATION IN CONFIDENCE AND TO RETURN THE SAME TO THE COMPANY IF THE RECIPIENT DOES NOT PURCHASE THE SECURITIES OFFERED HEREUNDER. ANY SUCH INQUIRIES OR REQUESTS FOR ADDITIONAL INFORMATION OR DOCUMENTS SHOULD BE MADE TO:

78404-0012/137330388.4

**EXHIBIT A**

**NOTE PURCHASE AGREEMENT**

CONFIDENTIAL - NOT TO BE REPRODUCED OR REDISTRIBUTED

**EXHIBIT B**

**SUBSCRIPTION DOCUMENTS**
**OF**
**ICAP EQUITY, LLC**