# Exhibit B

3710 Irongate, LLC v. Unit Owners Association of Judson..., Not Reported in Pac....

2025 WL 3143153

2025 WL 3143153
Only the Westlaw citation is currently available.

NOTE: UNPUBLISHED OPINION,
SEE WA R GEN GR 14.1

Court of Appeals of Washington, Division 1.

3710 IRONGATE, LLC, a Washington limited
liability company; Lee E. McDonald, an individual;
and Arshia Fathali, a married person, Appellants,
v.
UNIT OWNERS ASSOCIATION OF JUDSON
PLAZA CONDOMINIUM, a Washington
miscellaneous and mutual corporation, Respondent.

No. 86717-2-I
|
Filed November 10, 2025

Appeal from Whatcom County Superior Court, Docket No:
21-2-00936-3, Honorable Evan P. Jones, Judge

**Attorneys and Law Firms**

Aaron Taylor Haynes, CSD Attorneys At Law, 1500 Railroad
Ave., Bellingham, WA, 98225-4542, for Appellants.

Bryan L. Page, Luke Phifer, Carmichael Clark, P.S., 1700 D
St., Bellingham, WA, 98225-3101, for Respondent.

UNPUBLISHED OPINION

Smith, J.

**\*1** In 2021, the Unit Owners Association of Judson Plaza
Condominium (Association) levied a $2.2 million special
assessment against all condo units to finance building
repairs. Each assessment was based on the owner's allocated
percentage. Three condo unit owners, 3710 Irongate, LLC,
Lee McDonald, and Arshia Fathali (Owners), sued the
Association for declaratory judgment, injunctive relief, and
an accounting. The Owners contended the Condominium's
Declaration did not contemplate the assessment to be
allocated based on preestablished percentage liability, but
instead the assessment should be allocated based on the
benefit to the units.

The Association counterclaimed for judgment against each
owner and for foreclosure of its liens on unpaid assessments.
On competing summary judgment motions, the trial court
denied the Owners' motion, granted the Association's motion,
and entered judgments and decrees of foreclosure. The
court denied the Owners' motion for reconsideration and
McDonald's motion to vacate. Irongate appeals, McDonald
appeals pro se, and Fathali adopts the arguments of the other
appellants. Because the Owners failed to produce sufficient
evidence to create material issue of fact concerning the
allocation of the special assessment, we affirm the trial court's
rulings.

FACTS

Background

Judson Plaza Condominium is a mixed-use building in
Bellingham, Washington, consisting of commercial and
residential units. The Condominium is governed by the
"Declaration of Condominium Subdivision and Covenants,
Conditions, Restrictions and Reservations for Judson
Plaza" (Declaration). The Condominium is three stories high
and consists of 15 units—ten residential and five commercial.
The third-floor units have private rooftop decks and gardens
only accessible from within each third-floor unit. Irongate
owns two second floor condominiums, unit #200 and unit
#201; McDonald/Grover [1] owns unit #100, and Fathali owns
unit #101. [2] The building is comprised of, in relevant part,
units, common elements, and limited common elements.

[1] In July 2022, McDonald sold unit #100 to third
party defendants Nathan and Pandora Grover
without satisfying the Association's lien for unit
#100's unpaid Special Assessment allocation.

[2] Irongate, McDonald, and Fathali are collectively
known as the "Owners."

Common elements are portions of the Condominium other
than the units that are "necessary or convenient to its
existence, maintenance, and safety, or normally in common
use." Common elements include the roofs, foundations,
supports, main walls, stairways, and "all other structural
parts of the building." Limited common elements are "those
portions of the Common Elements allocated to and reserved
for the exclusive use of one or more, but fewer than all of
the Units." Examples of limited common elements include

25-80084-WLH    Doc 18-2    Filed 12/16/25    Entered 12/16/25 16:19:32    Pg 2 of 47

private decks, roof gardens, and outside fixtures designed to serve a single unit, such as awnings and window boxes.

Under the Declaration, each unit is allocated an undivided interest in the common elements. This allocation is determined by size of the unit relative to other units and is expressed as a percentage. Each unit's allocated interest is used to determine what proportion of the "common expenses" the unit is assigned. Common expenses are "expenditures made by or financial liabilities of the association, together with any allocation to reserves."

**\*2** When maintenance, replacement, or repair is required on common elements or limited common elements, the costs are a common expense. An exception occurs when "[a]ny Common Expense or portion thereof benefitting fewer than all of the Units shall be assessed exclusively against the Units benefited."

| | | |
|---|---|---|
| 3710 Irongate unit #200 1 | 14.11% | $310,420.00 |
| 3710 Irongate unit #201 | 5.63% | $123,860.00 |
| McDonald/Grover unit #100 | 8.88% | $195,360.00 |
| Fathali unit #101 | 3.60% | $79,200.00 |

### Procedural History

In September 2021, the Owners initiated a complaint for declaratory judgment and injunctive relief against the Association for breach of the Declaration. The Owners alleged the Association violated the Declaration by inappropriately allocating costs. The Owners asserted the special assessment should have been allocated pursuant to section 10.4.1(a) of the Declaration, which states, "Any Common Expense or portion thereof benefitting fewer than all of the Units shall be assessed exclusively against the Units benefitted." The Owners also sought an injunction preventing the Association from collecting funds from them and requested an accounting of the funds paid on the Association for the special assessment. The Association asserted counterclaims seeking judgment against the Owners for the respective shares of the special assessment, as well as foreclosure of the Association's liens for those unpaid assessments.

In October 2021, the Owners issued their first set of interrogatories to the Association. In response to questions

In 2017, the Association hired a building consultant to "investigate the building envelope for any deficiencies related to the weather resistant barrier." J2 Building Consultants conducted the investigation in June 2017 and found the Condominium was "displaying signs of weathering, construction defect and contains many locations where standard building practices were not followed and not to industry/code standards." J2 recommended a full remediation be performed, including repairing damage to the trim, windows, and decks. The Association hired Charter Construction, Inc., to perform the remodel.

In February 2021, the Association levied a $2,200,000 special assessment against all condo units to finance the repairs. The assessment was allocated to the unit owners on a pro rata basis based on their allocated interest for common expense liability. The Owners' shares of the special assessment were as follows:

concerning the scope of the work on each individual unit, the Association stated:

> No work is being done on this individual unit itself. Work is being done to the Common Elements and Limited Common Elements that are the responsibility of the Association. That work includes, but is not limited to, work on the roofs, main walls, exterior walls, structural parts of the building outside the boundaries of the units, parking garage, side decks, roof decks/gardens, awnings, railings, exterior windows and window framing, and exterior doors and door framing. The work and costs are described in detail in the J2 reports, plans, the Charter contract,

3710 Irongate, LLC v. Unit Owners Association of Judson..., Not Reported in Pac....

2025 WL 3143153

and budget(s) produced in response to Request Nos. 2 and 3.

In January 2023, the parties brought cross motions for summary judgment. The Association's summary judgment motion claimed the Owners lacked evidence to support their case, the special assessment was properly allocated on a pro rata basis, the Owners did not have a right to an accounting request because a fiduciary relationship did not exist, and the Association was entitled to foreclose its liens for the Owners. In their cross-motion, the Owners contended that, pursuant to section 10.4.1(a) of the Declaration, the special assessment benefitting fewer than all the units should be assessed exclusively against those units benefitted. The Owners relied on the declarations of Eric Heilborn, [3] Grover and Fathali as evidence to support their claims.

[3]      Heilborn is the owner of 3710 Irongate, LLC.

 **\*3**  In their motion, the Owners also requested a continuance based on two issues. First, the Owners stated that, insofar as the court deemed it necessary, a continuance should be granted to determine "whether the integrity of the Judson Plaza, and the associated cost savings, may be[ ] achieved through simple removal of the problematic limited common elements and appurtenances rather than their replacement." Second, the Owners requested a continuance on the accounting cause of action if the court found the Uniform Declaratory Judgments Act, ch. 7.24 RCW, did not permit it to order an accounting. The court granted a CR 56(f) continuance, noting factual questions existed concerning "what common expenses, if any, should be treated as those benefitting fewer than all units," and whether "a fiduciary duty was owed from the Association to the [Owners]."

In September 2023, the Owners sent a third set of interrogatories and requests for production to the Association. The interrogatories requested the Association describe work done on specific units, provide the cost of the individual unit work, and describe how the work benefitted all the units. Many of the questions required the Association to explain work done on "other fixtures," such as doorbells and awnings. For example, when asked about "other fixtures" for unit 310, the Association noted doorbell replacement was necessary to keep the building waterproof, and new awnings also helped keep the building weatherproof. But, the Association indicated no special assessment funds were used to pay for the awning work. The Association also stated deck railings were

installed to comply with code requirements, new windows were installed to "accomplish the weatherproofing needed for the window penetrations," and work done on the private decks and roof gardens was completed to ensure waterproofing.

In December 2023, the Owners sent the Association an e-mail discussing renote of their summary judgment motions. The e-mail stated, in relevant part:

> Based on the latest round of discovery between the Plaintiffs and the Association, we believe that renoting the parties' respective summary judgment motions on the issue of the unit benefit analysis is warranted. Depending on how the Court rules, the parties may be able to avoid further discovery and depositions related to the Plaintiffs' breach of fiduciary duty claim against the Association.

The Association responded, in relevant part, "How about a summary judgment hearing on March 29?" Both parties filed their supplemental briefing on March 1, 2024. In the introduction to their brief, the Owners noted,

> While the Court deferred its ruling to allow the Parties to conduct additional discovery as to the fiduciary duty owed by the Association to the Plaintiffs, the Parties request that the Court take this time to rule on the common expense question as the Court's ruling on the issue may save the Parties significant litigation costs.

Accordingly, the Owners' briefing focused solely on the issue of the unit-benefit analysis. But, in their conclusion, they requested the court order the Association to provide an accounting. The Association's supplemental brief addressed all of the Owners original summary judgment claims.

At the summary judgment hearing, the Owners expressed to the court that "there was some confusion as far as the

3710 Irongate, LLC v. Unit Owners Association of Judson..., Not Reported in Pac....

2025 WL 3143153

scope of today's hearings." The Owners stated that, based on their e-mail exchange with the Association in December, they believed the hearing was going to focus solely on the cost allocation issue. Because of this belief, they did not conduct additional discovery on the fiduciary duty claim, and they requested a continuance. The Association responded it was not under the impression the hearing would be limited.

In a written ruling, the trial court denied the Owners' request for a continuance, noting that, although the Owners made a request to the Association to limit the scope of the summary judgment hearing, "no agreement on that issue was apparently reached" and the Owners were "properly put on notice of the issues before the Court, and ha[ve] failed to demonstrate any other reason to further continue." The court also denied the Owners' motion for summary judgment and granted the Association's motion for summary judgment and decree of foreclosure for the Owners' units.

**\*4** In April 2024, the Owners moved for reconsideration of the orders granting summary judgment to the association and denying their request for a continuance. For the first time, the Owners asserted the Association failed to disclose insurance proceeds they had received. The court denied the motion for reconsideration. McDonald, individually, moved the court several times to vacate the judgment under Civil Rule 60. Among other issues, McDonald alleged the board of the condominium wrongfully withheld insurance proceeds. The court heard arguments on the motion to vacate in August 2024. The court denied McDonald's motion.

The Owners appealed the court's order denying their motion for summary judgment. Irongate, individually, appealed the order granting the Association summary judgement and the order denying the Owners' request for a continuance. No other orders were appealed.

## ANALYSIS

### Issues Pertaining to All Appellants

The Owners, collectively, appeal the court's order denying their motion for summary judgment, contending the trial court misinterpreted the Declaration and the special assessment was improperly allocated. The Association claims the special assessment was properly allocated based on a plain reading of the Declaration. We agree with the Association.

We review a trial court's ruling on a summary judgment motion de novo. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). " 'Summary judgment is appropriate when there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law.' " *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008) (alteration in original) (internal quotation marks omitted) (quoting *Locke v. City of Seattle*, 162 Wn.2d 474, 483, 172 P.3d 705 (2007)). To avoid summary judgment, the nonmoving party must " 'set[ ] forth specific facts which sufficiently rebut the mobbing party's contentions and disclose the existence of a genuine issue as to a material fact.' " *Ranger Ins. Co.*, 164 Wn.2d at 552 (quoting *Meyer v. Univ. of Wash.*, 105 Wn.2d 847, 852, 719 P.2d 98 (1986)). We consider "the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party." *Keck*, 184 Wn.2d at 370. But, the nonmoving party " 'may not rely on speculation, [or] argumentative assertions that unresolved factual issues remain.' " *Ranger Ins. Co.*, 164 Wn.2d at 552 (alteration in original) (quoting *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986)). The adverse party "must set forth specific facts showing that there is a genuine issue for trial." CR 56(e).

The interpretation of a document governing of a condo association is a question of law that we review de novo. *Bangerter v. Hat Island Comty. Assoc.*, 199 Wn.2d 183, 188, 504 P.3d 813 (2022). We apply the rules of contract interpretation when interpreting a declaration. *Wilkinson v. Chiwawa Communities Ass'n*, 180 Wn.2d 241, 249, 327 P.3d 614 (2014). The primary objective in interpreting a governing document is to ascertain the drafter's intent. *Wilkinson*, 180 Wn.2d at 250. "While intent is a factual question, when the available evidence warrants but one conclusion, assessing intent may be determined by this court as a matter of law." *Mullor v. Renaissance Ridge Homeowners' Assoc.*, 22 Wn. App. 2d 905, 912, 516 P.3d 812 (2022).

To determine intent, we look at the plain language of the document and give it its "ordinary and common meaning." *Riss v Angel*, 131 Wn. 2d 612, 621, 934 P.2d 669 (1997). The document is viewed as a whole and, if reasonably possible, we give meaning to every word. *Newport Yacht Ass'n of Condo. Owners v. Supreme Nw. Inc.*, 168 Wn. App. 56, 64, 277 P.3d 18 (2012).

**\*5** Here, the Owners contend a factual inquiry into what repairs to limited common elements benefitted fewer than all units is not necessary because the plain language of

the Declaration states that limited common elements, by definition, benefit fewer than all units and, accordingly, any work done to limited common elements should be levied against the individual units that benefit from the limited common element. But this interpretation takes too narrow a view of the Declaration.

The Declaration plainly states, "Maintenance, painting, repair or replacement of the structure and finish of the Limited Common Elements shall be a Common Expense." And common expenses are an expenditure or financial liability of the Association. Common expenses are allocated to each unit, as determined by the size of the unit. Therefore, maintenance of limited common elements is a common expense allocated to unit owners based on their allocated interest. But, 10.4.1(a) provides an exception for common expenses, noting any common expense "benefitting fewer than all of the Units shall be assessed exclusively against the Units benefitted."

The Owners maintain this exception means any maintenance done to a limited common element is the responsibility of the unit owner with exclusive use of that limited common element, because the unit owner is the only one benefitting from the use of the limited common element. But the Owners' definition of "benefit" is too narrow—there is more than one way to benefit from the maintenance of a limited common element. A limited common element may be for the exclusive use of one unit, but the maintenance of that limited common element can still benefit the entire condominium. For example, repairing and weatherproofing a balcony may protect the units underneath from water leaking into the unit.

The Owners have provided no evidence to support their claim that the repairs completed on limited common elements with the special assessment funds benefitted fewer than all units. And, importantly, nowhere in the Declaration does it state all costs associated with limited common elements shall be assessed exclusively against the unit assigned to that limited common element.

The Owners also point to Exhibit D to the Declaration to support their claim. The Owners contend Exhibit D supports the conclusion that, "[t]he Association's authority to retain control over maintenance and repairs over certain items in the Condominium ... is separate from a Unit Owner's liability to pay for such repairs, especially as to those that will exclusively benefit a particular Unit Owner." But Exhibit D also states, "In many cases maintenance responsibility is allocated to the Unit Owners Association to ensure central

maintenance responsibility, uniformity and quality of repair, and to protect community health and safety." The exhibit differentiates between repairs needed for the overall health and benefit of the building versus damage caused by an individual unit owner.

The Association's interpretation of the Declaration—that repairs and maintenance to limited common elements that benefit all unit owners is a common expense—is both reasonable and emphasizes the collective interest of the condo unit owners. The owners of all units benefit from the building being well-maintained and waterproof. As long as work done on limited common elements is for the benefit of all unit owners, the cost is a common expense. Accordingly, the Association met its burden on summary judgment by showing a genuine issue exists as to material facts regarding the interpretation of the Declaration. Therefore, the court did not err when it denied the Owners' motion for summary judgment.

### Issues Pertaining to Irongate

#### 1. Unit-Benefit Analysis

**\*6** Irongate claims that, even if the Association's interpretation of the Declaration is correct, a dispute of material fact still exists regarding the scope of work paid for by the special assessment and, therefore, the court erred when it granted the Association's motion for summary judgment. The Association contends Irongate failed to produce any evidence that the work done benefitted less than all units. We agree with the Association.

Here, to survive summary judgment, Irongate needed to put forth specific evidence to support its claim that work done on limited common elements benefitted fewer than all units, thereby triggering section 10.4.1(a) of the Declaration. While Irongate generally asserted work was done on limited common elements, such as doorbells and rooftop decks, it provided no specific evidence that this work benefitted fewer than all units. Irongate submitted declarations from the Owners stating restoration work was conducted on portions of the building not affecting their properties, but the declarations did not explain why the work did not benefit their units. When asked to identify and describe components of the work that did not benefit their units, Irongate objected, stating they "lack[ ] sufficient information to respond."

For the first time in its motion for reconsideration, Irongate[4] alleged the Association changed their stance on whether work to the awnings was part of the special assessment, and, accordingly, this raised an issue of material fact. Irongate pointed to its first set of interrogatories to the Association, where the Association stated the work being done as part of the project included work on awnings. Irongate then pointed to its third set of interrogatories, where the Association allegedly changed their stance and articulated that new awnings were installed, but were not part of the special assessment. But the Association never indicated the work done on the awnings was allocated to the special assessment. The first set of interrogatories simply asked what work was being done for the project—it did not specify whether the work was part of the special assessment. And, in the third set of interrogatories from Irongate, the Association clarified the work to the awnings was not part of the special assessment. The Association did not change its position that the work done on the awnings was part of the work done on "Common Elements and Limited Common Elements that are the responsibility of the Association," as stated it its answers to the first set of interrogatories. Other than the claim concerning the awnings, which Irongate did not raise in its motion for summary judgment,[5] Irongate provided no specific evidence or argument that the maintenance done on the building with special assessment funds benefitted less than all units.

[4]    This section refers to Irongate instead of "Owners," because Irongate, individually, appealed the orders.

[5]    The Association contends we should not review this argument because it was not raised during summary judgment, but we do not need to reach this issue because the claim does not create an issue of material fact.

Conversely, the Association supplied detailed explanations of the work being done and how it benefitted the entire condominium, including in its declarations and answers to interrogatories. The Association also provided the findings summary from J2 detailing its investigation of the building and the recommendation that "full remediation be performed" to repair "significant decay and damage" to the building.

**\*7**  Because Irongate did not present sufficient evidence to rebut the Association's claim that the allocation of the special assessment funds was proper, the trial court did not err when it granted the Association's motion for summary judgment.

2. <u>Motion for Continuance</u>

Irongate contends the trial court erred by denying its motion for a continuance to conduct an accounting and granting the Associations motion for summary judgment. The Association claims the trial court did not abuse its discretion when it denied the continuance because Irongate did not meet the standard for obtaining a continuance. We agree with the association.

We review a trial court's denial of a *CR 56(f)* continuance for abuse of discretion. *Pitzer v. Union Bank of California, 141 Wn.2d 539, 556, 9 P.3d 805 (2000)*. A court abuses its discretion when its decision is based on untenable or unreasonable grounds. *Bldg. Indus. Ass'n of Wash. v. McCarthy, 152 Wn. App. 720, 743, 218 P.3d 196 (2009)*.

Under *CR 56(f)*, "[a] trial court may continue a summary judgment hearing if the nonmoving party shows a need for additional time to obtain additional affidavits, take depositions, or conduct discovery." *McCarthy, 152 Wn. App. at 742*. A trial court does not abuse its discretion in denying a motion for continuance when " '(1) the requesting party does not offer a good reason for the delay in obtaining the desired evidence; (2) the requesting party does not state what evidence would be established through the additional discovery; or (3) the desired evidence will not raise a genuine issue of material fact.' " *Pitzer, 141 Wn. 2d at 556* (internal quotation marks omitted) (quoting *Tellevik v. Real Prop., 120 Wn.2d 68, 90, 838 P.2d 111 (1992)*).

Here, Irongate contends it reasonably believed in good faith that the Association agreed to limit the scope of the second summary judgment hearing and, accordingly, it was an abuse of discretion for the court to deny a continuance. Irongate claims that, had it known the Association was not agreeing to a continuance, it would have conducted additional discovery and presented evidence to the trial court on the issue of a fiduciary-in-fact relationship.

But the purpose of the first continuance was to allow Irongate more time to conduct discovery concerning the fiduciary issue. The court noted in its ruling that "factual questions [we]re raised in the [Owners'] motion regarding whether a special relationship, if any, existed in fact between the parties such that a fiduciary duty was owed from the Association to the [Owners]." The court acknowledged the e-mail from Irongate to the Association suggesting a limited scope for renote, but clarified the e-mail did not establish an agreement

25-80084-WLH    Doc 18-2    Filed 12/16/25    Entered 12/16/25 16:19:32    Pg 7 of 47

3710 Irongate, LLC v. Unit Owners Association of Judson..., Not Reported in Pac....

2025 WL 3143153

between the parties. The court also noted the Association's renote of their summary judgment motion clearly presented the issue of fiduciary duty and "should have dispelled any notion that certain issues were being reserved." The court concluded Irongate was properly put on notice of the issues before the court and did not demonstrate any other reason for the delay in obtaining evidence concerning the fiduciary issue. Accordingly, the trial court did not err when it denied Irongate's motion for a continuance.

### 3. Accounting Claim

**\*8** Irongate contends the trial court erred when it granted the Association's motion for summary judgment on its accounting claim because material issues of fact existed over whether Irongate demanded an accounting and whether a fiduciary relationship existed.

To state a cause of action for an accounting, the complaint " 'must show by specific averments that there is a fiduciary relation existing between the parties ... [a]nd it must allege that the plaintiff has demanded an accounting from the defendant, and the latter's refusal to render it.' " *Parr v. Haselwood Imp., Inc.*, 15 Wn. App. 2 d 604, 616-17, 476 P.3d 629 (2020) (quoting *Corbin v. Madison*, 12 Wn. App. 318, 327, 529 P.2d 1145 (1974)). A fiduciary relationship may be found between two parties when, "(1) one party has superior knowledge, and (2) that party uses that superior knowledge to induce reliance by the party to whom a duty is owed." *Retired Pub. Emp. Council of Wash. v. Charles*, 148 Wn.2d 602, 622, 62 P.3d 470 (2003). While some fiduciary relationships arise as a matter of law (e.g., attorney-client, doctor-patient), other fiduciary relationships "can arise *in fact* regardless of the relationship *in law* between the parties." *Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP*, 110 Wn. App. 412, 434, 40 P.3d 1206 (2002) (emphasis in original). Simply placing trust in someone is not sufficient to create a fiduciary relationship. *Micro Enhancement Int'l*, 110 Wn. App at 435.

Here, Irongate based its claim for accounting on (1) the court's authority under the Declaratory Judgment Act and (2) its contention a fiduciary relationship existed between itself and the Association. Irongate admits the court's authority under the Declaratory Judgment Act is only applicable insofar as the court determines the Association failed to properly allocate the special assessment. As discussed *supra*, the court properly granted summary judgment for the Association on the special assessment claim; therefore, Irongate's claim fails on that bases.

Irongate also contends the trial court erred in granting summary judgment because a material question of fact existed concerning whether Irongate had a fiduciary relationship with the Association and whether Irongate requested an accounting. Irongate maintains it demanded the Association provide an accounting in February 2021, and cites to the declaration of Eric Heilborn as support. Heilborn's declaration does state the Owners, in their communication with the Board, "demanded that the Board provide an accurate accounting." But Heilborn does not indicate when or where this demand occurred. Without more, this assertion is not sufficient evidence to show Irongate demanded an accounting from the Association.

Even if Irongate can show it demanded an accounting from the Association and the Association refused, it failed to establish a material issue of fact existed as to a fiduciary relationship between itself and the Association. Irongate does not cite to any legal authority to establish a fiduciary relationship, but simply asserts the Association had superior knowledge regarding the condition of the condominiums and was in a position of power. Other than these assertions, Irongate presents no evidence that the Association owed it a fiduciary duty, and " 'argumentative assertions that unresolved factual issues remain' " is not sufficient to overcome a motion for summary judgment. *State v. Meta Platforms, Inc*, 33 Wn. App. 2d 138, 148, 560 P.3d 217 (2024) (quoting *Bucci v. Nw. Tr. Serv., Inc.*, 197 Wn. App. 318, 326, 387 P.3d 1139 (2016)), *review granted*, 4 Wn.3d 1020 (2025). Because Irongate fails to raise a genuine issue of material fact, the trial court did not err when it granted summary judgment in favor of the Association on the accounting claim.

### McDonald's Appeal

**\*9** In a separate appeal, McDonald contends a number of errors on the part of the trial court. While it is hard to track his arguments, we deduce the following issues from his appeal: The trial court erred by (1) incorrectly interpreting the Declaration; (2) denying the Owners' motion for summary judgement; (3) failing to consider concealed insurance proceeds; (4) denying his motion to vacate; and (5) failing to recuse.[6] The Association maintains the issues in McDonald's appeal should not be reached because they were not raised at the trial court, they were not properly appealed and, even if the merits of his arguments are reached, no grounds for reversal exist. We agree with the Association.

6      Because we addressed the court's denial of the Owners' summary judgment motion *supra*, we do not address it again here.

Under RAP 5.1, "[a] party seeking review of a trial court decision reviewable as a matter of right must file a notice of appeal." Here, McDonald did not file a notice of appeal; therefore, his claims are not properly before this court. Accordingly, we decline to review his appeal.

#### Attorney Fees

Both parties request attorney fees on appeal. Irongate cites to RCW 64.34.455 and RCW 4.84.330 [7] to support its request. The Association cites to section 13.2.4 of the Declaration and RCW 64.34.364(14) to support its request. Because the Association prevails on appeal, we grant its request for attorney fees.

7      Irongate's brief cites to RCW 4.85.330, but no such statute exists. We assume this was a typo and Irongate meant to cite to RCW 4.84.330 which addresses attorney fees in actions involving contracts.

RAP 18.1 provides that applicable law may grant a party the right to recover reasonable attorney fees on review. A party requesting fees under RAP 18.1 must provide argument and citation to authority "to advise the court of the appropriate grounds for an award of attorney fees as costs." *Stiles v. Kearney*, 168 Wn. App. 250, 267, 277 P.3d 9 (2012).

Under RCW 64.34.455,

> If a declarant or any other person subject to this chapter fails to comply with any provision hereof or any provision of the declaration or bylaws, any person or class of persons adversely affected by the failure to comply has a claim for appropriate relief. The court, in an appropriate case, may award reasonable attorney's fees to the prevailing party.

The Condominium Act, ch. 64.34 RCW, also provides an association means to recover "any costs and reasonable attorneys' fees incurred in connection with the collection of delinquent assessments." RCW 64.34.364(14).

Here, because we conclude the trial court did not err when it denied the Owners' motion for summary judgment, denied the Owners' motion for a continuance, and granted the Association's motion for summary judgment, the Association prevails on appeal and is entitled to attorney fees.

We affirm.

WE CONCUR:

Diaz, J.

Coburn, J.

**All Citations**

Not Reported in Pac. Rptr., 2025 WL 3143153

---

**End of Document**      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Agena v. Cleaver-Brooks, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 11248590

2019 WL 11248590
Only the Westlaw citation is currently available.
United States District Court, D. Hawai'i.

Terry N. AGENA, et al., Plaintiffs,

v.

CLEAVER-BROOKS, INC., et al., Defendants.

Case No. 19-cv-00089-DKW-RT
|
Signed 10/31/2019

## Attorneys and Law Firms

Alyssa R. Segawa, Allison Mina Aoki, L. Richard DeRobertis, DeRobertis & Waxman LLP, Honolulu, HI, Charles S. Siegel, Pro Hac Vice, Christopher L. Johnson, Pro Hac Vice, Taryn Ourso, Pro Hac Vice, Peter Andrew Kraus, Waters Kraus & Paul, Dallas, TX, for Plaintiffs Terry N. Agena, John Manuel, Terry Aldean Blevins, Jane Lorraine Brown, Giles Brown, Brady Brown, Janet Ilene Futch, Joyce C. Cabasug, Anita M. Cassani, Pauline Gail Chang, Karro Yee, Henry Takaki, Jeanne Kahanaoi, Harriet H. Kaneshiro, Leina Morton, Irene Munze, Wanda J. Ralston, Curtis B. Ralston, Hisae Rio, Merle E. Loui-Sakamoto, Theresa R. Schriner, Katherine K. Yee, Cynthia Calvey, Julina Glaza, Enid L. Cabatbat, John Michael Clemente, Rafael de la Sierra, Stella S. Isara, Herbert Haruo Isara, Paula Yonezawa, Rosalyn W. Bohner, Jeanie Racoma, Helen Shimazu, Cheryl Matsumoto, Roxane E. Shintaku, Germaine Albeso, Clarita Wickman, Ethel Yasue Fujii, Anne Nonies, David K. Parages, Teresita Aguilar, Nofotolu Alo, Manhart Alo, Joseph A. Behlert, Maria Luisa Behlert, Herman Calbero, Jr., Evelyn Calbero, Danilo M. Capati, Bong Ae Chun, Richard M. Felimer, Florence L. Felimer, Sharon Lynn Yano Gabalis, Glenn Kaawalauole, Linda J. Kaawalauole, Douglas P. Leite, Mary Ann K. Leite, Barbara Jean Oshiro, Joann Roth, Patsy R. Ota, Lynn Dell Palada, Earl R. Riveira, Winifred K. H. Robinson, Albin Rosaldo, Prudence Rosaldo, Daniel Santos, Jr., Wayne K. Thompson, Alan Agodong, Carlene Yamamoto, Peggy Perkins, Darlene Maria Kehaulani Sharpe, Roberta Duncan, Patricia Pierce.

Alyssa R. Segawa, Allison Mina Aoki, L. Richard DeRobertis, DeRobertis & Waxman LLP, Honolulu, HI, Christopher L. Johnson, Pro Hac Vice, Taryn Ourso, Pro Hac Vice, Peter Andrew Kraus, Waters Kraus & Paul, Dallas, TX, for Plaintiff Marilyn Shizue Dote.

Cassandra C. Collins, Pro Hac Vice, Jonathan L. Caulder, Pro Hac Vice, Robert M. Rolfe, Pro Hac Vice, Hunton Andrews Kurth LLP, Richmond, VA, Margery S. Bronster, Skylar Garner Lucas, Jenna Lynne Durr, Kenneth S. Robbins, Bronster Fujichaku Robbins, Honolulu, HI, for Defendant Cleaver-Brooks, Inc.

Carolyn J. Fairless, Pro Hac Vice, Christopher P. Montville, Pro Hac Vice, Erin F. Tatman, Pro Hac Vice, Wheeler Trigg O'Donnell LLP, Denver, CO, David J. Minkin, Miyoko T. Pettit-Toledo, Jesse J.T. Smith, McCorriston Miller Mukai MacKinnon LLP, Honolulu, HI, for Defendant Husch Blackwell LLP.

## ORDER (1) GRANTING DEFENDANTS' MOTION FOR JUDICIAL NOTICE; (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS; AND (3) DISMISSING THE FIRST AMENDED COMPLAINT WITH LEAVE TO AMEND

Derrick K. Watson, United States District Judge

**\*1** This unusual lawsuit is a reminder that a settlement agreement in asbestos litigation does not necessarily mean that the parties have laid down their swords. Each of the seventy-five Plaintiffs in this case is either a former asbestos plaintiff or the representative of a former asbestos plaintiff, all of whom settled with Defendant Cleaver-Brooks, Inc. in sixty separate actions and at different times over the span of more than a decade. Plaintiffs now bring this action under Hawaii law and the Racketeer Influenced and Corrupt Organizations Act (RICO or Act), 18 U.S.C. § 1961 et seq., claiming that Cleaver-Brooks and the law firm that served as its coordinating counsel in nationwide asbestos litigation engaged in a long campaign to conceal adverse information during the discovery process in order to obtain favorable settlements. Plaintiffs do not seek to reopen their individual cases against Cleaver-Brooks, nor to set aside their settlement agreements. Rather, they seek damages for being fraudulently induced to settle for less than they would have if they had known the truth.

Cleaver-Brooks has moved to dismiss the complaint on several grounds (Dkt. No. 34) and asks the Court to take judicial notice of certain information outside the pleadings (Dkt. No. 35). Husch Blackwell, as the successor to the law firm that represented Cleaver-Brooks in the underlying asbestos litigation, has also moved for dismissal under Rule

*Agena v. Cleaver-Brooks, Inc.*, Not Reported in Fed. Supp. (2019)

2019 WL 11248590

12(b)(6) (Dkt. No. 36) and joins in Cleaver-Brooks' motion for judicial notice. Dkt. No. 37.

Although the release provisions of the underlying settlement agreements do not bar Plaintiffs' claims, as Defendants assert, Husch Blackwell's role was limited to providing legal services, and Plaintiffs have failed to plead their claims against either Defendant with the requisite particularity necessary to satisfy Rule 9(b). Defendants' respective motions are therefore GRANTED IN PART AND DENIED IN PART, and the First Amended Complaint is DISMISSED WITH LEAVE TO AMEND.

## FACTUAL & PROCEDURAL BACKGROUND

### A. General Background

The seventy-five individual Plaintiffs in this case consist of former asbestos plaintiffs and trustees or representatives of the estates of individuals who were former asbestos plaintiffs. At one time or another between 1940 and 2009, most of these former asbestos plaintiffs served in a branch of the armed forces or worked in some other capacity at Pearl Harbor Naval Shipyard. *See* Dkt. No. 29, ¶¶ 1–60. The first asbestos lawsuit against Cleaver-Brooks in Hawaii was filed in 2005 and other lawsuits soon followed. *See id.* at ¶¶ 79, 82, 146–51. Cleaver-Brooks' first response to interrogatories in these asbestos lawsuits was served in June 2007 in Hawaii state court. *Id.* at ¶¶ 80, 143. At various times between 2005 through 2015, each plaintiff settled their claims in Hawaii, resulting in settlement agreements in sixty separate actions that are now the subject of this lawsuit. *See id.* at ¶ 134. [1] Plaintiffs allege that Cleaver-Brooks and its national coordinating counsel provided intentionally false discovery responses between June 2007 and December 2014, and that they allegedly did so "in order to fraudulently induce asbestos personal injury Plaintiffs in Hawai'i ... to settle their claims at lower values than they would otherwise have demanded." *Id.* at ¶¶ 82–83, 116, 134.

[1] Attached to Cleaver-Brooks' motion to dismiss is, *inter alia*: (1) the settlement agreements for (59) of the (60) underlying asbestos lawsuits, Dkt. No. 34-5; and (2) the declaration of John Tornetta, Manager of Technical Services for Defendant Cleaver-Brooks, certifying the authenticity of the attached settlement agreements. Dkt. No. 34-3. Pursuant to this Court's Order, the parties have

jointly submitted a table listing the 60 individual actions underlying the allegations in the FAC and the date on which each case was settled. *See* Dkt. No. 66-1. The parties have been unable to locate the settlement agreement related to the claims asserted by Plaintiff Bernadette Richardson as successor trustee to the Raymond Souza Cavaco Trust, Dkt. No. 29, ¶ 26, and thus Plaintiff Richardson intends to withdraw her claims. Dkt. No. 66-1 at 9; *see also* Dkt. No. 35-2, ¶ 6.

### B. The Discovery Fraud in the Underlying Asbestos Lawsuits

**\*2** Cleaver-Brooks' national coordinating counsel for asbestos ligation in the 1990's into the 2000's was the law firm of Whyte Hirschboeck Dudek (WHD). Dkt. No. 29, ¶ 62. The individual at the helm of Cleaver-Brooks' defense against asbestos claims across the country was Michael T. Hart, a partner at WHD. *Id.* at ¶ 69. When Hart retired, another partner at WHD took his place until WHD merged with Defendant Husch Blackwell in 2016. *Id.* at ¶ 62. [2] Plaintiffs allege that Cleaver-Brooks and WHD perpetuated a campaign of discovery fraud in the underlying asbestos actions "in order to make it more difficult for plaintiffs to prove their claims against Cleaver-Brooks and to thereby induce plaintiffs to settle for artificially low values." *Id.* at ¶¶ 80, 116, 156; *see id.* at ¶¶ 103, 110. Plaintiffs specifically claim that during discovery Defendants withheld or misrepresented four categories of information: (1) the history of asbestos products that Cleaver-Brooks sold; (2) documents related to distillers and heat exchangers; (3) Cleaver-Brooks' knowledge of asbestos hazards and warnings; and (4) the existence of asbestos-related injuries sustained by its employees. The allegations pertaining to each information category are as follows.

[2] Defendant Husch Blackwell is allegedly the successor-in-interest to WHD. Dkt. No. 29, ¶ 62.

First, Cleaver-Brooks allegedly misrepresented its "historical sales of asbestos products." *See id.* at ¶¶ 71–73, 103–105. Plaintiffs assert in particular that Cleaver-Brooks withheld answers to questions, such as when Cleaver-Brooks stopped selling products containing asbestos and its reasons for doing so. *Id.* at ¶ 103. Likewise, when the interrogatories propounded "directly asked" Cleaver-Brooks to "identify all asbestos-containing products [it] ever sold," Plaintiffs allege that Cleaver-Brooks only identified its "boilers," "intentionally" failing to identify its Aqua-Chem distillation

25-80084-WLH    Doc 18-2    Filed 12/16/25    Entered 12/16/25 16:19:32    Pg 11 of 47

Agena v. Cleaver-Brooks, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 11248590

equipment and Davis Engineering heat exchangers as product lines that also contained asbestos. *Id.* at ¶¶ 72, 84, 87–88, 92–93. Additionally, Plaintiffs aver that Cleaver-Brooks "falsely" claimed that information about its boilers was inaccessibly buried in a "matrix of 12 million documents" that an employee would need to sift through for 35–40 hours for each individual boiler to determine whether it was equipped with asbestos-containing components. *Id.* at ¶¶ 72–73, 81, 104–105. Despite facing an indemnity claim as early as 1996 for asbestos exposure resulting from its Aqua-Chem distillers and Davis heat exchangers, *id.* at 91, Cleaver-Brooks did not voluntarily disclose these product lines until its responses to interrogatories in December 2013. *Id.* at ¶¶ 88, 92. Documents produced in July 2015 further revealed that in a lawsuit in 1980, Cleaver-Brooks had identified three-thousand specific asbestos products by part and prefix that were sold by Cleaver-Brooks' boiler division. *Id.* at ¶ 76.

Second, Plaintiffs allege Cleaver-Brooks deliberately withheld drawings, manuals, and sales records for the Aqua-Chem distillers and Davis heat exchangers that Cleaver-Brooks sold. *Id.* at ¶¶ 96–97, 99, 101. Specifically, Cleaver-Brooks allegedly provided false responses to interrogatories, stating either that it was "unaware" of such documents or that the documents were virtually "inaccessible" because they could only be retrieved by expending 35 to 100 hours of labor for each piece of equipment. *Id.* at ¶¶ 97, 99. At least as to the distillers, Plaintiffs learned this was not true on January 8, 2015, during the deposition of Cleaver-Brooks' corporate representative, David Fitch. *Id.* at ¶ 100. Fitch testified that Aqua-Chem files, manuals, and drawings were "neatly organized in the files of Aqua-Chem, Inc., and could easily be retrieved by ship in about two and half hours per ship." *Id.*

Third, Cleaver-Brooks purportedly withheld documents and information related to Cleaver-Brooks' historical knowledge of asbestos hazards and warnings. *Id.* at ¶¶ 103, 106–07, 110–14. In broad terms, Cleaver-Brooks allegedly withheld answers to questions, such as whether Cleaver-Brooks received or considered any asbestos warnings or material safety data sheets (MSDS) for any of its products. *Id.* at ¶ 103. Plaintiffs claim that for years Cleaver-Brooks provided sworn testimony that: (1) it "never received asbestos warnings or MSDS sheets from its suppliers"; (2) "never considered providing such warnings with the asbestos products it sold"; and (3) had "no records related to asbestos warnings or MSDS sheets." *Id.* at ¶ 111.[3] These statements were false, as allegedly evidenced by documents Cleaver-Brooks produced

in May 2015, showing that Cleaver-Brooks: (a) "maintained MSDS sheets for a variety of asbestos products used in its equipment as part of a Hazard Communication Program" initiated in the mid-1980's; (b) established the Hazard Communication Program under the guidance of WHD; (c) "specifically discussed whether it was required to provide an MSDS sheet with asbestos gaskets sold to customers"; and (d) "considered providing asbestos warnings" for its boilers with asbestos components. *Id.* at ¶¶ 112–14.

[3]    Plaintiffs do not aver who among Cleaver-Brooks' personnel made these statements, to whom in particular they were made, or in which particular action they were made.

**\*3** Relatedly, in decades of sworn testimony, Cleaver-Brooks evidently represented that: (1) it had "never made a policy decision to stop using asbestos"; (2) it did not know "when or why it stopped using asbestos"; (3) it possessed "no documents related to its decision to stop using asbestos"; and (4) its suppliers of parts phased out the use of asbestos "at times and for reasons unknown to Cleaver-Brooks." *Id.* at ¶¶ 107, 110. Plaintiffs allege Cleaver-Brooks also made similar representations in written discovery. *Id.* at ¶ 74. Documents produced in May 2015, however, showed that: (a) Cleaver-Brooks systematically phased out the use of asbestos gaskets beginning in 1980, with the purpose of removing asbestos from Cleaver-Brooks' product lines, and the effort intensified in 1988 pursuant to Cleaver-Brooks' policy entitled, "Company Guidelines on Gasket Material & Reduce Company Product Liability"; and (b) Cleaver-Brooks' treasurer and CEO knew that the company was still selling asbestos gaskets for water distillation equipment in 1996, which is corroborated by sales records showing sales of replacement asbestos gaskets well into the 1990's. *Id.* at ¶¶ 108–09.

Lastly, Plaintiffs aver that Cleaver-Brooks "falsely testified for decades that the company ... has never had an asbestos-related workers' compensation claim despite all of the thousands of Cleaver-Brooks employees" who worked with boilers containing asbestos. *Id.* at ¶ 117.[4] In Hawaii state court in 2007, Cleaver-Brooks also allegedly stated in response to interrogatories that "Cleaver-Brooks is not aware of any asbestos related injury or disease suffered by any employee in the history of the Company." *Id.* at ¶ 121.[5] But these statements were shown to be false when documents produced in May and July 2015 allegedly revealed that Cleaver-Brooks had one claim in 1979 arising from the

Agena v. Cleaver-Brooks, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 11248590

death of a former boiler service employee as a result of mesothelioma, and two asbestosis workers' compensation claims in 1996. *Id.* at ¶¶ 124–25.

4     Plaintiffs provide two examples of such testimony by corporate representatives of Cleaver-Brooks. George Provance, Plaintiffs allege, began testifying in the mid-1990's that Cleaver-Brooks had "no reason to think that [its] product has ever harmed anyone" because "since 1930, when [it was] manufacturing, [it] had never had a workers' comp claim for any pleural diseases," and "these people work with the boilers every day." Dkt. No. 29, ¶ 119 (alterations in original). Similarly, John Tornetta allegedly testified, "[w]e have never received a Workers' Comp claim related to asbestos from people that have worked with [our] boilers for years, and we have been in business for 75 years." *Id.* at ¶ 120.

5     Plaintiffs maintain that in asbestos litigation, Cleaver-Brooks would often cite the absence of any asbestos-related claim by its employees as evidence to support its belief that its products were "safe." Dkt. No. 29, ¶ 118.

Plaintiffs claim Defendants knew that by withholding the above information, this would "make it more difficult" for Plaintiffs to prove at trial that Cleaver-Brooks was negligent in selling asbestos-containing products, and this, in turn, "would reduce the value of the asbestos personal injury claims brought against Cleaver-Brooks." *Id.* at ¶¶ 116, 135. As noted, beginning in 2005 through 2015, Plaintiffs collectively settled their asbestos claims against Cleaver-Brooks. Dkt. No. 34-5; Dkt. No. 66-1. According to Plaintiffs, the above misrepresentations were made for the purpose of inducing them "to agree to artificially low settlement amounts, far below their settlement value" or "lower values than they would otherwise have demanded" had they known the true facts at the time. *Id.* at ¶¶ 83, 132, 134, 156; *see also id.* at ¶¶ 102, 122.

Seeking compensation for the alleged discovery fraud, Plaintiffs filed this lawsuit in state court on January 14, 2019. Dkt. No. 1-2. After timely removal to federal court, Defendants moved to dismiss the complaint. Dkt. Nos. 21, 24. Before responding to the motions, Plaintiffs filed their First Amended Complaint (FAC). Dkt. No. 29. Defendants have now moved to dismiss the FAC, Dkt. Nos. 34, 36, based on substantially the same grounds raised in the initial motions to dismiss.

## STANDARD OF REVIEW

**\*4** To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed.R.Civ.P. 8(a)(2). Even though a "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted).

On a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw "any reasonable inferences" in favor of the plaintiff. *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1122 (9th Cir. 2008). To that end, a court must judge the sufficiency of a complaint under a two-pronged approach: (1) disregard all "legal conclusions" and "conclusory statements"; and (2) determine whether the remaining "well-pleaded factual allegations," accepted as true, "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–81 (2009). Dismissal is warranted "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 886 (9th Cir. 2018) (quoting *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017)).

Accordingly, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. That is, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations omitted). If, from the well-pleaded facts, the court cannot "infer more than the mere possibility of misconduct, the complaint has alleged—but has not 'show[n]'—'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)).

Agena v. Cleaver-Brooks, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 11248590

## DISCUSSION

### I. Cleaver-Brooks' Motion to Dismiss

#### A. Request for Judicial Notice

To support various arguments for dismissal, Cleaver-Brooks first asks that the Court consider details in the sixty settlement agreements underlying this action, Dkt. No. 34-1 at 4 n.1, and pursuant to a separate motion for judicial notice, Defendants request that the Court consider Plaintiffs' testamentary letters (or lack thereof) and the absence of any judicial appointment in the Hawaii probate courts. Dkt. No. 35 at 1–3; *see* Dkt. No. 37.

Although materials outside the pleadings are generally not considered in ruling on a Rule 12(b)(6) motion, courts may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Extrinsic documents are necessarily incorporated into the complaint by reference "if the document's authenticity is not contested and the plaintiff's complaint necessarily relies on it." *Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1007 (9th Cir. 2015); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (noting that such documents attached to a defendant's motion to dismiss may be considered, "even though the plaintiff does not explicitly allege the contents of that document in the complaint."). [6] Where a written instrument contradicts allegations in the complaint, the former controls. *Johnson*, 793 F.3d at 1007–08; *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) ("[W]e need not accept as true allegations contradicting documents that are referenced in the complaint."). Additionally, under Fed. R. Evid. 201, a court may take judicial notice of "undisputed matters of public record," such as "documents on file in federal or state courts," *Harris v. Cty. of Orange*, 682 F.3d 1126, 1131–32 (9th Cir. 2001), and "records and reports of administrative bodies." *Ritchie*, 342 F.3d at 907–09.

---

[6]    A complaint "necessarily relies" on a particular document if: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (citation and internal

quotation marks omitted). The "authenticity" requirement relates to "whether the documents are 'what its proponent claims.' " *Davis v. HSBC Bank*, 691 F.3d 1152, 1161 (9th Cir. 2012) (quoting *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 533 (9th Cir. 2011)).

**\*5** Here, Plaintiffs' claims rely, at least in part, on the terms of the 60 settlement agreements underlying this action, and these agreements are referenced in the FAC. *See, e.g.*, Dkt. No. 29, ¶¶ 1–60 ("settlement and release"); *id.* at ¶ 136. While Plaintiffs suggest that it would somehow be "highly misleading" to take judicial notice of the agreements (Dkt. No. 50 at 2), Plaintiffs do not dispute that they rely on the agreements, nor do they appear to dispute the authenticity of the agreements, including when discussed at oral argument. *See also* Dkt. No. 50 at 7 ("Plaintiffs do not contest the authenticity of the "Probate" exhibits that Defendants filed."). Further, Plaintiffs' testamentary papers on file in the Hawaii courts and the absence of any judicial appointments in Hawaii (or any other State) probate court are textbook examples of "matters of public record" that are appropriate for judicial notice. *Cf.* In re *Estate of Campell*, 106 F.3d 1096, 1106–07 (Haw. 2005) (discussing the public's "right of access to probate proceedings and records."). Accordingly, the Court will consider both the settlement agreements and the probate materials in ruling on the motions to dismiss. The motion for judicial notice is therefore GRANTED.

#### B. The Settlement Agreements Do Not Bar Plaintiffs' Claims

Under Hawaii law, [7] to prevail on a claim for fraudulent inducement of a settlement agreement, plaintiffs must prove, *inter alia*, "that their reliance upon a defendant's representations was reasonable." *Matsuura v. E.I. du Pont de Nemours & Co.*, 73 P.3d 687, 701 (Haw. 2003) (listing elements). [8] "[W]here plaintiffs' attorneys and others have accused the defendant of fraud and dishonesty during the course of prior [discovery], plaintiffs are not precluded as a matter of law from establishing that their reliance on the defendant's representations was reasonable." *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 359–60 (9th Cir. 2005) (quoting *Matsuura*, 73 P.3d at 704). [9] In such an action, the defrauded party in the end is free to choose one of two remedies: "(1) rescinding the contract, returning any benefits received, and being returned to the status quo or (2) affirming the contract, retaining the benefits, and seeking damages." *Exotics Hawai'i-Kona, Inc. v. E.I. Du*

25-80084-WLH    Doc 18-2    Filed 12/16/25    Entered 12/16/25 16:19:32    Pg 14 of 47

Agena v. Cleaver-Brooks, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 11248590

*Pont De Nemours & Co.*, 172 P.3d 1021, 1035, 1041 (Haw. 2007) ("They cannot have it both ways"). Plaintiffs have unequivocally chosen the latter. Dkt. No. 29. ¶¶ 136–37; Dkt. No. 51 at 30, 32.

7    The parties agree that Hawaii contract law governs the dispute. *See* Dkt. No. 34-1 at 16; Dkt. No. 54 at 3–5; Dkt. No. 51 at 14–15.

8    Plaintiffs here have pleaded reasonable reliance: Plaintiffs "reasonably relied on Cleaver-Brooks. . . and [WHD] to obey statutes, court orders, court rules, rules of evidence, written agreements, representations to the court by officers of the court, and representations made under oath to the court by [Defendants'] officers and agents." Dkt. No. 29, ¶ 157.

9    Whether a plaintiff's reliance was reasonable is generally "for the trier of fact to determine." *Matsuura*, 73 P.3d at 701 (citation omitted).

Cleaver-Brooks, however, contends that Plaintiffs' claims, including their fraudulent inducement claims, are barred by the "reliance disclaimer" in each Plaintiff's settlement agreement. Dkt. No. 34-1 at 17–18, 22–23. In advancing this argument, Cleaver-Brooks points to the following provision common to Plaintiffs' settlement agreements:

> Releasor expressly and specifically understands, that no statements of fact or opinion have been made by any party to this Release and the terms and conditions of this Release are to be strictly construed as a compromise of a contested claim for the purpose of avoiding further controversy, litigation and expense ... [I]n making this Release, it is agreed and understood that the Releasor rely wholly upon his own judgment, belief and knowledge of the nature, extent, effect and duration of said injuries or possible injuries and liability therefore, and that this compromise is made by the Releasor with full knowledge of the

facts of and possibilities of the case and with the advice of counsel.

**\*6**  Dkt. No. 34-1 at 17; *see also* Dkt. No. 34-5 at 1–2.

This provision is insufficient as a matter of law to bar Plaintiffs' claims. Under Hawaii law, settlement agreements "are simply a species of contract," and thus, they "are governed by principles of contract law." *Exotics*, 172 P.3d at 1032 (citations omitted). As such, the terms of the agreement "are interpreted according to their plain, ordinary, and accepted sense in common speech." *Hawaiian Ass'n of Seventh-Day Adventists v. Wong*, 305 P.3d 452, 461 (Haw. 2013); *State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc.*, 978 P.2d 753, 761–62 (Haw. 1999) (construing settlement agreement). To determine whether a settlement agreement bars claims involving fraud in the discovery process, the Hawaii Supreme Court has adhered to the majority approach and followed the reasoning of the leading cases applying Delaware law. *See Exotics*, 172 P.3d at 1033–1035, 1038, 1042 (discussing *DiSabatino v. United States Fidelity & Guaranty Co.*, 635 F. Supp. 350 (D. Del. 1986); *E.I. DuPont de Nemours & Co. v. Florida Evergreen Foliage*, 744 A.2d 457 (Del. 1999); *Matsuura v. Alston & Bird*, 166 F.3d 1006 (9th Cir. 1999); and *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353 (9th Cir. 2005)). "Delaware has repeatedly said that fraudulent inducement claims based on representations made outside a contract are not barred by contract language stating the parties relied only on representations in the contract." *Matsuura*, 166 F.3d at 1011. In accordance with this rationale, "if one party is to be held to release a claim for fraud in the execution of the release itself, the release should include a specific statement of exculpatory language referencing the fraud." *Living Designs*, 431 F.3d at 371 (quoting *Florida Evergreen*, 744 A.2d at 460–61).

In Plaintiffs' settlement agreements, the text is devoid of an explicit reference to claims for fraud in the execution of the agreement. In that regard, contrary to Cleaver-Brooks' contention (Dkt. No 54 at 3), there is no legally significant difference between the settlement agreements here and those at issue in cases where courts have held that the release language did not bar plaintiffs' claims for fraudulent inducement. *See, e.g., Matsuura*, 166 F.3d at 1009 n.8; *Fuku-Bonsai, Inc. v. E.I. du Pont de Nemours & Co.*, 187 F.3d 1031, 1034 (9th Cir. 1999); *see also Living Designs*, 431 F.3d at 358–59, 370–71. [10] Thus, Plaintiffs' settlement agreements do not abrogate the elementary principle that

25-80084-WLH    Doc 18-2    Filed 12/16/25    Entered 12/16/25 16:19:32    Pg 15 of 47

Agena v. Cleaver-Brooks, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 11248590

"parties may reasonably rely upon an opposing party's responses to discovery requests." *See, e.g., Matsuura*, 73 P.3d at 704.

[10]     While the Court acknowledges that the plain language of the agreements may be read, in a vacuum, to have released the claims at issue here, a vacuum is not the environment in which the agreements present. *See e.g. Matsuura*, 166 F.3d at 1011 ("If a release of 'any and all claims' were held to bar this fraud action, DuPont, the alleged perpetrator of the fraud, would have successfully silenced its victims by fraudulently inducing them blindly to agree in advance not to complain."); *Fuku-Bonsai*, 187 F.3d at 1034 (holding, as in *Matsuura*, that "plaintiffs' claim for fraudulent inducement is not barred by the release language" in the settlement agreement because defendant's "fraudulent actions" during discovery and "lack of good faith negotiations undermined plaintiffs' ability to bargain freely for a fair settlement").

**\*7** Accordingly, Plaintiffs' claims against Defendants, based on alleged discovery fraud, are not barred by the release language in Plaintiffs' respective settlement agreements.

### C. Counts I–III Do Not Satisfy Rule 9(b)'s "Particularity Requirement"

Claims asserted under RICO and those sounding in fraud are subject to the requirement under Federal Rule of Civil Procedure 9(b) that the claim must be pled with "particularity." *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (*en banc*). Thus, Rule 9(b) applies to Counts I–III. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) ("Rule 9(b)'s particularity requirement applies to state-law causes of action.").

To satisfy Rule 9(b), "the pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (citations and internal quotation marks omitted). In other words, Plaintiffs "must state the time, place, and specific content of the false representations as well as *the identities of the parties* to the misrepresentation." *Odom*, 486 F.3d at 553 (citation omitted; emphasis added).

Here, the defect plaguing the FAC is that it does not state which of the plaintiffs in the 60 underlying actions received which of Cleaver-Brooks' various discovery statements and, thus, who was the *other* party to the misrepresentation. Plaintiffs allege that Cleaver-Brooks gave three particular "interrogatory responses" in June 2007, allegedly misrepresenting how its boiler documents were stored, the years in which it sold asbestos-containing products, and its knowledge of asbestos warnings, and Plaintiffs aver that these responses "applied to all cases brought against Cleaver-Brooks in Hawai'i state court." Dkt. No. 29, ¶ 81; *id.* at ¶¶ 72–74. But there are (28) federal cases among the underlying asbestos lawsuits. Dkt. No. 66-1. Moreover, because the sixty underlying actions were settled at different times, it is simply impossible that every former asbestos plaintiff received the same statements during the relevant time period of alleged discovery fraud between June 2007 and December 2014. Dkt. No. 29, ¶¶ 82–83. [11] Former asbestos plaintiff Clarence Faber, for instance, could not have received any of the identified interrogatory statements because he had already settled his claim in 2005. *See* Dkt. No. 66-1 at 1. And all of the alleged misrepresentations were revealed to be false by July 2015, *see* Dkt. No. 29, ¶¶ 76, 88, 92, 100, 108–09, 112–14, 121, long *before* Allan Chamizo settled his claim. *See* Dkt. No. 66-1 at 9. Further, Plaintiffs do not identify in which case(s) Cleaver-Brooks' corporate representatives George Provance and John Tornetta were deposed, much less allege that they were deposed in all sixty of the underlying actions and made the same statements to each Plaintiff. Dkt. No. 29, ¶¶ 119–20. Although Plaintiffs also identify several misrepresentations that were made, or documents that were withheld during the discovery that occurred between October 13, 2008 and December 16, 2014 in five specific asbestos lawsuits, Dkt. No. 29, ¶¶ 144–51, there are fifty-five other lawsuits underlying this action and seven Plaintiffs settled before October 13, 2008. Dkt. No. 66-1 at 1–2.

[11]     One settlement agreement was executed in 2005; three were executed in 2007; three were executed in 2008; nine were executed in 2009; ten were executed in 2010; four were executed in 2011; seventeen were executed in 2014; and twelve were executed in 2015. *See* Dkt. No. 66-1.

**\*8** Despite these glaring rifts in the FAC, Plaintiffs urge the Court to apply a "relaxed pleading standard" because "who *made* which misrepresentations" is within Cleaver-Brooks' knowledge. Dkt. No. 51 at 9–10, 13 (emphasis added).

Agena v. Cleaver-Brooks, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 11248590

Plaintiffs misconstrue the deficiency in the FAC. While "Rule 9(b) may be relaxed with respect to matters within the opposing party's knowledge," *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993); *United States ex rel. Insoon Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051–52 (9th Cir. 2001), as the above examples from the FAC demonstrate, the mystery is not "who" communicated the statements, but "who"—with respect to each "particular" Plaintiff—*received* each alleged misrepresentation *and when*.

The Plaintiff who allegedly received false discovery materials, and relied on them, will have personal knowledge of those facts and, therefore, "it is not unreasonable to expect" each Plaintiff to comply with Rule 9(b). *See Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010) (holding plaintiffs failed to satisfy Rule 9(b) because they "failed to allege which of them made any of the telephone calls" or the "mailings *they* received"); *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) (holding that a complaint did not satisfy Rule 9(b) because it "d[id] not specify *which* plaintiff received *which* prospectus, or *which* plaintiff(s) made purchases through the stockbroker defendants" (emphases added)). Plaintiffs blanket approach to pleading fraud based on discovery responses from a sampling of "several" cases, Dkt. No. 51 at 12, is antithetical to the "particularity" requirement of Rule 9(b). Put another way, Plaintiffs do not get a pass on satisfying Rule 9(b) merely because of the collective fashion in which they have chosen to bring this case.

Because Plaintiffs have not alleged fraud with the requisite level of particularity to satisfy Rule 9(b), Counts I–III as to Cleaver-Brooks are DISMISSED, albeit with leave to amend.

### D. Plaintiffs' Federal RICO Claim (Count II)

#### 1. Plaintiffs Suffered an Injury to "Business or Property"

In Count II, Plaintiffs assert a civil RICO claim against Cleaver-Brooks under 18 U.S.C. Section 1962(c). Under RICO's private right of action, [12] a civil RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Generally, harm "resulting from a personal injury" is not compensable under RICO. *See, e.g., Diaz v. Gates*, 420 F.3d 837, 899–900 (9th Cir. 2005)

(*en banc*). Because Plaintiffs allege Defendants "fraudulently induce[d] asbestos personal injury Plaintiffs ... to settle their claims at lower values than they would otherwise have demanded," Dkt. No. ¶ 83, Cleaver-Brooks argues Plaintiffs are seeking "additional damages for their personal injuries" that are not cognizable under RICO. Dkt. No. 34-1 at 21. Controlling precedent dictates otherwise.

| | |
|---|---|
| [12] | In relevant part, 18 U.S.C. Section 1964(c) states that "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] may sue therefor in any appropriate United States district court." |

To establish a business or property injury, a plaintiff must allege (1) a "concrete financial loss"; and (2) that the financial loss amounts to a " 'harm to a specific business or property interest.' " *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008) (first quoting *Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (*en banc*), and then quoting *Diaz*, 420 F.3d at 900 (*en banc*)). Whether a particular loss constitutes a harm to the plaintiff's business or property is "a categorical inquiry typically determined by reference to state law." *Diaz*, 420 F.3d at 900, *cert. denied*, 546 U.S. 1131 (2006).

**\*9** The outcome here is governed by *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353 (9th Cir. 2005), *cert. denied*, 547 U.S. 1192 (2006). There, the plaintiffs settled their claims for damage to their crops that was allegedly caused by DuPont's fungicide product. *Living Designs*, 431 F.3d at 356–57. When plaintiffs later learned that adverse testing data had been concealed during discovery in order to obtain favorable settlements in the prior litigation, plaintiffs again brought suit against DuPont, asserting claims under RICO and state law. *Id.* at 357–58. The plaintiffs' alleged injury was that "they were harmed by DuPont's fraudulent conduct because they would have requested more money or refused to settle had they known about the concealed data." *Id.* at 358 (citation and internal quotation marks omitted). In holding that this constituted an injury to business or property under RICO, the Ninth Circuit did not look to the nature of plaintiffs' underlying claims. *See id.* at 364. The harm was "fraudulent inducement, which is actionable under Hawaii law[,]" and the loss was the diminished settlement value plaintiffs suffered. *Id.*

In this case, Plaintiffs adequately allege that they suffered both a financial loss and harm to a specific property interest recognized by Hawaii law. First, as in *Living Designs*, the

25-80084-WLH   Doc 18-2   Filed 12/16/25   Entered 12/16/25 16:19:32   Pg 17 of 47

Agena v. Cleaver-Brooks, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 11248590

financial loss Plaintiffs claim is that they settled their asbestos claims against Cleaver-Brooks "for a lower amount than they would have settled for if the true facts were known." Dkt. No. 29, ¶ 142; *id.* at ¶¶ 83, 116, 132, 156; *Living Designs, 431 F.3d at 364* (plaintiffs "settled their claims for a smaller percentage of their alleged damages than they could have received absent [Cleaver-Brooks'] fraudulent inducement."). Second, the resulting harm is that the value of each Plaintiff's cause of action was "artificially reduced," Dkt. No. 29, ¶ 141, and in Hawaii, a cause of action is considered property because when a plaintiff executes a settlement agreement and forgoes the right to pursue their tort claims, "the plaintiff is a seller of a cause of action." *See, e.g., Exotics, 172 P.3d at 1034–35* (citations omitted); *Living Designs, 431 F.3d at 364* (citing *Matsuura,* 73 P.3d at 700–01).

Indeed, the measure of damages Plaintiffs may ultimately recover will be based on "the *probable amount of settlement* in the absence of fraud after considering all known or foreseeable facts and circumstances affecting *the value of the claim* on the date of settlement." *Exotics,* 172 P.3d at 1042 (emphasis added) (quoting *DiSabatino,* 635 F. Supp. at 355); *accord Living Designs,* 431 F.3d at 368. "The nature of the injuries in the foregone tort action are relevant only to the extent of how they would affect the value of the claim to be compromised." *Exotics,* 172 P.3d at 1038 (quoting *DiSabatino,* 635 F. Supp. at 355); *see also Living Designs,* 431 F.3d at 364, 368 ("The critical consideration is the settlement value of the case on the date settlement was reached."). In other words, damages for the fraud alleged "would be the difference between the fair settlement value absent fraud and the amount of the plaintiffs' actual settlement." *Exotics,* 172 P.3d at 1045. As such, Plaintiffs will not be recovering "additional damages for their personal injuries," as Cleaver-Brooks contends, and it is thus of no import that the underlying claims here differ from those at issue in *Living Designs.*

Accordingly, because Plaintiffs allege the settlement value of their respective causes of action was impaired by the alleged discovery fraud perpetuated by Defendants, Plaintiffs have asserted a compensable injury to property under RICO.

### 2. The Federal RICO Claims for the Plaintiffs Connected to Forty-Nine Settlement Agreements are Time-Barred

The statute of limitations is four years for a civil RICO claim under federal law. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,* 483 U.S. 143, 156 (1987); *Scott v. Boos,* 215 F.3d 940, 942 n.4 (9th Cir. 2000). Cleaver-Brooks argues that the federal RICO claims of (61) Plaintiffs connected to (50) settlement agreements are time-barred because these claims were filed four years and six days after the corresponding Plaintiffs first discovered their alleged injury on January 8, 2015. Dkt. No. 34-1 at 19–20; *see also* Dkt. No. 34-4 at 1. Plaintiffs contend otherwise, arguing that the limitations period did not begin to run until several months later when "the pattern of fraud and its dimensions could be discerned." Dkt. No. 51 at 23. Plaintiffs' theory is unavailing.

**\*10** In *Rotella v. Wood,* 528 U.S. 549 (2000), the Court rejected the "injury and pattern discovery" rule and emphasized, "we have been at pains to explain that a discovery of the *injury,* not discovery of the other elements of a claim, is what starts the clock [for civil RICO claims]." *Id.* at 555 (emphasis added). Thus, "[t]he limitations period for civil RICO actions begins to run when a plaintiff knows or should know of the injury which is the basis for the action." *Living Designs,* 431 F.3d at 365 (citation omitted); *Pincay v. Andrews,* 238 F.3d 1106, 1109 (9th Cir. 2001) (noting that even "constructive notice begins to run the statute of limitations regardless of any fiduciary relationship between the injured and the injurer").

The injury alleged by Plaintiffs was the "false discovery responses" they received that caused them to settle their claims against Cleaver-Brooks for less than they would have if they had known the truth during discovery. Dkt. No. 29, ¶ 142. Plaintiffs are "deemed to have had constructive knowledge if [they] had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud." *Pincay,* 238 F.3d at 1110 (citation and internal quotation marks omitted). Because Plaintiffs filed their original Complaint on January 14, 2019, Dkt. No. 1-2, in order for Plaintiffs' RICO claims to be timely, a Plaintiff who settled an asbestos claim cannot have learned of the truth regarding alleged discovery fraud *before* January 14, 2015. Here, Plaintiffs had notice of at least two injuries before that date.

First, Plaintiffs allege Cleaver-Brooks withheld the fact that its Aqua-Chem distillers and Davis heat exchangers contained asbestos, Dkt. No. 29, ¶¶ 72–73, 81, 104–05, but Plaintiffs concede this was revealed to be false on December 3, 2013 when Cleaver-Brooks responded to interrogatories and

**Agena v. Cleaver-Brooks, Inc., Not Reported in Fed. Supp. (2019)**

2019 WL 11248590

"voluntarily disclose[d] [that] those product lines" contained asbestos. *Id.* at ¶¶ 88, 92. Receiving a "written disclosure of the possibility of injury is sufficient to put a civil RICO plaintiff on constructive notice of his injury." *Pincay*, 238 F.3d at 1110 (citing *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1412, 1414–15). Thus, when Cleaver-Brooks made the written disclosure on December 3, 2013, a RICO cause of action accrued for those Plaintiffs connected to (30) previously executed settlement agreements, [13] warranting a further investigation on their part regarding the parameters and extent of the fraud. The limitations period expired for these Plaintiffs on December 3, 2017. Therefore, the federal RICO claims for these Plaintiffs are time-barred. [14]

[13]   *See* Parties' Jointly Filed Settlement Table, Dkt. No. 66-1 at ¶¶ 1–30.

[14]   See id.

Second, Plaintiffs allege that Cleaver-Brooks stated in its answers to interrogatories that it was "unaware" of documents related to Aqua-Chem distillers and Davis heat exchangers or that these documents were practically "inaccessible," Dkt. No. 29, ¶¶ 97, 99, but Plaintiffs learned "[t]hese discovery responses ... were false as revealed during the January 8, 2015, deposition of Cleaver-Brooks['] corporate representative, David Fitch." *Id.* at ¶ 100. Fitch testified "that the Aqua-Chem service files, manuals, and drawings were neatly organized in the files of Aqua-Chem, Inc., and could easily be retrieved by ship name in about two and half hours per ship." *Id.* By the time of Fitch's deposition, (19) settlement agreements (in addition to the (30) agreements identified above) had been executed. [15] It bears emphasis that the law firm representing the former asbestos plaintiffs in the underlying litigation is the same law firm representing Plaintiffs in this action. Dkt. No. 29, ¶ 143; *see* Dkt. No. 34-5. Thus, notwithstanding Plaintiffs' conjecture that "[i]t is likely that a completed transcript [of Fitch's deposition] was not received for several weeks," Dkt. No. 51 at 19, on January 8, 2015, the Plaintiffs associated with these additional (19) settlement agreements had "enough information to warrant an investigation" into whether they had been duped into settling their claims, and, thus, they had constructive notice of their injury. Because the Plaintiffs connected to these (19) settlement agreements filed suit after January 8, 2019, their federal RICO claims are time-barred.

[15]   *See* Parties' Jointly Filed Settlement Table, Dkt. No. 66-1, ¶¶ 31–49.

**\*11** Accordingly, the federal RICO claims for the Plaintiffs connected to (49) settlement agreements are time-barred as a matter of law. [16] Count II as to these Plaintiffs is therefore DISMISSED and leave to amend in this instance would be futile.

[16]   *See* Parties' Jointly Filed Settlement Table, Dkt. No. 66-1, ¶¶ 1–49. Although Cleaver-Brooks initially claimed there were (50) settlement agreements relevant to the statute of limitations issue, Dkt. No. 34-4 at 1, according to the settlement table more recently submitted by both parties the Court counts (49) settlements. The difference in the number of settlement agreements is unclear from the record.

**E. Several Representative Plaintiffs Lack the Capacity to Sue**

Cleaver-Brooks avers that a number of Plaintiffs have failed to plead facts to support their capacity to sue on behalf of the former asbestos plaintiff's estate they purport to represent. *See* Dkt. No. 34-1 at 24, 27–29 & n.19. True or not, claimants are not required to allege capacity. Fed.R.Civ.P. 9(a)(1)(A) ("a pleading need not allege ... a party's capacity to sue or be sued"). Moreover, capacity is not the equivalent of standing, and capacity defects are generally not jurisdictional. *De Saracho v. Custom Food Mach., Inc.*, 206 F.3d 874, 878 (9th Cir. 2000); *see* Fed.R.Civ.P. 82; 4 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 17.20(2), (4) (Matthew Bender 3d ed. 2018) (emphasis added) [hereinafter "MOORE'S"]. Nonetheless, if such a defect does exist, an objecting party must raise it "by a specific denial" in the responsive pleading, Fed.R.Civ.P. 9(a)(2), "or by motion before pleading" – otherwise, the issue is waived. *Summers v. Interstate Tractor & Equip. Co.*, 466 F.2d 42, 49–50 (9th Cir. 1972); *De Saracho*, 206 F.3d at 878–79.

Seeking to avoid such waiver, Cleaver-Brooks asserts various legal reasons as to why several Plaintiffs lack the capacity to sue: either because they were never judicially appointed as a personal representative; they allowed their representative authority to expire; they obtained their authority outside the State of Hawaii; or their status as a trustee of a decedent's estate, without more, is insufficient. *See* Dkt. 34-1 at 25–31.

As set forth below, the Court concludes that at this time: [17] (1) fifteen Plaintiffs lack any form of legal capacity to sue on behalf of another individual or their estate; (2) eight Plaintiffs have the capacity to sue as the trustee for an estate; and (3) two

Agena v. Cleaver-Brooks, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 11248590

Plaintiffs lack the capacity to sue because they were appointed as a personal representative outside the State of Hawaii and have not complied with Hawaii law.[18] The Court addresses each *seriatim*.

[17] Since briefing concluded, the status of many Plaintiffs has changed and continues to be in flux. For ease of reference, a table is attached as an Appendix to this Order (App. A), noting which representative Plaintiffs have the capacity to sue and those that do not.

[18] In addition, there is one Plaintiff suing under a power of attorney. *See* App. A. However, Defendants do not challenge the capacity of this individual Plaintiff. Dkt. No. 67-1 at 2; Dkt. No. 34-1 at 28.

### 1. Personal Representatives

Under Hawaii law,[19] "a personal representative of a decedent ... has the same standing to sue and be sued ... as the decedent had immediately prior to death." Haw. Rev. Stat. § 560:3-703(c); *id.* § 560:3-715(22) ("[A] personal representative ... may properly ... prosecute or defend claims, or proceedings in any jurisdiction for the protection of the estate[.]"). But "to acquire the powers ... of a personal representative of a decedent, a person must be appointed by order of the court or registrar, qualify and be issued letters." *Id.* § 560:3-103. As a result, an individual "who has not been judicially appointed as the personal representative of a decedent's estate, is not a 'proper party.' " *Roxas v. Marcos*, 969 P.2d 1209, 1240 (Haw. 1998).[20]

[19] Pursuant to Fed.R.Civ.P. 17(b), an individual's capacity to sue is determined "by the law of the state where the court is located," and thus Hawaii law applies. *See* Fed.R.Civ.P. 17(b)(3).

[20] Letters testamentary issued to an individual are generally "effective for three years." Haw. Rev. Stat. § 560:1-201.

**\*12** Therefore, consistent with the parties' jointly filed statement regarding the capacity status of each Plaintiff, Dkt. No. 67-1, there are (15) Plaintiffs who have either never been judicially appointed or who have allowed their authority to

lapse.[21] These individuals lack the capacity to sue in this case.

[21] On the other hand, (35) Plaintiffs have capacity to sue as the judicially appointed personal representative for an estate (but, in one instance, a party substitution is required). *See* App. A.

### 2. The Trustee Plaintiffs

A trustee of a trust is no substitute for a "personal representative judicially appointed for his estate." *See Dowling v. 808 Boats LLC*, 2018 WL 6177427, at *2 (Haw. Ct. App. Nov. 27, 2018) (table). Cleaver-Brooks therefore posits, and Plaintiffs evidently concede, Dkt. No. 51 at 29–30, 32–34, the only alternative is that a "settlor or personal representative must assign a claim to the trust before a trustee may prosecute it." Dkt. No. 34-1 at 29. Cleaver-Brooks maintains that Hawaii law prohibits the assignment of the type of claims asserted here. *Id.* at 28–29, 31. The Court concludes otherwise.

The Hawaii Supreme Court "has repeatedly adhered to the principle that "personal" claims for relief are unassignable." *TMJ Haw., Inc. v. Nippon Trust Bank*, 153 P.3d 444, 450 (Haw. 2007). In *TMJ*, the court reiterated that "in determining assignability, the issue is not only whether the claim is assignable, but also whether the damages arising from the claim are purely personal in nature." *TMJ*, 153 P.3d at 451 (quoting *Sprague v. Cal. Pacific Bankers*, 74 F.3d 12, 22–23 (Haw. 2003) (explaining that "most items of general damages are not assignable due to their personal nature" and holding that "general damages awarded for a negligence cause of action" are unassignable)).[22]

[22] *See also TMJ*, 74 P.3d at 451 ("General damages ... include such items as physical pain and suffering, inconvenience, and loss of enjoyment which cannot be measured definitively in monetary terms." (citation omitted)). *TMJ* underscores that "it is the *personal nature* of the damages, not the label, that ultimately determines assignability." *TMJ*, 153 P.3d at 451 (emphasis in original) (quoting *Sprague*, 74 F.3d at 22 n.11); *id.* at 451–52 (surveying prior holdings that "damages sought for injury to the commercial credit and reputation of [a business]" and "damages for

Agena v. Cleaver-Brooks, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 11248590

loss of business opportunities were personal and unassignable" (citation omitted)).

"The proper inquiry ... is whether the cause of action alleges a personal injury or an injury to property." *Id.* at 455. After surveying prior rulings, the *TMJ* Court summarized that "tort claims that are 'personal' in nature are not assignable" and " 'non-personal' or 'property' tort claims" may be assigned. *Id.* at 452 (citations omitted). Claims in the latter category include "those that arise out of an injury to the claimant's property or estate," such as, for example, causes of action that arise from "from frauds, deceits, and other wrongs" and cause "real or personal property" of the estate to be "injured, diminished, or damaged." *Id.* (citations omitted). However, "a claim's title (*i.e.*, 'professional malpractice,' 'breach of fiduciary duty,' 'fraud,' etc.) is not dispositive. Indeed, a 'fraud' may harm either person or property." *Id.* at 455. Moreover, "an allegation of economic harm is not always indicative of non-personal injury." *Id.* (citing *Sprague*, 74 P.3d at 24 ("We do not think, however, that economic damages, otherwise known as 'out-of-pocket' damages, are automatically indicative of non-personal damages. Depending on the circumstances of the case, economic damages may be purely personal in nature, thus precluding assignment.")). In the end, the *TMJ* Court concluded that the "professional malpractice, breach of fiduciary duty, and fraud claims" asserted were assignable because they qualified as "non-personal injuries" that were "direct and quantifiable economic injuries." *Id.*

**\*13** In this case, the same result obtains. Having concluded that (1) a cause of action is considered property under Hawaii law; (2) the injury Plaintiffs claim is the diminished value of their causes of action as a result of the alleged misrepresentations of Defendants; and (3) calculating this amount is not "speculative" as a matter of law, *see Living Designs*, 431 F.3d at 369; *Exotics*, 172 P.3d at 1038 n.9, 1045-50, it follows that Plaintiffs' fraud claims assert "non-personal" injuries to property that are therefore assignable. Thus, the (8) trustee Plaintiffs may sue on behalf of their respective decedent's estate, so long as the fraud and RICO claims have been assigned to the trust.

One Plaintiff, however, purports to be a co-trustee. App. A at 6. Where there are co-trustees, "it is improper for one to act alone in matters involving discretion and judgment." In re *Trust Estate of Holt*, 33 Haw. 352, 360 (Haw. 1935); Haw. Rev. Stat. §§ 554A-4, 554A-6. Therefore, the other co-trustee(s) must be joined in this action.

### 3. Out-of-State Representatives

There are (2) Plaintiffs who were judicially appointed outside Hawaii as the personal representative of a former asbestos plaintiff's estate. It is well established that a "foreign representative has capacity to litigate claims arising under state law only if that person complies with the conditions of the forum state law." 4 MOORE'S § 17.22(1)(b). Under Haw. Rev. Stat. Section 560:4-205, a "foreign personal representative who has complied with section 560:4-204 ... may maintain actions and proceedings in this State subject to any conditions imposed upon nonresident parties generally." To comply with Haw. Rev. Stat. Section 560:4-204, the foreign personal representative must file with a Hawaii circuit court "authenticated copies of the representative's appointment and of any official bond the representative has given." Therefore, the (2) representative Plaintiffs appointed outside Hawaii lack the capacity to sue until they have filed these documents.

### 4. Remedy

In sum, there are (17) Plaintiffs who currently lack the capacity to sue on behalf of the estate they purport to represent. [23] Under Federal Rule of Civil Procedure 15(c), a district court has discretion to relate back an amendment to a complaint to the filing of the original pleading when, *inter alia*, "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out-or attempted to be set out-in the original pleading." Federal Rule of Civil Procedure 17(a)(3) further provides that a court "may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Such relief depends on whether an "understandable mistake" was made in naming the appropriate party or whether the defendant would be prejudiced by the substitution and amendment. *See United States for Use & Benefit of Wulff v. CMA, Inc.*, 890 F.2d 1070, 1073–75 (9th Cir. 1989); *see also Hassanati ex rel. Said v. International Lease Finance Corp.*, 643 F. App'x 620, 622–23 (9th Cir. 2016) (nearly two-year delay in seeking appointment of plaintiffs' representatives, after the district court ordered that appointment was necessary, was "unreasonable and not understandable neglect").

Agena v. Cleaver-Brooks, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 11248590

23    Five of these Plaintiffs are currently awaiting judicial approval to serve as a personal representative. *See* App. A.

The (17) Plaintiffs lacking the capacity to sue offer no justification for why they brought suit without such authority or why they have yet to obtain that authority nearly a year after filing this lawsuit. Nevertheless, consistent with the "longstanding policy in favor of deciding cases on the merits" and Rule 17, the Court will afford Plaintiffs a "reasonable opportunity to substitute the right party" or file proof that the above noted deficiencies for the identified representative Plaintiffs have been cured. *See Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1128–29 (9th Cir. 2017). Although Plaintiffs are not required to allege capacity, Fed.R.Civ.P. 9(a)(1)(A), because Plaintiffs will ultimately need to file a second amended complaint to proceed, *supra* Part I.C, Plaintiffs may avoid further confusion and contention in this case by alleging the capacity in which each Plaintiff is now suing.

**\*14** Accordingly, no later than three months from entry of this Order, Plaintiffs are hereby DIRECTED to file proof that the defects in capacity have been corrected.[24]

24    *See* App. A.

### F. Punitive Damages (Count IV)

Plaintiffs concede that "a claim for punitive damages is not an independent tort, but is purely incidental to a separate cause of action." *Ross v. Stouffer Hotel Co.*, 879 P.2d 1037, 1049 (Haw. 1994); *see* Dkt. No. 51 at 38. As such, Count IV is DISMISSED (as to all Defendants) insofar as Plaintiffs purport to assert a separate cause of action. Plaintiffs, however, may seek punitive damages in connection with their fraud claims as part of their prayer for relief, so long as Plaintiffs can show that Defendants' actions were wanton, with malice, or rise to the level of willful misconduct. *See, e.g., Kekona v. Bornemann*, 349 P.3d 361, 263 (Haw. 2015); *Masaki v. Gen. Motors Corp.*, 780 P.2d 566, 575 (1989).

### II. Husch Blackwell's Motion to Dismiss

Because of Husch Blackwell's role in the underlying asbestos litigation, Plaintiffs assert two claims against the law firm: (1) fraudulent inducement of Plaintiffs' settlement agreements, Dkt. No. 29, ¶¶ 127–37; and (2) violation of Hawaii's anti-racketeering statute, Haw. Rev. Stat. § 842-2 (Hawaii RICO). Dkt. No. 29, ¶¶ 160–69. As a threshold matter, the same

Rule 9(b) deficiencies detailed above, *supra* Part I.C, are fatal to Plaintiffs' fraudulent inducement and Hawaii RICO claims against Husch Blackwell. On that basis alone, Counts I and III are therefore DISMISSED with respect to Husch Blackwell. The Court nevertheless grants Plaintiffs leave to amend.[25] Notwithstanding, Husch Blackwell raises two other challenges to Plaintiffs' claims. Each is addressed below.

25    Although Husch Blackwell maintains that Plaintiffs failed to allege that any misrepresentations were made by Husch Blackwell in particular, and instead the allegations refer only to statements made by Cleaver-Brooks, Dkt No. 36-1 at 8–13; Dkt. No. 56 at 2–3, "a complaint need not distinguish between defendants that had the exact same role in a fraud." *United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018). The situation alleged is just that. *See, e.g.*, Dkt. No. 29, ¶¶ 81–82 ("Cleaver-Brooks in coordination with its national coordinating counsel at WHD gave the same intentionally false statements"); *id.* at ¶ 83 ("Cleaver-Brooks and its national coordinating counsel at WHD fraudulently withheld evidence" during discovery between June 2007 and December 2014); *id.* at ¶ 142 ("CLEAVER-BROOKS and WHD engaged [in] coordinated efforts to draft intentionally false discovery responses and transmit those responses from Wisconsin to Hawai'i through mail and/or wires between June 2007 and December 2014").

### A. Plaintiffs' State RICO Claim (Count III) Against Husch Blackwell

The language in Section 842-2(3) of Hawaii RICO "is virtually identical to that of 18 U.S.C. § 1962(c)." *State v. Ontai*, 929 P.2d 69, 74 (1996); *State v. Bates*, 933 P.2d 48, 59 (Haw. 1997) ("[Hawaii RICO] incorporated provisions of 18 U.S.C. § 1962]").[26] As a result, the Hawaii Supreme Court looks to "federal case law for guidance" in applying Hawaii RICO because "the most useful source in interpreting [Section] 842-2(3) is federal law." *Ontai*, 929 P.2d at 74; *Bates*, 933 P.2d at 59. Indeed, Plaintiffs concede that "the elements of a cause of action under the Hawai'i RICO statute ... have been analyzed 'interchangeably' with those under the federal RICO statute." Dkt. No. 51 at 26; Dkt. No. 49 at 22; *cf. Bates*, 933 P.2d at 57 (stating elements under Hawaii RICO); *Ontai*, 929 P.2d at 74, 76 (noting that the parallel provisions differ only as to the requirements relating

25-80084-WLH   Doc 18-2   Filed 12/16/25   Entered 12/16/25 16:19:32   Pg 22 of 47

Agena v. Cleaver-Brooks, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 11248590

to interstate commerce and "the Hawaii statute requires only one act of racketeering activity," Haw. Rev. Stat. § 842-1, whereas a federal RICO claim requires a "pattern of racketeering activity").

26     Section 842-2(3) of Hawaii RICO provides:

> It shall be unlawful ... [f]or any person employed by or associated with any enterprise to conduct or participate in the conduct of the affairs of the enterprise through racketeering activity or collection of an unlawful debt.

> Similarly, 18 U.S.C. Section 1962(c) states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> A "pattern of racketeering activity" requires at least two predicate acts of racketeering activity, as defined in 18 U.S.C. Section 1961(1), within a period of ten years. 18 U.S.C. § 1961(5).

**\*15** "To state a claim under § 1962(c), a plaintiff must allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.' " *Odom*, 486 F.3d at 547 (*en banc*) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). Here, only the "conduct" element is at issue.

In *Reves v. Ernst & Young*, 507 U.S. 170 (1993), the Supreme Court interpreted the word " 'conduct' to require some degree of direction and the word 'participate' to require some part in that direction." *Id.* at 179. Thus, the Court held, to satisfy the "conduct" element, a defendant must have "participated in the operation or management of the enterprise itself." *Id.* at 183, 185.

In *Reves*, an outside accounting firm had allegedly misrepresented the financial health of an organization by omitting certain financial information on the audit reports and financial statements it had prepared, *see id.* at 172–75, but such involvement was determined not to have satisfied the "operation or management" test. *Id.* at 186. Likewise, in *Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993), an attorney allegedly helped a corporation "cover-up" its scheme to sell illegal, fractional partnership interests by sending two letters to the State department of corporations, filing "a false partnership agreement in which he inflated the number of limited partners," and assisting with bankruptcy proceedings

where he purportedly misrepresented available assets. *Id.* at 1342–43. Once again, the court held that the attorney's conduct did not qualify as "operation or management" of the enterprise because the attorney's "role was limited to providing legal services" and he "at no time held any formal position in the limited partnership" or played any part in "directing the affairs of the enterprise." *Id.* at 1344. And in *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776 (9th Cir. 1996), where a corporation allegedly operated a fraudulent pyramid scheme and among the named defendants were the corporation's outside counsel and his law firm, *id.* at 779–80, the court held that the attorney's conduct did not rise to the level of "operation or management" of the enterprise, despite counsel's position of "Assistant Secretary" in the corporation and appearance in a promotional video in which he made "statements allegedly promoting the scheme." *Id.* at 780, 789. Most recently, in *Walter v. Drayson*, 538 F.3d 1244 (9th Cir. 2008), the plaintiff alleged—as in this case—that an attorney and her law firm were an associated-in-fact enterprise. *Id.* at 1246. Plaintiff claimed defendants pursued the wrongful taking of trust assets, fraudulently obtained releases of liability, concealed their acts, and impeded justice. *Id.* The Ninth Circuit, however, held that the attorney's involvement was insufficient because "she and her firm were not acting under direction from the trust or the trustees" and, instead, she merely "wrote emails, gave advice, and took positions on behalf of her clients." *Id.* at 1248.

As these cases demonstrate, the allegations pertaining to Husch Blackwell's involvement do not satisfy the "operation or management" test. Setting aside legal conclusions, Plaintiffs merely allege that WHD (Husch Blackwell's predecessor) "respond[ed] to discovery propounded to Cleaver-Brooks"; "coordinat[ed]" with Cleaver-Brooks in responding to interrogatories; provided "guidance" to Cleaver-Brooks; "allowed Cleaver-Brooks to give false discovery responses and perjured testimony" and otherwise served as national coordinating counsel in asbestos litigation. Dkt. No. 29, ¶¶ 68, 70, 81, 114, 126, 142. As such, it is readily apparent that Husch Blackwell's "role was limited to providing legal services." *Baumer*, 8 F.3d at 1344. At best, Cleaver-Brooks' outside counsel was acquiescent in the alleged fraud. [27] But merely allowing Cleaver-Brooks to "carry on" is not enough to constitute "operation or management." *See Reves*, 507 U.S. at 177–78; *Walter*, 538 F.3d at 1248 ("It is not enough that [an attorney] failed to stop illegal activity"). Moreover, whether Husch Blackwell "rendered [its] services well or poorly, properly or improperly, is irrelevant to the *Reves* test." *Baumer*, 8 F.3d at 1344; *Walter*,

25-80084-WLH    Doc 18-2    Filed 12/16/25    Entered 12/16/25 16:19:32    Pg 23 of 47

*Agena v. Cleaver-Brooks, Inc.*, Not Reported in Fed. Supp. (2019)

2019 WL 11248590

538 F.3d at 1248 ("[T]he quality of the services rendered doesn't matter."); *Reves*, 507 U.S. at 186 ("[P]rofessional standards ... do not define what constitutes management of an enterprise."). Finally, the facts alleged provide no indication that Husch Blackwell sought to "exert control over" the enterprise through acts akin to "bribery." *See Reves*, 507 U.S. at 184.

27    If anything, the FAC establishes that Husch Blackwell operated "under the direction of Cleaver-Brooks," Dkt. No. 29, ¶ 71, not that it "operated" or "managed" the enterprise.

**\*16** In short, "[s]imply performing services for the enterprise does not rise to the level of direction, whether one is 'inside' or 'outside.' " *Walter*, 538 F.3d at 1249. Because Plaintiffs have failed to allege sufficient facts to show that Husch Blackwell "participated in the operation or management of the enterprise itself," *Reves*, 507 U.S. at 183, 185, Husch Blackwell cannot be held liable under Hawaii RICO. Count III as to Husch Blackwell is therefore DISMISSED.

### B. Husch Blackwell is not Shielded by the Litigation Privilege

With respect to Plaintiffs' fraudulent inducement claim (Count I), Husch Blackwell asserts that liability cannot attach because "the litigation privilege forecloses their claim." Dkt. No. 56 at 4; *see also* Dkt. No. 36-1 at 10–11. The litigation privilege, however, is inapplicable under the facts of this case.

Husch Blackwell maintains that *Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel*, 151 P.3d 732 (Haw. 2007) stands for the proposition that "the litigation privilege immunizes participants in the judicial process from claims arising from statements or conduct in the course of litigation." Dkt. No. 56 at 5. The holding in *Kahala*, however, was not nearly so broad. The court there applied the litigation privilege but did so only with respect to claims of intentional interference with contractual relations, intentional interference with prospective economic advantage, and unfair methods of competition. *Kahala*, 151 P.3d at 752. Indeed, even the attorneys in that case recognized that the litigation privilege did not extend to the type of fraud claims asserted here. *Id.* at 748 ("The Lawyers ... contend that '[i]t is well settled that an attorney who represents a client in litigation proceedings cannot be held liable to his client's litigation adversary based on the attorney's conduct of the litigation, *absent proof of malicious prosecution, abuse of process,*

*fraud[,] or malice.* ' " (emphasis added)). And as the Supreme Court of Hawaii has stated:

**An attorney can be held liable for fraudulent misrepresentation.** *Kahala Royal Corp.*, 151 P.3d at 749–50 (citing caselaw from other jurisdictions stating that it is well settled that an attorney can be sued by an adverse party for fraud); *Matsuura v. E.I. du Pont*, 73 P.3d 687, 700 ([Haw.] 2003) ("Under Hawai'i law, a party is not immune from liability for civil damages based upon that party's fraud engaged in during prior litigation proceedings."); *Giuliani v. Chuck*, 620 P.2d 733, 736–37 (Haw. Ct. App. 1980) ("The rule of law that an attorney representing a client may be held personally liable to an adverse party or a third person who sustains injury as a result of an attorney's intentional tortious acts is well settled." (Citations omitted.)).

*Buscher v. Boning*, 159 P.3d 814, 832 n.13 (Haw. 2007) (emphasis added); *see also Living Designs*, 431 F.3d at 372 ("[S]o long as a cause of action for fraud is asserted, the litigation privilege does not protect subsequent litigation asserting other causes of action stemming from the fraud allegedly committed in prior proceedings.").

The Court therefore concludes that the litigation privilege does not shield Husch Blackwell from Plaintiffs' fraud claim.

### CONCLUSION

For the reasons set forth herein, Defendants' Motions to Dismiss the First Amended Complaint, Dkt. Nos. 34, 36, are GRANTED IN PART AND DENIED IN PART, and the First Amended Complaint is DISMISSED WITH LEAVE TO AMEND. The Motions for Judicial Notice, Dkt. Nos. 35, 37, are GRANTED.

**\*17** Plaintiffs may have until **December 2, 2019,** to file a second amended complaint to the extent allowed herein. **The Court cautions Plaintiffs that failure to file an amended complaint by December 2, 2019 may result in the dismissal of those claims that the Court has only thus far dismissed with leave to amend in this Order.**

IT IS SO ORDERED.

**Agena v. Cleaver-Brooks, Inc., Not Reported in Fed. Supp. (2019)**

2019 WL 11248590

**All Citations**

Not Reported in Fed. Supp., 2019 WL 11248590

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 1380644
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

Gene DARROUGH, individually and on
behalf of all others similarly situated, Plaintiff
v.
SOC LLC, et al., Defendants
Nicholas DeFiore, individually and on behalf
of all others similarly situated, et al., Plaintiffs
v.
SOC LLC, et al., Defendants

Case No. 2:20-cv-01951-CDS-BNW,
Case No. 2:20-cv-01981-CDS-DJA
|
Signed May 12, 2025

**Attorneys and Law Firms**

Scott E. Gizer, Early Sullivan Wright Gizer & McRae LLP, Las Vegas, NV, for Plaintiff.

Jennifer K. Hostetler, Lewis Roca Rothgerber Christie LLP, Las Vegas, NV, Scott Lerner, Pro Hac Vice, Tara Melissa Lee, Pro Hac Vice, White & Case LLP, Washington, DC, E. Leif Reid, Womble Bond Dickinson (US) LLP, Reno, NV, for Defendants.

**Order Granting in Part and Denying
in Part Defendants' Motion to Dismiss**

Cristina D. Silva, United States District Judge

**\*1** Defendants SOC LLC ("SOC"), SOC-SMG, Inc. ("SOC-SMG"), and Day & Zimmermann, Inc. (collectively, "defendants") filed a consolidated motion to dismiss plaintiffs Gene Darrough and Nicholas DeFiore's amended complaints (Darrough am. compl., ECF No. 56; DeFiore am. compl., ECF No. 56). Mot. to dismiss, ECF No. 59 (Darrough); ECF No. 59 (DeFiore). [1] In their amended complaints, plaintiffs, who were previously employed by defendants to provide war-zone security services to the Department of Defense (DOD) in Iraq, make allegations of false promises and representations regarding work conditions. Darrough and DeFiore oppose the consolidated motion to dismiss. ECF No. 60 (Darrough). [2]

For the reasons set forth herein, defendants' consolidated motion to dismiss is granted in part and denied in part.

[1] Because the consolidated motions filed in *Darrough* and *DeFiore* are identical, the court refers only to the motion to dismiss filed in *Darrough* (ECF No. 59) throughout this order.

[2] It appears plaintiffs erroneously failed to file the opposition in the *DeFiore* case. For this reason, and clarity of record, the court refers only to the response filed in *Darrough* (ECF No. 60) throughout this order. The plaintiffs are directed to file the opposition in *DeFiore*.

**I. Background**

Plaintiff Gene Darrough filed his amended complaint against defendants on August 13, 2024. Darrough am. compl., ECF No. 56. Plaintiffs Nicholas DeFiore, along with twenty-eight other plaintiffs, [3] filed their complaint against defendants on the same day. DeFiore am. compl., ECF No. 56. The complaints are substantially similar. [4] *Compare* DeFiore am. compl., ECF No. 56, *with* Darrough am. compl., ECF No. 56.

[3] The other plaintiffs are Keith Quick, Neil Robinson, Christopher Williams, Shawn Whitehead, Paul Mills, Jr., Rene Perez, Robert Herring, Houston Williams, Allen Cain, Richard Landry, Warren Woods, Arnold Alexander, Daniel Mercanton, David Wolderzak, Jaquelyn Joubert-Young, Abdelrahim Khamis, Curtis Watson, Joseph Scott, Babatunda Douglas, Dustin Boyle, Alfredo Luis Cruz, George Munn, Todd Dupont, Jerome Mundy, Benton Williams Jr., Eduardo Zuniga, Christopher Warren, Christopher Fields, Plaintiffs-in-Intervention Kelvin Hardin, Kenneth Robinson, and Marlesh Mbory.

[4] All plaintiffs in the present actions were also members of the putative Risinger class action. *See Risinger v. SOC LLC*, No. 2:12-cv-00063-MMD-PAL (D. Nev.). The class consisted of 1,298 of defendants' employees who worked across 22 bases in Iraq. The class was certified on September 30, 2015, but ultimately, decertified on July 26, 2019, with reconsideration of that order denied on September 30, 2019. ECF No. 374 in *Risinger*.

Plaintiffs were employed as armed guards by SOC, providing security to DOD bases in Iraq. DeFiore am. compl., ECF No. 56 at ¶ 1; *see also* Darrough am. compl., ECF No. 56 at ¶ 1. SOC, which stands for "Securing Our Country," provides worldwide security services for individuals, domestic facilities, nuclear power plants, and military bases. DeFiore am. compl., ECF No. 56 at ¶ 5; *see also* Darrough am. compl., ECF No. 56 at ¶ 5. SOC is owned by SOC-SMG and Day & Zimmermann. DeFiore am. compl., ECF No. 56 at ¶ 2; *see also* Darrough am. compl., ECF No. 56 at ¶ 2.

**\*2** Plaintiffs bring this action alleging that SOC recruited them under false promises "with respect to the schedule [they] would work." DeFiore am. compl., ECF No. 56 at ¶ 1; *see also* Darrough am. compl., ECF No. 56 at ¶ 1. Plaintiffs allege that the working conditions were "not revealed" to them "until after they had agreed to overseas employment" and "had been physically transported to Iraq." DeFiore am. compl., ECF No. 56 at ¶ 1. Once in Iraq, they were forced to "work in ultra-hazardous conditions in excess of 12 hours per day without meals or rest periods, seven days per week." DeFiore am. compl., ECF No. 56 at ¶ 1; *see also* Darrough am. compl., ECF No. 56 at ¶ 1. According to the complaints, this "directly violated not only the representations made by SOC to secure Plaintiffs' employment, but its [DOD] contract[.]" DeFiore am. compl., ECF No. 56 at ¶ 1; *see also* Darrough am. compl., ECF No. 56 at ¶ 1. That contract mandated that SOC would not require any guard to work longer than one twelve-hour shift per twenty-four-hour period, and not more than seventy-two hours per week (i.e., the "6/12 schedule"). DeFiore am. compl., ECF No. 56 at ¶ 1; *see also* Darrough am. compl., ECF No. 56 at ¶ 1. Plaintiffs further allege that "SOC thus subjected Plaintiffs and SOC's clients, including the United States of America, to undue risk by jeopardizing the physical and psychological condition of [plaintiffs] in the course of ultra-hazardous activities." DeFiore am. compl., ECF No. 56 at ¶ 1; *see also* Darrough am. compl., ECF No. 56 at ¶ 1.

The complaints assert eight claims for relief: (1) promissory fraud; (2) negligent misrepresentation; (3) unjust enrichment–fraud; (4) money had and received; (5) breach of contract; (6) breach of covenant of good faith and fair dealing; (7) quantum meruit; and (8) unjust enrichment–breach of contract. *See generally* DeFiore am. compl., ECF No. 56; *see also* Darrough am. compl., ECF No. 56. Defendants move to dismiss counts one through four, as well as count eight, for failure to plead with specificity as required by Rule 9(b) and count six for failure to state a claim for relief. *See generally*

ECF No. 59. Defendants also argue that plaintiffs' alter ego allegations are insufficient, so they move to dismiss SOC-SMG and Day & Zimmermann. *Id.* Last, Defendants argue that the claims brought by the "plaintiffs-in-intervention" in the DeFiore case are untimely and should be dismissed with prejudice. *Id.*

## II. Legal standard

The Federal Rules of Civil Procedure require a plaintiff to plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal is appropriate under Rule 12(b)(6) when a pleader fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A pleading must give fair notice of a legally cognizable claim and the grounds on which it rests, and although a court must take all factual allegations as true, legal conclusions couched as factual allegations are insufficient. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Accordingly, Rule 12(b)(6) requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

If the court grants a motion to dismiss for failure to state a claim, leave to amend should be granted unless it is clear that the deficiencies of the complaint cannot be cured by amendment. *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992). Under Rule 15(a), a court should "freely" give leave to amend "when justice so requires," and in the absence of a reason such as "undue delay, bad faith or dilatory motive of the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

### III. Discussion

25-80084-WLH    Doc 18-2    Filed 12/16/25    Entered 12/16/25 16:19:32    Pg 27 of 47

### A. Federal Rule of Civil Procedure 9(b) (counts one through four, count eight)

**\*3** Allegations based in fraud must be pled with particularity in accordance with Federal Rule of Civil Procedure 9(b). A plaintiff alleging fraud must "state with particularity the circumstances constituting fraud ..., [although] [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The allegations of fraud must be "specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong.... Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotations omitted). This requires an account of the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) (citation omitted). The plaintiff must also explain what is false or misleading about the purportedly fraudulent statement, and why it is false. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1546 (9th Cir. 1994). A claim that is "grounded in fraud" or "sounds in fraud" must satisfy Rule 9(b). *Vess*, 317 F.3d at 1106.

Plaintiffs allege that defendants orchestrated a broad scheme that included false representations about employees' future salary and work conditions in Iraq. DeFiore am. compl., ECF No. 56 at ¶¶ 41–48; *see also* Darrough am. compl., ECF No. 56 at ¶¶ 10–20. Plaintiffs also allege that defendants knew that the representations were false and fraudulent at the time they made them, and that defendants had no intention to honor the representations. DeFiore am. compl., ECF No. 56 at ¶ 54; *see also* Darrough am. compl., ECF No. 56 at ¶ 26. Because of these statements, plaintiffs raise claims alleging promissory fraud, negligent representation, tortious and contractual unjust enrichment,[5] and money had and received., which are subject to the heightened pleading standard under Rule 9(b). *See generally* DeFiore am. compl., ECF No. 56; *see also* Darrough am. compl., ECF No. 56.

[5] Plaintiffs again bring two claims for unjust enrichment: "unjust enrichment – promissory fraud" (count three) and "unjust enrichment– breach of contract" (count eight). In my prior order dismissing the first complaint I treated these two claims as one quasi-contract theory of recovery because plaintiffs did not demonstrate any

meaningful difference between counts three and eight. *See* Order, ECF No. 55 at 5 n.6. A review of the amended complaint demonstrates that these claims are identical to the claims brought in the original complaint. Plaintiffs seemingly to concede that these two claims should be combined as they refer only to one "unjust enrichment claim." ECF No. 60 at 18. Therefore, I again treat these two counts as one quasi-contract theory of recovery.

Defendants move to dismiss plaintiffs' fraud claims because the amended complaint again fails to meet the heightened pleading standard. ECF No. 59 at 18. Defendants argue that, although plaintiffs "have added some detail about various purportedly false statements made by specific individuals, they have made no effort to specifically identify what misrepresentations each Plaintiff allegedly *relied upon*." *Id.* at 18–19 (citing DeFiore am. compl., ECF No. 56 at ¶ 45 and Darrough am. compl., ECF No. 56 at ¶ 16) (emphasis in original). Defendants also argue that although plaintiffs had identified some of the "Recruiters" who allegedly made false statements, they have failed to allege "which, if any, Plaintiff participated in such a call, let alone when such a call occurred and who made a false statement on a call attended by any Plaintiff." *Id.* at 19. Defendants argue instead that "Plaintiffs have formulaically alleged for each Plaintiff that 'Defendants, through the Recruiters and other employees, misrepresented to [each Plaintiff] that he could expect a 6/12 schedule within a few months of, immediately prior to, and in' the month when Plaintiff first deployed to Iraq." *Id.* at 19 (citing DeFiore am. compl., ECF No. 56 at ¶ 46(a)–(ff), and Darrough am. compl. ECF No. 56 at ¶ 17). Defendants further argue that although plaintiffs have added details that the statements were made during an alleged, mandatory orientation in either Chicago or Nevada, plaintiffs have not alleged "if, when, or where each Plaintiff purportedly heard these false statements[.]." ECF No. 59 at 19.

**\*4** In their opposition, plaintiffs argue that the defendants are requesting them to go above and beyond the already stringent requirements of Rule 9(b) and that they specifically remedied the problems in their first complaint that were identified by the court in its dismissal order. Resp., ECF No. 60 at 13. Plaintiffs argue that because they allege fraud against a corporation, they are entitled to use group pleading. *Id.* (citing *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1108 (D. Nev. 1998)). They contend that identifying the employee who made the representation by their job title or responsibilities is sufficient. *Id.* (citing *Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007)).

25-80084-WLH     Doc 18-2     Filed 12/16/25     Entered 12/16/25 16:19:32     Pg 28 of 47

In their reply, defendants reiterate that plaintiffs have not identified with particularity which, if any, of the alleged recruiters participated in any of the specific recruiting calls, when the calls occurred, and which recruiters made any alleged false statements on a call attended by any plaintiff. ECF No. 62 at 10. Because the pleading burden is on the plaintiffs, defendants also argue that the plaintiffs have not identified "if, when, or where each Plaintiff purportedly heard false statements at a specific in-person orientation." *Id.* at 10–11. "And Plaintiffs' allegation that they were again told about the 6/12 schedule upon arrival in Iraq likewise fails to identify from whom each Plaintiff heard the specific alleged misrepresentation and exactly when each Plaintiff heard the alleged misrepresentation." *Id.* at 11 (citing DeFiore am. compl., ECF No. 56 at ¶ 45(d); Darrough am. compl., ECF No. 56 at ¶ 16(d)). Defendants also argue that plaintiffs are asking the court to adopt a lower pleading standard because this is a case of "corporate fraud." *Id.* But defendants state that plaintiffs cite to authorities that involve scenarios where "courts determined that group pleading as to conduct by **multiple defendants** was permissible." *Id.* (citing multiple cases) (emphasis in original). According to defendants, because plaintiffs' allegations concern the conduct of multiple *plaintiffs*, this case law is therefore inapposite. *Id.*

Plaintiffs' amended complaints again fails to meet the heightened pleading requirement under Rule 9(b). Plaintiffs cite no case law indicating that the group pleading standard can be used to apply to the alleged conduct of multiple plaintiffs without meeting Rule 9(b)'s specificity requirement. The case law plaintiffs cite to involve scenarios where courts found that group pleading as to conduct by multiple defendants was permissible. *See In re Stratosphhere, 1 F. Supp. 2d at 1108* (allowing plaintiffs to use group pleading doctrine instead of naming specific **defendants**) (emphasis added); *Juju, Inc. v. Native Media, LLC, 2020 WL 3208800, at *8 n.5 (D. Del. June 15, 2020)* ("[I]t is true that normally, when a plaintiff asserts fraud claims, Rule 9(b) requires that the plaintiff separately plead the allegedly fraudulent acts of each **defendant** ... But in cases like this, where details about the alleged fraud at issue are peculiarly in the control of the **defendants**, there is 'no per se rule that group pleading cannot satisfy Rule 9(b).' " (quoting *In re Genesis Health Ventures, Inc., 355 B.R. 438, 455 (Bankr. D. Del. 2006)* (emphasis added)); *Odom, 486 F.3d at 554* (holding that Rule 9 is not offended when the plaintiff cannot identify the name of which **defendant** engaged in which

representation) (emphasis added). Therefore, the argument that plaintiffs are entitled to group pleading is unpersuasive.

**\*5** Indeed, in this circuit, a "complaint must state the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Sanford v. MemberWorks, Inc., 625 F.3d 550, 558 (9th Cir. 2010).* Although the complaints do identify some names of the recruiters involved with the group recruiting calls, the amended complaints do not allege or identify which, if any, of the plaintiffs participated in such calls or when the calls occurred. Consequently, it is not clear whether any plaintiff participated in a group recruiting call or even heard the call script that contained an alleged misrepresentation, nor what was said that constituted the alleged misrepresentation. Instead, the amended complaints generically allege that "the Recruiters always discussed the 12 hours a day, 6 days a week schedule with recruits, so the call script included a bullet point as a topic to be discussed." DeFiore am. compl., ECF No. 56 at ¶ 45(a); *see also* Darrough am. compl, ECF No. 56 at ¶ 16(a). The amended complaint also fails to allege with any specificity what, where, and when plaintiffs attended these group orientations. For example, the DeFiore complaint restates the same statement for each plaintiff: "Defendants, through the Recruiters and other employees, misrepresented to [plaintiff name] that he could expect a 6/12 schedule within a few months of, immediately prior to, and in, [month of deployment]." *See* DeFiore am. compl., ECF No. 56 at ¶ 45(a)–(ff). But these statements lack the required when, where, and how to meet the specificity requirement. Indeed, it is unclear from the complaint "who —with respect to each particular plaintiff—*received* each alleged misrepresentation *and when.*" *Agena v. Cleaver-Brooks, Inc., 2019 WL 11248590, at *8, 2019 U.S. Dist. LEXIS 231710, at *26 (D. Haw. Oct. 31, 2019)* (emphasis in original). "To avoid dismissal for inadequacy under Rule 9(b) [the] complaint would need to state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Edwards, 356 F.3d at 1066.* Here, the time, place, and specific context of the alleged false representations, as well as the identities of which plaintiff was a party to which misrepresentation, are all still missing from the complaint. *Sanford, 625 F.3d. at 558; see United States ex rel. Lee v. SmithKline Beecham, Inc., 245 F.3d 1048, 1051 (9th Cir. 2001)* (holding that Rule 9(b) was not satisfied when plaintiffs did not "identify the [defendant's] employees who performed the tests, or provide any **dates, times, or places** the tests were conducted) (emphasis added). Therefore, plaintiffs have failed to surpass the heightened

pleading standard Rule 9(b) requires and their fraud claims are therefore dismissed. Defendants' motion to dismiss is granted as to these claims.

If the court grants a motion to dismiss for failure to state a claim, leave to amend should be granted unless it is clear that the deficiencies of the complaint cannot be cured by amendment. *DeSoto*, 957 F.2d at 658. Although this case has been going on for years and plaintiffs have yet to plead their fraud claims with the required specificity, it is not entirely clear that amendment would be futile. Therefore, plaintiffs' fraud claims: promissory fraud, negligent representation, tortious and contractual unjust enrichment, and money had and received are dismissed without prejudice .Should plaintiffs choose to file a third amended complaint addressing the deficiencies in these claims, they must do so no later than two weeks after the date of this order.

### B. Plaintiffs' breach of implied covenant of good faith and fair dealing claim is dismissed with prejudice.

Plaintiffs again bring a breach of implied covenant of good faith and fair dealing claim. *See* DeFiore am. compl., ECF No. 56 at ¶¶ 82–88; *see also* Darrough am. compl., ECF No. 56 at ¶¶ 54–60. In my prior order dismissing the original complaint, I dismissed this claim because it was identical to the plaintiffs' breach of contract claim. Order, ECF No. 55 at 9. Defendants argue that this claim must be dismissed again because "Plaintiffs failed to make even a single substantive amendment to [the breach of contract claim or the breach of implied covenant claim], warranting dismissal on the same grounds and with prejudice. In their opposition, plaintiffs do not deny that the claims in the amended complaint are identical to the ones in the original complaint. Instead, plaintiffs argue that

> [i]n its July Order, the Court reasoned that Plaintiffs' allegations supporting their breach of the implied covenant of good faith and fair dealing cause of action were duplicative of the breach of contract allegations because both concern the 6/12 Schedule. *See* ECF No. 55, pp. 9–10. There is, in fact, a subtle difference. As discussed above, Defendants' contention is that the 6/12 Schedule was not contemplated within the terms of Plaintiffs' employment

agreements. Therefore, if Defendants are successful in their argument, the contracts would be silent as to the schedule that Plaintiffs were expected to adhere to while serving as armed guards in Iraq. If that is the case, the question becomes – did Defendants act in good faith in working Plaintiffs seven days a week, in excess of twelve hours per day, when their contract with the United States required them to adhere to a 6/12 Schedule?

ECF No. 60 at 21. Instead of making any changes to the claims in the amended complaint, plaintiffs argue that my prior order dismissing the claim was incorrect and that there is actually a "subtle difference" between each claim. This is tantamount to a request that I reconsider my prior order. However, the request that I reconsider my prior order is improper in both substance and procedure. *See Marquez-Perez v. Nevada*, 2023 WL 1868523, at *—, 2023 U.S. Dist. LEXIS 22085, at *4 (D. Nev. Feb. 8, 2023) (rejecting a motion for reconsideration when it attempts to re-argue or clarify points made in the original motion); *see also Lorenzo v. Qualcomm Inc.*, 2009 WL 2448375, at *4 n.1 (S.D. Cal. Aug. 10, 2009) (holding that it is procedurally improper to use an amended complaint, rather than a motion for reconsideration, to relitigate issues already dealt with). Because plaintiffs have made no changes to their breach of implied covenant of good faith and fair dealing claim, it remains duplicative of their breach of contract claim and it cannot survive. *Stebbins v. Geico Ins. Agency*, 2019 WL 281281 at *2 (D. Nev. Jan. 22, 2019) (finding a breach of the implied covenant of good faith and fair dealing cannot be based on the same conduct establishing a separately pled breach of contract claim). When I dismissed the breach of implied covenant claim in the original complaint, I dismissed it without prejudice and gave plaintiffs the opportunity to cure the deficiencies and re-plead the claim. Plaintiffs did not cure the deficiencies. [6] Therefore, as plaintiffs were already given the opportunity to amend the claim and chose not to, I find that amendment here would be futile. The breach of implied covenant of good faith and fair dealing claim is dismissed with prejudice.

[6]    Even accepting as true plaintiffs' "subtle difference" argument, it does not change the outcome because it's the same conduct alleged

for both claims. *Shaw v. CitiMortgage, Inc.*, 201 F. Supp. 3d 1222, 1252 (D. Nev. 2016) (citation omitted) ("It is well established that a claim alleging breach of the implied covenants of good faith and fair dealing cannot be based on the same conduct establishing a separately pled breach of contract claim.").

**C. All claims against SOC-SMG are dismissed.**

**\*6** Plaintiffs argue that SOC-SMG, Inc. and Day & Zimmerman Inc., despite being members of SOC LLC, are proper parties and can be held liable for these allegations because they entered into a joint venture with SOC LLC. DeFiore am. compl, ECF No. 56 at ¶¶ 49–51; *see also* Darrough am. compl., ECF No. 56 at ¶¶ 21–23. As alleged, plaintiffs contend that "[a]ll members of a joint venture are jointly and severally for wrongful acts committed in furtherance of the joint enterprise," DeFiore am. compl., ECF No. 56 at ¶ 50; *see also* Darrough am. compl., ECF No. 56 at ¶ 22. Plaintiffs further allege that "not only did [Day & Zimmerman] and SOC-SMG actively engage in the fraudulent and negligent conduct alleged herein, [Day & Zimmerman] and SOC-SMG are liable as joint venturers because the wrongful acts alleged herein were done by [Day & Zimmerman] and SOC-SMG in furtherance of, and within the scope of, the joint venture." DeFiore am. compl., ECF No. 56 at ¶ 51; *see also* Darrough am. compl., ECF No. 56 at ¶ 23.

Defendants first argue that the " 'principles of law related to joint ventures' have no application to [SOC-SMG and Day & Zimmerman], who adopted the corporate formalities of a Delaware limited liability company, SOC LLC, to structure their business." ECF No. 59 at 15. Nevada, defendants point out, defines joint ventures as an "informal partnership" and applies its Uniform Partnership Act,[7] to joint ventures. *Id.* (citing *Baroi v. Platinum Condo. Dev., LLC*, 874 F.Supp.2d 980, —— – —— (D. Nev. July 10, 2012)). However, Nevada respects the long-standing principle of corporate law that "an entity formed pursuant to other statutory authority,"—e.g., the Delaware LLC Act, under which SOC-SMG and Day & Zimmerman formed SOC LLC—"is governed by the body of law pursuant to which the entity was formed." *Id.* (citing *Baroi*, 874 F.Supp.2d at ——; *Uhlmeyer v. USAA Cas. Ins. Co.*, 2020 WL 732950, at \*4, 2020 U.S. Dist. LEXIS 25538, at \*11 (D. Nev. Feb. 13, 2020); Nev. Rev. Stat. § 87.060(2) ("Any association formed under any other statute of this State, or any statute adopted by authority, other than the authority of this State, is not a partnership[.]")). Because SOC-SMG and Day & Zimmerman are members of an LLC registered and

doing business in Nevada, they are not joint venturers and not proper parties to a proceeding "by or against the company." *Id.* (citing Nev. Rev. Stat. § 86.381).

[7]    Nev. Rev. Stat. § 87.001–565.

Defendants next argue that the amended complaint "continues to define SOC LLC and [SOC-SMG and Day & Zimmerman] collectively as 'SOC' and then proceed[s] to allege that 'SOC' committed various wrongful acts in violation of Plaintiffs' 'written employment agreement with SOC.' " *Id.* at 16. However, "there can be no doubt that each Plaintiff had an employment agreement with SOC LLC alone." *Id.*

In response, plaintiffs argue that SOC-SMG and Day & Zimmerman are proper parties because "the thrust of Plaintiffs' allegations concerning [SOC-SMG and Day & Zimmerman] is that they participated in the wrongdoing." ECF No. 60 at 22. Plaintiffs also reiterate that SOC-SMG and Day & Zimmerman are joint venturers under Nev. Rev. Stat. § 87.150 and so "while [SOC-SMG and Day & Zimmerman] might be members of SOC LLC and would generally be shielded from liability, because they are joint venturers in the enterprise, if one of them participated in the fraud or were negligent in making misrepresentations, both are liable." *Id.*

Nevada's Uniform Partnership Act governs partnership law in this state. Nev. Rev. Stat. ch. 87; *see also Baroi*, 874 F.Supp.2d at \*——. The Uniform Partnership Act provides that "[a]ny association formed [under any other statute of this State, or any statute adopted by authority, other than the authority of this State, is not a partnership under NRS 87.010 to 87.430." Nev. Rev. Stat. § 87.060(2). "Instead, an entity formed pursuant to other statutory authority is governed by the body of law pursuant to which the entity was formed." *Baroi*, 874 F.Supp.2d at \*——. In their amended complaints, plaintiffs acknowledge that SOC LLC is a "Delaware limited liability company." DeFiore Am. compl., ECF No. 56 at ¶ 2; *see also* Darrough Am. compl., ECF No. 56 at ¶ 2. Because SOC LLC is a Delaware limited liability company, which was formed under the authority of the state of Delaware, it is not governed by the Nevada Uniform Partnership Act. *See* Nev. Rev. Stat. § 87.060(2) ("Any association formed under any other statute of this State, or any statute adopted by authority, other than the authority of this State, is not a partnership under NRS 87.010 to 87.430[.]"). Therefore, its members are not joint venturers. *See Baroi*, 874 F.Supp.2d at \*—— (the "unequivocal existence of a definite business form is the most reliable express of the relationship among the parties").

**\*7** Because SOC-SMG and Day & Zimmerman are not joint venturers and cannot be held liable on that theory, I assess whether plaintiffs have properly alleged that SOC-SMG and Day & Zimmerman participated in the wrongdoing. To hold members of an LLC liable for tortious actions, the members must have personally participated in the tortious act. See *Gardner v. Henderson Water Park, LLC*, 133 Nev. 391, 399 P.3d 350, 351 (Nev. 2017). [8] Turning first to Day & Zimmerman, plaintiffs allege that the recruiters used in the group recruiting calls were employed by Day & Zimmerman. DeFiore am. compl., ECF No. 56 at ¶ 45 (a) ("The recruiters initially included the following individuals employed by Defendants: Tom Wilson, Angela Broyles, and Paul Bogart (the "Recruiters"), all of whom were employed by Day & Zimmerman."); *see also* Darrough am. compl., ECF No. 56 at ¶ 16(a) (same). Taking these facts in the light most favorable to plaintiffs, a reasonable inference can be drawn that the recruiters were working on behalf of Day & Zimmerman when they participated in these group calls and created the alleged call list. See *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1301 (D. Nev. 2014) ("Although the precise details of the agency relationship need not be pleaded to survive a motion to dismiss, sufficient facts must be offered to support a reasonable inference that an agency relationship existed."). Therefore, at this stage in the proceedings, Day & Zimmerman are proper defendants.

[8]     SOC LLC is a Delaware limited liability company. ECF No. 56 at ¶ 2; *see also* Darrough Am. compl., ECF No. 56 at ¶ 2. Neither party has put forth argument as to whether Delaware or Nevada law applies here. However, I note that Delaware law applies the same test. See *Reserves Dev. LLC v Crystal Props., LLC*, 2009 WL 1514929, at \*10, 2009 Del. Super. LEXIS 198, at \*27 (Del. Super. Ct. May 18, 2009) ("To impose personal liability on a member of a limited liability company for its torts, the member must have participated in them.") (internal citation omitted).

However, plaintiffs have failed to allege any facts that would allow me to find that SOC-SMG personally participated in the alleged wrongdoing. Darrough's sole allegation against SOC-SMG is that "Plaintiff is informed and believes, and based thereon alleges that SOC-SMG, Inc. and Day & Zimmerman, Inc. made demands upon SOC LLC to falsify the time records so that they were not found to have violated their contract with the Department of Defense, and ratified and approved the falsified records knowing them to be false." Darrough

am. compl., ECF No. 56 at ¶ 20. [9] This allegation is wholly conclusory and cannot withstand a motion to dismiss. See *Mann v. City of Tucson*, 782 F.2d 790, 793 (9th Cir. 1986) (per curium). Given that plaintiffs have continually failed to plead allegations supporting SOC-SMG as a proper party, plaintiffs' claims against SOC-SMG are dismissed with prejudice.

[9]     Notably, this allegation is absent from the DeFiore amended complaint.

**D. The intervenor plaintiffs are proper parties to this action.**

Defendants argue that all of the intervenor-plaintiffs' claims should be dismissed. Defendants argue that intervenor-plaintiff Gregory Niffen's motion to intervene is untimely. ECF No. 59 at 23. However, I recently found that Niffen's motion to intervene was timely and allowed him to intervene. Order, ECF No. 63. Therefore, I decline to dismiss Niffen's claims at this time.

Defendants also argue that intervenor-plaintiffs Kelvin Hardin, Kenneth Robinson, and Marlesh Mbory's claims should be dismissed because the proposed intervenors have not yet filed a motion to intervene in the action. ECF No. 59 at 22. In response, Plaintiffs argue that prior to the removal from state court, Hardin, Robinson, and Mbory filed a motion to intervene, to which defendants did not oppose, and were granted the right to intervene. ECF No. 60 at 23. Therefore, their claims are proper. *Id.* In their reply, defendants argue that the Nevada state court entered the order granting the motion to intervene when the court lacked jurisdiction over the case due to the defendants' interlocutory appeal pending before the Ninth Circuit. ECF No. 62 at 15. Therefore, defendants believe the order is void ab initio.

Although an appeal can automatically stay a proceeding in the district court from which the appeal came, *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740, 143 S.Ct. 1915, 216 L.Ed.2d 671 (2023), the same is not true for state court. See *City & Cnty. of San Francisco v. PG&E Corp.*, 433 F.3d 1115, 1122 (9th Cir. 2006) (acknowledging that "the entry of a remand order ends the proceeding in the federal court and the state court (or other) proceeding gets under way" and the reality that state court case may proceed to judgment before a decision is made in any pending appeal of the remand). The DeFiore case was remanded to the Eighth Judicial District Court, Clark County, Nevada on February 5, 2021. Mins. of proceedings, ECF No. 34. Defendants appealed the removal on February 12, 2021. Notice of appeal, ECF No. 36. While that appeal was pending,

the case was returned to state court and intervenor plaintiffs filed their motion to intervene on June 9, 2021. *DeFiore et al. v. SOC LLC, et al.*, Case No. A-20-823307-C. Additionally on June 25, 2021, defendants filed a motion to stay the case. [10] *Id.* On July 7, 2021, Judge Johnson granted both the motion to stay and the motion to intervene. *Id.* The case was not stayed when Judge Johnson granted the motion to intervene, and so Judge Johnson properly granted the motion. Therefore, intervenors Hardin, Robinson, and Mbory are proper parties in this action. [11]

[10]    This further weakens defendants' argument that the case was automatically stayed pending the Ninth Circuit appeal.

[11]    The docket does not yet reflect Hardin, Robinson, and Mbory as intervenors in this case. I will provide the clerk directions to add them as intervenors in the conclusion of this order.

**\*8** I note, however, that the briefing relating to Niffen's motion to intervene included extensive briefing on the question of whether Niffen's claims were barred by the statute of limitations. *See* ECF Nos. 48, 52, 53. I declined to conclusively rule on the issue in deciding on the motion to intervene. ECF No. 63. Although the briefing for the motion to dismiss touches upon this question, it does not provide similar extensive analysis from either party as to whether the intervenor-plaintiffs' claims are barred by statutes of limitations. *See* ECF Nos. 59, 62. Therefore, as set forth in the conclusion of this order, the parties are ordered to provide supplemental briefing on whether plaintiff-intervenors Niffen, Hardin, Robinson, and Mbory's claims are barred by the statute of limitations.

**IV. Conclusion**

IT IS THEREFORE ORDERED that defendants' consolidated motion to dismiss **[DeFiore: ECF No. 59, Darrough: ECF No. 59] is GRANTED in part and DENIED in part.** Plaintiffs' fraud claims: promissory fraud, negligent representation, tortious and contractual unjust enrichment, and money had and received are **dismissed without prejudice.** Additionally, plaintiffs' breach of implied covenant of good faith and fair dealing claim is **dismissed with prejudice.**

IT IS FURTHER ORDERED that all claims against SOC-SMG are **dismissed with prejudice.**

IT IS FURTHER ORDERED that should plaintiffs wish to file a second amended complaint to replead their fraud claims they must do so **no later than May 23, 2025**.

IT IS FURTHER ORDERED that the parties are to submit briefs no longer than five pages by **May 30, 2025,** for the limited purpose of determining whether the intervenor-plaintiffs' claims are barred by statutes of limitations.

The Clerk of Court is kindly instructed to add Kelvin Hardin, Kenneth Robinson, and Marlesh Mbory as intervenor-plaintiffs in *DeFiore, et al. v. SOC LLC, et al.*, Case No. 2:20-cv-01981-CDS-DJA.

The plaintiffs are kindly instructed to file the response to the motion to dismiss (ECF No. 60 in *Darrough v. SOC LLC*, Case No. 2:20-cv-01951-CDS-DJA) into the *DeFiore* case.

**All Citations**

Slip Copy, 2025 WL 1380644

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4279374
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States Bankruptcy Court, W.D. Washington,
at Tacoma.

In re Yoshiko Saito HAINES, Debtor.
Yoshiko Saito Haines, Plaintiff,
v.
Internal Revenue Service, Defendant.

Bankruptcy No. 08–41390.
|
Adversary No. 08–04066.
|
Sept. 11, 2008.

**Attorneys and Law Firms**

Yoshiko Saito Haines, Pro Se.

Michael P. Hatzimichalis, U.S. Dept. of Justice, Washington, DC, for Defendant.

**MEMORANDUM DECISION**

PAUL B. SNYDER, U.S. Bankruptcy Judge.

 **\*1** This matter came before the Court on September 4, 2008, on the United States' Second Motion to Dismiss filed on behalf of the Internal Revenue Service (IRS). In her Amended Complaint, Yoshiko Saito Haines (Plaintiff) seeks to have returned to her the $39,545.80 levied by the IRS for assessed taxes, punitive damages, release of the tax lien, and other relief. The parties agreed to waive oral argument. This Memorandum Decision shall constitute Findings of Fact and Conclusions of Law as required by Fed. R. Bankr.P. 7052.

**I**

**FINDINGS OF FACT**

The Debtor failed to file income tax returns and pay taxes due for the 1998 through 2007 tax years. As a result of this failure, an Internal Revenue Service Agent prepared substitute returns for the Plaintiff, assessed the Plaintiff, and proceeded to attempt to collect on the delinquent taxes owed.

On September 15, 2005, the IRS filed a tax lien against the Plaintiff in the Pierce County Auditor's Office. On June 22, 2007, the IRS instituted a monthly levy upon the Pension Benefit Guaranty Corporation (PBGC) because the Plaintiff was awarded an interest in her ex-husband's fixed benefit pension plan. Pursuant to the levy, the IRS received seven payments of $5,656.40 totaling $39,594.80. The IRS received its last levy payment on March 31, 2008. The Plaintiff filed a voluntary Chapter 11 bankruptcy on this date at 4:05 p.m.

The IRS filed a proof of claim for $1,940,538.58 for pre-petition income taxes alleged to be owed. On June 13, 2008, the Plaintiff initiated this adversary proceeding by filing a complaint (Complaint) against the IRS and PBGC. After the United States of America (United States), on behalf of the IRS, had filed a Motion to Dismiss, the Plaintiff filed an Amended Complaint, dismissing PBCG and asserting additional relief against the IRS. On September 4, 2008, the Plaintiff filed a pleading entitled "Addendum to Amended Complaint" (Addendum). The Plaintiff never sought leave of the Court to amend her Complaint, contrary to Fed.R.Civ.P. 15(a) made applicable by Fed. R. Bankr.P. 7015. Nonetheless, the Court now grants the Plaintiff authority to amend her original Complaint, nunc pro tunc, and has considered the Plaintiff's September 4, 2008 Addendum. After the Plaintiff filed the Amended Complaint, the United States withdrew its Motion to Dismiss. On August 12, 2008, the Court entered an Order dismissing PBGC.

On August 15, 2008, the United States, on behalf of the IRS, filed a Second Motion to Dismiss. The United States moves to dismiss the Plaintiff's Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6), made applicable by Fed. R. Bankr.P. 7012(b).

**II**

**CONCLUSIONS OF LAW**

A party may move to dismiss a case under Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. A federal court is presumed to lack subject matter jurisdiction until a plaintiff establishes otherwise; thus, the plaintiff bears the burden of establishing the existence of subject matter jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 377, 114 S.Ct. 1673 (1994).

**\*2** In order for a court to grant a motion to dismiss under Fed.R.Civ.P. 12(b)(6), it must be established that the plaintiff has failed "to state a claim upon which relief can be granted." While a complaint does not need detailed factual allegations, it requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964–65 (2007). "[A]ll well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." *Wyler Summit P'ship v. Turner Broad. Sys., Inc.* 135 F.3d 658, 661 (9th Cir.1998). While factual allegations in the complaint are assumed to be true, they "must be enough to raise a right to relief above the speculative level." *Twombly,* 127 S.Ct. at 1965. A plaintiff's conclusory unsupported allegations may be disregarded. *Holden v. Hagopian,* 978 F.2d 1115, 1121 (9th Cir.1992).

**A. Improper Defendant**

The United States correctly states that the IRS is not an entity subject to suit and should be dismissed. *Krouse v. U.S. Gov't Treasury Dep't IRS,* 380 F.Supp. 219, 221 (D.C.Cal.1974). In its Second Motion to Dismiss, the United States consents to substitution of it as the proper defendant in lieu of the IRS. Additionally, in the Plaintiff's Addendum, the Plaintiff names the United States as a defendant. Consequently, in order to resolve the issues presented and save the Court and litigants resources, the Court shall dismiss the IRS, substitute the United States for the IRS, and rule on the balance of the United States' motion.

**B. Subject Matter Jurisdiction**

1. *Refund Action*

The Plaintiff's Amended Complaint appears to seek a refund of $39,545.80 received in a levy. While a bankruptcy estate may seek a tax refund under 11 U.S.C. § 505(a)(2)(B), the United States argues that the Plaintiff has failed to meet a jurisdictional pre-requisite for maintaining a refund action in any court, let alone this Court.

The law regarding claims for tax refunds is unusually clear, and does not appear to admit any exceptions: "No suit or proceeding shall be maintained *in any court* for the recovery of any internal revenue tax ... until a claim for refund or credit has been duly filed with the Secretary...." 26 U.S.C. § 7422(a) (emphasis added).

*In re Graham,* 981 F.2d 1135, 1138 (10th Cir.1992). The administrative claim must be filed within the later of two

years after the tax was paid or three years after the return was filed. 26 U.S.C. § 6511(a). "These rules are nonwaivable jurisdictional requirements." *Graham,* 981 F.2d at 1138. "Simply put, no claim, no refund." *Graham,* 981 F.2d at 1138. The United States' declaration in support of the Second Motion to Dismiss in paragraph five that the Plaintiff has not pursued or exhausted administrative claims for a refund of income taxes. The Plaintiff has not alleged that she has filed a claim for refund with the Secretary. Unless and until an administrative claim is filed, the Plaintiff has not satisfied the jurisdictional requirements for a refund action.

2. *Collection Due Process (CDP) Hearing*

**\*3** The Plaintiff's Amended Complaint appears to seek equitable relief from, or review, of the IRS's collection of assessed taxes via a tax lien filed in Pierce County and a levy upon PBGC. The United States argues that a CDP Hearing was held and determination was made concerning the collection actions, but that the Plaintiff chose not to dispute the determination. The United States' declaration provides that the IRS Appeals Officer who conducted that CDP Hearing sent the Plaintiff a Notice of Determination by certified mail on January 12, 2006, but the Plaintiff did not petition either the Tax Court or District Court to review the settlement officer's determination within thirty days as required by 26 U.S.C. § 6330(d)(1). Because review of the CDP hearing can occur only in the District Court or Tax Court, the United States argues that this Court lacks subject matter jurisdiction to review the collection claim. This Court agrees that it lacks subject matter jurisdiction to review the validity of the levy upon PBGC or provide any equitable relief there from.

3. *Fraud Claim*

The Plaintiff appears to allege fraud by the IRS in "stealing funds" from the Plaintiff. The United States correctly asserts that to the extent the Plaintiff has alleged a claim for fraud, the Federal Tort Claims Act, 28 U.S.C. § 2671, does not extend to "[a]ny claim arising in respect to the assessment or collection of any tax...." 28 U.S.C. § 2680(c).

For the reasons stated above, this Court lacks subject matter jurisdiction over the Plaintiff's action against the United States, and the United States is entitled to dismissal pursuant to Fed.R.Civ.P. 12(b)(1). As set forth below, dismissal is also warranted pursuant to Fed.R.Civ.P. 12(b)(6).

## C. No Claims Upon Which Relief Can be Granted

### 1. *Taxpayer*

The primary contention underlying the Plaintiff's action is that she is not a taxpayer, and thus not subject to the Internal Revenue Code (IRC). IRC §§ 1 and 6012(a)(1)(A) require United States citizens whose income exceeds certain thresholds to file income tax returns. IRC § 6151(a) requires taxpayers to submit payments with their tax returns. Exhibit 1 to the United States' declaration indicates a taxable income of $1,024,418 for the Plaintiff for the tax period ending December, 1998. The Plaintiff has failed in her burden of proof in establishing that she is not a taxpayer. Since the core allegation in the Plaintiff's Amended Complaint is that she is not a taxpayer, she has failed to state a claim upon which relief can be granted, and the United States is entitled to dismissal of the Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6).

### 2. *Substitute Returns*

The Plaintiff also contends that the IRS prepared substitute returns, which are the basis of the tax assessments, without authority and that these substitute returns are not valid support for the tax assessments. IRC § 6020, however, authorizes the IRS to prepare a return if a person fails to do so. 26 U.S.C. § 6020(a), (b)(1). Moreover, any return "so made and subscribed by the Secretary shall be prima facie good and sufficient for all legal purposes." 26 U.S.C. § 6020(b)(2). The Plaintiff has failed to state a claim upon which relief can be granted.

**\*4** The United States is entitled to dismissal of all claims against it made by the Plaintiff in her Amended Complaint filed August 6, 2008, and referenced in the Plaintiff's Addendum.

### All Citations

Not Reported in B.R., 2008 WL 4279374, 102 A.F.T.R.2d 2008-6154, 2008-2 USTC P 50,558

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3320916
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

ML SERVICING CO., INC., an Arizona
corporation; and ML Liquidating Trust, Plaintiffs,

v.

GREENBERG TRAURIG, LLP, a New York
limited liability partnership; Robert S. Kant and
Ellen P. Kant, husband and wife; John and Jane
Does 1–30; Black Corporations 1–30; White
Partnerships 1–30; and Gray Trusts 1–30, Defendants.

No. CV11–0832–PHX DGC.
|
Aug. 2, 2011.

**Attorneys and Law Firms**

Michael C. Manning, Sarah Kate Langenhuizen, Stinson Morrison Hecker LLP, Phoenix, AZ, for Plaintiffs.

Colette Tyrell Connor, Ellen E. Oberwetter, Kevin M. Downey, Patrick Joseph Houlihan, Williams & Connolly LLP, Washington, DC, Martin Richard Galbut, Michaile Janae Berg, Galbut & Galbut PC, Phoenix, AZ, for Defendants.

**ORDER**

DAVID G. CAMPBELL, District Judge.

**\*1** Defendants Robert and Ellen Kant ("Kant Defendants") move to dismiss on grounds of fraudulent joinder. Doc. 10. Plaintiffs oppose the motion (Doc. 13), and the Kant Defendants have filed a reply (Doc. 16). Plaintiffs also filed a motion to remand the case to Maricopa County Superior Court. Doc. 14. All Defendants oppose (Doc. 17), and Plaintiffs have filed a reply (Doc. 23). For the reasons that follow, the Court will grant Plaintiffs' motion for remand and decline to rule on the Kant Defendants' motion to dismiss.[1]

[1] The request for oral argument is denied because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed.R.Civ.P. 78(b); *Partridge v. Reich,* 141 F.3d 920, 926 (9th Cir.1998).

**I. Background.**

The relevant allegations in the complaint (Doc. 1–1) are summarized as follows. Defendants Greenberg Traurig, LLP ("GT") and Robert Kant were securities counsel for Mortgages, Ltd. ("ML") during the period leading up to ML's bankruptcy.[2] GT and Kant prepared at least eleven Private Offering Memoranda ("POM") for ML to use in connection with its efforts to procure funds from investors. Doc. 1–1 ¶ 50. In June of 2008, some of ML's creditors forced ML into an involuntary bankruptcy proceeding. *Id.* at ¶ 161.

[2] As part of its Chapter 11 plan, Mortgages, Ltd. changed its name to ML Servicing Co., Inc. The Court will refer to the entity as ML for purposes of this motion.

On May 20, 2009, the Bankruptcy Court confirmed ML's Chapter 11 reorganization plan ("Plan"). The Plan allows the liquidating trust to pursue ML's claims against professionals such as Defendants. *Id.* at ¶ 4. On January 10, 2010, the Securities and Exchange Commission "entered an Order Instituting Administrative Proceedings Pursuant to § 15(b) of the Securities Exchange Act of 1934, Making Findings, and Revoking Broker–Dealer Registration" ("SEC Order") against ML. *Id.* at ¶ 183. Plaintiffs and GT on its own behalf and on behalf of its affiliates executed a tolling agreement ("Agreement") which tolled all applicable statutes of limitations. *Id.* at ¶ 14.

Almost one year after the parties signed the Agreement, Plaintiffs commenced this action against Defendants in Maricopa County Superior Court, alleging legal malpractice and breach of fiduciary duty. *Id.* On April 25, 2011, Defendants removed the case to this Court on two independent grounds: (1) bankruptcy jurisdiction under 28 U.S.C. § 1334(b) because the case is "related to" the ongoing bankruptcy proceeding;[3] and (2) diversity jurisdiction under 28 U.S.C. § 1332. Doc. 1. On May 26, 2011, Plaintiffs filed the motion to remand for lack of subject matter jurisdiction. Doc. 14.

[3] The bankruptcy case in question is *In re Mortgages Ltd.,* No. 2:08–bk–07465.

**II. Removal and Remand Principles.**

Pursuant to 28 U.S.C. § 1441(a), a civil case brought in state court over which the federal district courts have original jurisdiction may be removed to the federal court in the district

25-80084-WLH    Doc 18-2    Filed 12/16/25    Entered 12/16/25 16:19:32    Pg 37 of 47

where the action is pending. The statute is to be strictly construed against removal jurisdiction. *See Syngenta Crop Protection, Inc. v. Henson,* 537 U.S. 28, 32, 123 S.Ct. 366, 154 L.Ed.2d 368 (2002); *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 108, 61 S.Ct. 868, 85 L.Ed. 1214 (1941). This "strong presumption" against removal "means that the defendant always has the burden of establishing that removal is proper." *Gaus v. Miles, Inc.,* 980 F.2d 564, 566 (9th Cir.1992). Federal jurisdiction must be rejected, and the case remanded to state court, "if there is any doubt as to the right of removal in the first instance." *Id.; see* 28 U.S.C. § 1447(c). Moreover, the burden of showing jurisdiction exists is allocated to the party asserting jurisdiction. *Indus. Tectonics, Inc. v. Aero Alloy,* 912 F.2d 1090, 1092 (9th Cir.1990) (citing *McNutt v. Gen. Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)). The Court is "free to hear evidence regarding jurisdiction and to rule on that issue prior to trial, resolving factual disputes where necessary." *Augustine v. United States,* 704 F.2d 1074, 1077 (9th Cir.1983); *see Roberts v. Corrothers,* 812 F.2d 1173, 1177 (9th Cir.1987).

### III. "Related To" Bankruptcy Jurisdiction.

**\*2** Federal courts have original jurisdiction over cases "related to" bankruptcy proceedings. 28 U.S.C. § 1334(b). Bankruptcy "related to" jurisdiction is not limitless, *Celotex Corp. v. Edwards,* 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995), and the "Ninth Circuit has adopted the *'Pacor test'* for determining the scope of 'related to' jurisdiction" generally. *In re Pegasus Gold Corp.,* 394 F.3d 1189, 1193 (9th Cir.2005) (internal citation omitted). Under the *Pacor* test, federal courts have "related to" jurisdiction over any proceeding where "the outcome could conceivably have any effect on the estate being administered in bankruptcy." *Id.* (citing *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3rd Cir.1984)).

The Ninth Circuit has stated, however, that bankruptcy jurisdiction after a reorganization plan has been approved (i.e., post-confirmation jurisdiction) is necessarily more limited than pre-confirmation jurisdiction, and has adopted the Third Circuit's "close nexus" test for determining whether post-confirmation "related to" jurisdiction exists. *Pegasus,* 394 at 1194. The Third Circuit concluded that "matters affecting the 'interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus.' " *Id.* (quoting *In re Resorts Int'l, Inc.,* 372 F.3d 154, 167 (3rd Cir.2004)). Bankruptcy courts generally do not retain "related to"

jurisdiction over claims that "could have existed entirely apart from the bankruptcy proceeding and did not necessarily depend upon resolution of a substantial question of bankruptcy law." *In re Ray,* 624 F.l3d 1124, 1135 (9th Cir.2010).

Although a bankruptcy plan has already been confirmed here, rendering this a post-confirmation action, Defendants argue that *Pacor's* "any effect" test should be used instead of the narrower "close nexus" test adopted by the Ninth Circuit in *Pegasus.* Doc. 17 at 8. Defendants assert that *Pegasus* is not analogous to this case and suggest that the "close nexus" test does not apply to "post-confirmation cases involving liquidating plans." Doc. 17 at 10 n. 3. This argument is unpersuasive because the bankruptcy plan in *Pegasus* created a liquidating trust just as the plan in this case. 394 F.3d at 1194. Absent case law suggesting otherwise, the Court will apply the "close nexus" test in determining whether post-confirmation "related to" bankruptcy jurisdiction exists here.

Defendants argue in the alternative that "related to" jurisdiction exists because "recovery for actions brought by [Plaintiff] ML Liquidating Trust is placed in a Liquidation Fund and used to pay creditors under the Plan," Doc. 17 at 11, but the Ninth Circuit has rejected a similar argument as overbroad. *Pegasus,* 394 F.3d at 1194 n. 1 ("[W]e are not persuaded by the Appellees' argument that jurisdiction lies because the action could conceivably increase the recovery to the creditors. As the other circuits have noted, such a rationale could endlessly stretch a bankruptcy court's jurisdiction." (citation omitted)). Defendants have not shown that this case is different, or that the Court would be required to interpret the bankruptcy plan in order to resolve Plaintiffs' claims, *see id.* at 1194 (holding that "related to" jurisdiction existed where resolution of claims involved interpretation of the bankruptcy plan). In light of the presumption against removal, Defendants have not shown that Plaintiffs' claims satisfy the "close nexus" test necessary for "related to" jurisdiction to be found in this case.

### IV. Diversity Jurisdiction.

**\*3** A federal court's diversity jurisdiction extends to "all civil actions where the matter in controversy exceeds ... $75,000 ... and is between ... [c]itizens of different states. 28 U.S.C. § 1332(a)(1). Plaintiffs argue that diversity does not exist here. It is undisputed that ML Servicing Co., Inc. and ML Liquidating Trust's ("Trust") trustee are both citizens of Arizona (Doc. 1 ¶¶ 5–6), that at least one beneficiary of the Trust is a citizen of New York (Doc. 14–3), that GT is a citizen

25-80084-WLH Doc 18-2 Filed 12/16/25 Entered 12/16/25 16:19:32 Pg 38 of 47

of New York (Doc. 1 ¶ 7), and that the Kant Defendants are citizens of Arizona (Doc. 1 ¶ 9). The Court will address the two parties at issue, namely the Trust Plaintiff and the Kant Defendants.

### A. Citizenship of Trust.

In cases where entities rather than individuals are litigants, diversity jurisdiction depends on the form of the entity. *Johnson v. Columbia Props. Anchorage, LP,* 437 F.3d 894, 899 (9th Cir.2006). In *Navarro Sav. Ass'n v. Lee,* the Supreme Court held that a business trust's trustees—who had legal title, managed assets, and controlled litigation—were the real parties to the controversy and could invoke diversity jurisdiction on the basis of their own citizenship without regard to the citizenship of the trust's beneficiaries. 446 U.S. 458, 465–66, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980). Ten years later, the Supreme Court stated that it has "never held that an artificial entity, suing or being sued in its own name, can invoke the diversity jurisdiction of the federal courts based on the citizenship of some but not all of its members." *Carden v. Arkoma Assocs.,* 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). In clarifying *Navarro,* Justice Scalia explained that *"Navarro* had nothing to do with the citizenship of the 'trust,' since it was a suit by the trustees in their own names." *Id.* at 192–93. On the issue of whether a trust has the citizenship of only its trustees or of both its trustees and its beneficiaries, the circuits are split. *Carden* did not define which entities qualify as "members" for the jurisdictional analysis.

In this circuit, however, *Johnson* held that "[a] trust has the citizenship of its trustee or trustees." 437 F.3d at 899. Despite this unambiguous language, Plaintiffs contend that the Ninth Circuit has not addressed the issue squarely and that *Johnson* is not controlling because it did not consider the citizenship of the trust's beneficiaries when making its jurisdictional analysis. Doc. 23 at 5. Plaintiffs urge this Court to follow Third and Eleventh Circuit case law holding that a trust has the citizenship of its trustee(s) and beneficiaries. Doc. 23 at 4–7. Defendants argue that *Johnson* clearly holds that the citizenship of a trust is determined by the citizenship of its trustee only. Doc. 17 at 4.

Although the relevant language in *Johnson* is terse and relies on *Navarro,* the court appears to have considered *Carden* by citing to it more than once. Moreover, the language in *Johnson* is unambiguous. *Johnson* is binding on this Court, and therefore only the citizenship of the trustees is relevant. Because the trustee is a citizen of Arizona, the Trust also

is a citizen of Arizona. The dispositive issue, therefore, is whether the Kant Defendants—also Arizona citizens—have been fraudulently joined.

### B. Fraudulent Joinder.

**\*4** Removal under diversity jurisdiction is proper "only if none of the parties in interest *properly* joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b) (emphasis added); *see* 28 U.S.C. § 1332(a)(1). Because diversity jurisdiction requires complete diversity of citizenship, each of the plaintiffs must be a citizen of a different state than each of the defendants. *Morris v. Princess Cruises, Inc.,* 236 F.3d 1061, 1067 (9th Cir.2001) (citing *Caterpillar Inc. v. Lewis,* 519 U.S. 61, 68, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996)). "Nevertheless, one exception to the requirement of complete diversity is where a non-diverse defendant has been 'fraudulently joined.' " *Id.*

"[F]raudulent joinder is a term of art." *McCabe v. General Foods Corp.,* 811 F.2d 1336, 1339 (9th Cir.1987). "Joinder of a non-diverse defendant is deemed fraudulent, and the defendant's presence in the lawsuit is ignored for purposes of determining diversity, '[i]f the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state.' " *Martori v. Golden Rule Ins., Co.,* Case No. 09–00212, 2009 WL 1257389 at *2–4 (D.Ariz. May 14, 2009) (quoting *Morris,* 236 F.3d at 1067).

In evaluating the allegations and evidence, courts employ a presumption against finding fraudulent joinder. *See Plute v. Roadway Package Sys., Inc.,* 141 F.Supp.2d 1005, 1008 (N.D.Cal.2001); *Diaz v. Allstate Ins. Group,* 185 F.R.D. 581, 586 (C.D.Cal.1998). The Court must "resolve all ambiguities in state law in favor of the plaintiff[ ]." *Diaz,* 185 F.R.D. at 586. "[A]ll doubts concerning the sufficiency of a cause of action because of inartful, ambiguous or technically defective pleading must be resolved in favor of remand." *Plute,* 141 F.Supp.2d at 1008; *see Levine,* 41 F.Supp.2d at 1078; *Charlin v. Allstate Ins. Co.,* 19 F.Supp.2d 1137, 1140 (C.D.Cal.1998).

Defendants argue that the claims against the Kant Defendants are time-barred and that their joinder therefore is fraudulent. As the removing party, Defendants must defeat the presumptions against removal and against a finding of fraudulent joinder by showing the statute of limitations under state law clearly bars the claim. *See Bertrand v. Aventis Pasteur Laboratories, Inc.,* 226 F.Supp.2d 1206, 1212 (D.Ariz.2002) ("To establish that an instate defendant has been fraudulently joined, the removing party must show" that

"there is no possibility that the plaintiff would be able to establish a cause of action against the instate defendant in state court"). The statute of limitations in Arizona for legal malpractice and breach of fiduciary duty is two years, and begins to run when the cause of action accrues. A.R.S. § 12–542. These causes of action accrue when (1) "the client knew or should have known of his attorney's negligence," and (2) "the plaintiff-client has sustained some injury or damaging effect from the malpractice." *Ariz. Mgmt. Corp. v. Kallof,* 142 Ariz. 64, 688 P.2d 710, 712–13 (Ariz.App.1984); *see also CDT, Inc. v. Addison, Roberts & Ludwig, C.P.A., P.C.,* 198 Ariz. 173, 7 P.3d 979, 981–82 (Ariz.App.2000).

**\*5** "[U]nder Arizona law, the question of when [a client] knew or should have known of [an attorney's] negligence is critical in determining whether the statute of limitations has run." *Cannon v. Hirsch Law Office, P.C.,* 222 Ariz. 171, 213 P.3d 320, 331 (Ariz.Ct.App.2009) (quoting *Long v. Buckley,* 129 Ariz. 141, 629 P.2d 557, 559 (Ariz.Ct.App.1981)). The discovery issue itself involves questions of reasonableness and knowledge, matters which courts are particularly wary of deciding as a matter of law. *Id.* (citing *Long,* 629 P.2d at 560).

Defendants argue that Plaintiffs' complaint clearly demonstrates that Plaintiffs, through their predecessor ML, were on notice of all the facts underlying their claims against Kant and had allegedly suffered harm by June 20, 2008, the date ML was forced into voluntary bankruptcy. Doc. 10 at 7–8. Defendants cite the following allegations in the complaint, all occurring by June 20, 2008:(1) Kant had drafted his last ML POM; (2) ML Managing Director Robert Furst had become "very concerned about the inadequacies in [Mortgages Ltd.'s] disclosures to its investors, including the disclosures that had been prepared by GT and Kant;" and (3) ML was no longer raising money from investors or distributing the POMs drafted by Kant. *Id.*

Defendants also argue that even if Plaintiffs did not or should have not known of potential claims against the Kant Defendants by June 20, 2008, ML was directly informed that it might have claims against them on June 27, 2008. *Id.* at 8, 629 P.2d 557. Defendants cite a brief, filed by the group of creditors who forced ML into involuntary bankruptcy, stating that "[t]o the extent any improprieties tainted these private offerings, [Mortgages Ltd.'s] estate may possess claims against Greenberg for its work associated with the same." *Id.* Based on this statement, Defendants assert that there can be no doubt ML was on notice of its claims against Kant by the end of June 2008. *Id.*

Plaintiffs assert that ML did not know nor should it have known about actual claims against GT and Kant until the SEC Order was entered on January 19, 2010. Doc. 13 at 10. According to Plaintiffs, the SEC Order is evident that Kant and GT had breached their duties to ML and failed to provide correct and complete legal advice regarding ML's securities. Doc. 14 at 5. If ML's cause of action did not accrue until the SEC Order was entered, ML's suit against the Kant Defendants would not be time-barred and the Kant Defendants would not be fraudulently joined.

Plaintiffs counter Defendants' argument regarding ML's knowledge before ML was forced into involuntary bankruptcy by stating that the Kant Defendants are merely speculating about when ML knew that it had viable claims against them. Doc. 13 at 10. Plaintiffs argue that ML's knowledge that it was in serious financial trouble does not equate to knowledge that GT or Kant had done anything to cause the financial trouble. *Id.* Plaintiffs also contend that ML would not have continued to allow GT to represent ML in its bankruptcy proceeding through May 2009 had ML known or even suspected that Kant and GT's action had caused ML to deepen its insolvency. *Id.;* Doc. 14 at 8.

**\*6** Plaintiffs do not contest Defendants' statement that ML was directly informed it might have claims against Defendants on June 27, 2008. But Plaintiffs do contest Defendants' assertion that the June 27, 2008 brief created the knowledge or even reasonable suspicion of Plaintiffs' claims against the Kant Defendants that is required for the action to accrue. Doc. 14 at 7. The Court agrees. Simply because ML was informed that it might have claims against the Kant Defendants "to the extent that improprieties" occurred does not equate to ML's knowledge that it actually had those claims. Whether ML reasonably should have known that it had claims against the Kant Defendants on June 27, 2008 is a question of fact that cannot be resolved at this stage.

Given the presumption against fraudulent joinder and the factual issues that must be resolved before claims against the Kant Defendant are time-barred, the Court cannot conclude that fraudulent joinder has occurred. As already noted, "all doubts concerning the sufficiency of a cause of action because of inartful, ambiguous or technically defective pleading must be resolved in favor of remand." *Plute,* 141 F.Supp.2d at 1008. Because the Court cannot conclude that the Kant Defendants have been fraudulently joined, the Court lacks diversity jurisdiction and this case must be remanded. In light

25-80084-WLH   Doc 18-2   Filed 12/16/25   Entered 12/16/25 16:19:32   Pg 40 of 47

of this ruling, the Court need not address whether the case should be remanded on equitable grounds under 28 U.S.C. § 1452(b). Because remand is appropriate, the Kant Defendants' motion to dismiss will not be ruled upon by this Court.

**IT IS ORDERED:**

1. Plaintiffs' motion to remand (Doc. 14) is **granted.**

2. The Clerk shall remand the action to the Maricopa County Superior Court.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3320916

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

VHS Liquidating Trust v. Blue Cross of California, Not Reported in B.R. Rptr. (2021)

2021 WL 11134503

2021 WL 11134503
Only the Westlaw citation is currently available.
United States Bankruptcy Court, N.D. California.

VHS LIQUIDATING TRUST, a liquidating
trust for Verity Health System of California,
Inc. A California corporation; et al. Plaintiffs,

v.

BLUE CROSS OF CALIFORNIA, et al. Defendants.

Case No. 21-4034
|
Signed: November 22, 2021

**Attorneys and Law Firms**

Tobias S. Keller, Thomas B. Rupp, Keller Benvenutti Kim LLP, San Francisco, CA, Mark McKane, Michael P. Esser, Kirkland & Ellis LLP, San Francisco, CA, David Zott (pro hac vice), Daniel Laytin, (pro hac vice), Zachary Holmstead (pro hac vice), Kirkland & Ellis LLP, Chicago, IL, Attorneys for Defendant Blue Cross Blue Shield Association.

Patrick M. Ryan, John F. McLean, Oliver Q. Dunlap, Sean R. McTigue, Bartko Zankel Bunzel & Miller, San Francisco, CA, Attorneys for Plaintiffs.

Timothy S. Laffredi Office of The United States Trustee, San Francisco, CA, Assistant United States Trustee.

## ORDER DENYING MOTION TO STAY AND GRANTING MOTION TO REMAND

Charles Novack, United States Bankruptcy Judge

**\*1** On November 12, 2021, this court conducted a hearing on a) Defendant Blue Cross Blue Shield Association's motion to stay this adversary proceeding pending the Judicial Panel on Multidistrict Litigation's resolution of plaintiffs VHS Liquidating Trust, Prime Healthcare Services, Inc., Prime Healthcare Foundation, Inc. and Prime Healthcare Management, Inc.'s objection to the conditional transfer of this adversary proceeding to the Northern District of Alabama, and b) Plaintiffs' motion to remand the adversary proceeding to Alameda County Superior Court. All appearances were noted on the record. For the reasons stated below, the motion to stay is denied and the motion to remand is granted.

The pertinent facts are not in dispute. In July 2021, Plaintiffs, which, as stated above, include VHS Liquidating Trust, an entity created by a confirmed Chapter 11 plan in the Central District of California case of *In re Verity Health Systems of California, Inc., et. al.*, sued numerous BlueShield/Blue Cross related entities in Alameda County Superior Court on allegations of price fixing and antitrust violations in the health insurance field (the "Alameda County litigation"). After Plaintiffs filed an amended complaint, the Defendants removed the Alameda County litigation to this court on September 22, 2021, alleging, as their jurisdictional basis, that the Alameda County litigation satisfied this court's "related to" jurisdiction under 28 U.S.C. § 1334(b). Defendants also contend that the Alameda County litigation bears striking similarities to the claims asserted in multidistrict litigation – *In re Blue Cross Blue Shield Antitrust litigation*, MDL No. 2406 – which is pending in the United States District Court for the Northern District of Alabama (the "MDL Court"). The Defendants notified the Judicial Panel on Multidistrict Litigation (the "MDL Panel") that this adversary proceeding may be a "Tag-Along Action," and as a result, the MDL Panel issued a Conditional Transfer Order on September 29, 2021. The Plaintiffs have objected to the transfer, and the MDL Panel will consider their objection in early December, 2021. In the interim, Defendant Blue Cross Blue Shield Association ("BlueCross/Blue Shield") filed a motion to stay this adversary proceeding pending the outcome of the transfer objection, which motion was filed on September 30, 2021. Plaintiffs thereafter filed their motion to remand.

Defendants contend that they are entitled to litigate in federal court under this court's "related to" jurisdiction. Their argument fully relies on VHS Liquidating Trust's presence in the litigation. Plaintiff VHS Liquidating Trust (the "Trust") was created under the confirmed Chapter 11 plan of reorganization in the Verity Health Systems' Chapter 11 bankruptcies. Verity Health Systems operated several hospitals and medical clinics throughout the State of California, and it filed a Chapter 11 bankruptcy in 2018 in the United States Bankruptcy Court for the Central District of California.[1] During its Chapter 11 (which was consolidated with several other Chapter 11 cases), Verity Health Systems sold several of its hospital centers (including the Seton and St. Francis Medical Centers). The Seton and St. Francis Medical Center asset purchase agreements extensively documented the terms of sale, and they provided, among other things, that the Verity Health bankruptcy estate would retain certain assets of these medical centers (the purchase agreements frequently

25-80084-WLH   Doc 18-2   Filed 12/16/25   Entered 12/16/25 16:19:32   Pg 42 of 47

VHS Liquidating Trust v. Blue Cross of California, Not Reported in B.R. Rptr. (2021)

2021 WL 11134503

described these retained assets as "Excluded Assets"). For example, the Seton Medical Centers' APA "Excluded Assets" provision defines the assets retained by the Verity bankruptcy estate as:

**\*2** "except as set forth in Section 1.7(w) and 1.8(g), all claims, counterclaims and causes of action of such Seller or such Seller's bankruptcy estate ... including, without limitation, rights of recovery or set-off of every kind and character against third parties, causes of action arising out of any claims and causes of action under chapter 5 of the Bankruptcy Code and any related claims, counterclaims and causes of action under applicable non-bankruptcy law, and any rights to challenge liens asserted against property of such Seller's bankruptcy estate, including, but not limited to, liens attaching to the Purchase Price paid to such seller, and the proceeds from any of the foregoing ...."

See § 1.8(i) of the Seton APA [2] . It therefore appears that the Verity Health bankruptcy estate retained the antitrust/price fixing claims that accrued before the Seton Medical Centers' sale.

[1]   The Plaintiffs allege in their complaint that the low Blue Shield/Blue Cross reimbursement rates were one of the reasons for Verity Health's bankruptcy filing.

[2]   The Seton asset purchase agreement is generally governed by California law. *See* Seton APA § 12.3.

Verity Health Systems filed its modified second amended Chapter 11 plan on August 12, 2020 (the "Plan"), which was confirmed on August 14, 2020. The Plan called for the Chapter 11 debtors' liquidation, and it created the Trust for that purpose. The Trust's primary function is to liquidate and distribute the "Trust Assets," a phrase which, when several Plan definitions are consulted, includes the type of anti-trust/price fixing claims asserted in this adversary proceeding. *See, e.g.*, Plan §§ 1.30, 1.97, 1.115, 6.2 and 13.9. The claims at issue in this adversary proceeding constitute one of many classes of litigation claims that were transferred to the Trust for prosecution (*see* Plan § 13.9), and neither the Plan nor its disclosure statement further defined, assessed or valued them. The Plan further provides in § 6.5(g) that "[o]n and after the Effective Date, the Liquidating Trustee shall not be required to obtain any approvals from the Bankruptcy Court, any court or Governmental Unit and/or provide any notices under any applicable laws ... to implement the terms of the Plan." While

the Plan was confirmed more than a year ago, the Chapter 11 case remains open.

The Alameda County litigation claims are premised on the anti-trust provisions (and related laws) of several states. The Trust describes itself and the claims it is pursuing in paragraphs 110 through 114 of the complaint:

"110. Plaintiff VHS Liquidating Trust ("Verify") is the bankruptcy liquidator for Verity Health System of California, Inc.

111. Verity Health System of California, Inc. was a not-for-profit healthcare services organization based in California. It was the sole owner of six medical centers serving the San Francisco, Los Angeles, and San Jose metropolitan areas: Seton Medical Center in Daly City, Seton Coast in Moss Beach, St. Vincent Medical Center in Los Angeles, O'Connor Hospital in San Jose, St, Louise Regional Hospital in Gilroy and St. Francis Medical Center in Lynwood. These hospitals had 1,650 patient beds, 6 active emergency rooms, a trauma center, and a host of medical specialities including tertiary and quaternary care.

112. Verity Health System of California, Inc. filed for bankruptcy on August 31, 2018.

113. The Bankruptcy Court on August 14, 2020 ordered the creation [of] Verity (VHS Liquidating Trust) and subsequently vested in it and transferred to it the Verity Health System of California, Inc. claims asserted in this lawsuit.

114. Thus, Verity controls the claims of St. Louise, St. Francis (up until the date of its sale to Prime), St. Vincent, Seton, Seton Coastside, and O'Connor hospitals, their affiliated medical foundations and affiliates, and Verity Health System of California, Inc."

**\*3**  As described in more detail below, the Defendants assert that the Trust may have overstated the scope of its claims. The court now turns to the two motions before it.

## MOTION TO STAY

While the pertinent facts are not in dispute, the parties wholeheartedly disagree a) regarding which legal standard this court should apply to determine the motion to stay, b) which motion (stay or remand) should be decided first, and c) whether this court should even reach the motion to remand.

VHS Liquidating Trust v. Blue Cross of California, Not Reported in B.R. Rptr. (2021)

2021 WL 11134503

In truth, these motions simply debate which court – the MDL Court or this bankruptcy court – should determine the motion to remand. Plaintiffs do not strongly dispute that their causes of action resemble those pending in the MDL Court, and their objection to the MDL Panel's conditional transfer order simply restates their contention that there is no subject matter jurisdiction here. Moreover, their Alameda County litigation complaint alleges that some of the MDL Court's substantive rulings demonstrate the strength of their anti-trust claims. [3] Simply, the critical issue is whether, under these circumstances, this court should defer to the MDL process, stay the litigation, and not decide what is usually a gatekeeper question: subject matter jurisdiction.

[3]    The Rules of the MDL Panel do not favor either side. MDL Rule 2.1(d) states that "[t]he pendency of a motion ... [or] conditional transfer order ... before the Panel pursuant to 28 U.S.C. § 1407 does not affect or suspend orders and pretrial proceedings in any pending federal district court action and does not limit the pretrial jurisdiction of that court."

Generally speaking,

"[t]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. While a district judge 'should not automatically stay discovery, postpone rulings on pending motions, or generally suspend further rulings upon a parties' motion to the MDL Panel for transfer and consolidation,' '[c]ourts frequently grant stays pending a decision by the MDL panel regarding whether to transfer a case.' " [citations omitted].

*Johnson v. Sanofi, S.A.*, 2017 WL 132631, *2 (E.D.Cal. April 11, 2017).

Plaintiffs contend that this court should apply the so called "*Meyers*" test to determine the order in which to resolve the stay and remand motions. This test, arising out of *Meyers v. Bayer AG*, 143 F.Supp. 2d 1044 (E.D.Wisc. 2001), requires a court to initially scrutinize the remand motion to determine its degree of difficulty, ascertain whether the MDL court has considered or is likely to consider an identical or similar subject matter jurisdiction question, and if both elements are met, address the motion to stay first. Blue Cross/Blue Shield posits another test. It argues that since the Ninth Circuit has not adopted the *Meyers* test, this court should apply the

"*Rivers*" test, which is based on more generic, albeit well-established Ninth Circuit case law which instructs a court to consider whether a stay will promote judicial economy and avoid prejudice and hardship for the parties. *See Rivers v. Walt Disney Co.*, 980 F.Supp. 1358, 1360 (C.D.Cal. 1997); *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962). The *Rivers* test assesses "(1) potential prejudice to the non-moving party; (2) hardship and inequity to the moving party if the action is not stayed; and (3) the judicial resources that would be saved by avoiding duplicative litigation." *Rivers, supra*, at 1360. Regardless of the test used, the party seeking the stay bears the burden of establishing that a stay is appropriate. *Ohio Envtl. Council v. U.S.Dist. Court*, 565 F.2d 393, 396 (9th Cir. 1977). Numerous District Courts within the Ninth Circuit have addressed this conflict [4].

  **\*4** "Despite their slightly different formulations, both tests focus on the same essential inquiry: how similar is the jurisdictional issue in the instant case to cases that are or will be in the MDL? If the remand issue is highly similar to cases in the MDL, then judicial economy counsels in favor of a stay so that, if transferred, the MDL court can resolve all the related issues together. However, if the remand issue is unique to the case at hand, no efficiencies are achieved through transfer – the same amount of judicial resources must be expended, whether by the transferee court or the MDL court." *City of Corona v. 3M Company*, 2021 WL 3829700, *2 (C.D.Cal. 2021).

[4]    The court respectfully refers the parties to their memoranda for evidence of this conflict.

Regardless of which test is applied, the motion to stay is denied. While Blue Shield/Blue Cross is only seeking a short reprieve, a stay under the *Rivers* test will not conserve judicial resources or eliminate prejudice or inequity (particularly because none exist). First, there is no evidence indicating that the MDL Court has or is likely to address the specifics of this subject matter jurisdiction question. Since the parties' alleged jurisdictional dispute arises from the terms of a carefully crafted Chapter 11 plan, extensively negotiated asset purchase agreements, and a lengthy superior court complaint, it is hard to imagine how the MDL Court would ever address this exact (or similar) fact pattern. For the same reasons, neither Plaintiffs nor Defendants have demonstrated that they will be prejudiced or harmed by this court denying the stay and determining the motion to remand. Simply, some court must resolve the question of subject matter jurisdiction, and this court is in as good a position to decide the remand motion as

25-80084-WLH    Doc 18-2    Filed 12/16/25    Entered 12/16/25 16:19:32    Pg 44 of 47

**VHS Liquidating Trust v. Blue Cross of California, Not Reported in B.R. Rptr. (2021)**

2021 WL 11134503

the United States District Court for the Northern District of Alabama. [5]

[5]        This court recognizes that its remand order could be reviewed by the MDL Court if the MDL Panel overrules the Plaintiffs' objection to its conditional transfer order. Under such a scenario, two courts indeed might consider the same motion. See *In re Aldelphia*, 2005 WL 1026559 (S.D.N.Y. May 2, 2005). This court does not believe, however, that this prospect should deter it or any other bankruptcy court from carefully considering the merits of competing motions to stay and remand and determining how to proceed.

Application of the *Meyers* test leads to the same result. Notwithstanding the results of a preliminary scrutiny of the subject matter jurisdiction question, there is no evidence that the MDL Court has addressed or will address an identical or similar jurisdiction scenario. Accordingly, deferring to the MDL process will not avoid possibly inconsistent or contradictory subject matter jurisdiction analyses.

## MOTION TO REMAND

"The burden of establishing federal jurisdiction is on the party seeking removal, and the removal statute is strictly construed against removal jurisdiction." *Nishimoto v. Federman-Bachrach & Assoc.*, 903 F.3d 709, 712 n.3 (9th Cir. 1990). Federal jurisdiction "must be rejected if there is any doubt as to the right of removal in the first instance." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). Blue Cross/Blue Shield argues that this court has "related-to" jurisdiction under 28 U.S.C. § 1334(b). The Defendants' Notice of Removal supports this contention by stating, among other things, that the Plan "explicitly reserves to the Liquidating Trust claims 'arising from claims against health Plans' such as the Blue Plans," and that any damages that the Trust may recover on these claims "would likely affect the administration of the estates and the amount of property available for distribution." Notice of Removal, ¶¶ 30–32. The Notice of Removal also alleges (notwithstanding its earlier statement that the Plan explicitly assigned the claims to the Trust) that the Trust's standing to assert some portion of its anti-trust/price fixing claims may be in question and thus require this court to interpret the Plan:

    **\*5**  "Specifically, Plaintiffs seek damages for hospitals that were allegedly harmed by Defendants' conduct starting in 2008 and continuing until today, and seek to recover

assets. Compl. ¶ 627. The Liquidating Trust, however, did not receive a wholesale transfer of every hospital's assets; the Plan's definition of 'Liquidating Trust Assets' carves out, inter alia, 'Operating Assets' as well as 'Hospital Purchased Assets,' Plan § 1.97. [6] An interpretation of the Plan may therefore be necessary in this Action." Notice of Removal, § 33.

[6]        The Plan defines the phrase "Hospital Purchased Assets" as "the assets purchased by Prime and AHMC pursuant to the [St. Francis] Asset Purchase Agreement and the Seton Asset Purchase Agreement, respectively. For the avoidance of doubt, the Hospital Purchased Assets relate only to the Hospitals subject to the [St. Francis] and Seton Sale. The Plan defines "Operating Assets" to "mean, collectively, (a) the Hospitals; (b) the Hospital Purchased Assets; and (c) the Post-Effective Date Debtors' right to Quality Assurance Payments." Defendants have not stated how these definitions bring into substantial question the Trustee's "standing."

Defendants' arguments, while artfully drafted, are insufficient. The Ninth Circuit's general test for determining whether a bankruptcy court has post-confirmation, "related-to" jurisdiction is well established. Such related-to jurisdiction requires "a 'close nexus' to the bankruptcy plan or proceeding sufficient to uphold bankruptcy jurisdiction over the matter." *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1193 (9th Cir. 2005). Matters affecting "the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Ibid*. Application of the close nexus test "requires particularized consideration of the facts and posture of each case, as the test contemplates a broad set of sufficient conditions and retains a certain flexibility." *In re Wilshire Courtyard*, 729 F.3d 1279, 1289 (9th Cir. 2013). The *Wilshire* court cautioned that the test "can only be properly applied by looking at the whole picture." *Ibid*.

While the Ninth Circuit has not provided explicit guidance regarding which factors should be assigned more or "the relative importance to ascribe to each factor," *In re Consol. Meridian Funds*, 511 B.R. 140, 147 (W.D.Wash. 2014), certain patterns can be discerned. First, matters that truly involve the interpretation or enforcement of a significant plan provision create a close nexus. The case summaries provided by the District of Hawaii in *Batiste v. Sun Kon Fin. I, LLC*,

25-80084-WLH   Doc 18-2   Filed 12/16/25   Entered 12/16/25 16:19:32   Pg 45 of 47

**VHS Liquidating Trust v. Blue Cross of California, Not Reported in B.R. Rptr. (2021)**

2021 WL 11134503

2016 U.S. Dist. LEXIS 23697 (D. Hawaii February 26, 2016) are instructive.

> "[I]n *Pegasus*, the court found a close nexus where the complaint included allegations that the appellants in the case had 1) breached both the bankruptcy plan and a settlement agreement approved by the bankruptcy court prior to confirmation of the plan; 2) breached "the covenant of good faith and fair dealing with respect to these agreements"; and 3) "committed fraud in the inducement at the time it entered into" the agreements. 394 F.3d at 1194. The court determined that "[r]esolution of these claims will likely require interpretation of the [settlement] Agreement and the Plan," id., contrasting the case with Resorts Int'l, in which the Third Circuit found the bankruptcy court lacked jurisdiction where the claim at issue did not require that a court "interpret or construe the Plan or the incorporated Litigation Trust Agreement," id. (quoting *Resorts Int'l*, 372 F.3d at 170). The court acknowledged that "the majority" of the claims in the complaint involved only "post-confirmation conduct," but did not view these claims as barring the bankruptcy court's "related-to" jurisdiction. Id.

> **\*6** Similarly, in *Wilshire*, the Ninth Circuit determined there was a close nexus where "the ultimate merits question depend[ed] in part on the interpretation of the confirmed Plan." 729 F.3d at 1289. Although the court acknowledged that the "Plan itself [was] ambiguous" as to a key issue raised in the relevant litigation and "ma[de] no mention of state tax consequences" also at issue, the court held that resolution of these issues would "require[ ] a close look at the economics of the transaction [at issue] as detailed in the Plan and Confirmation Order." Id. More recently, in *In re Valley Health System*, 584 Fed. App'x. 477, 479 (9th Cir. 2014), the Ninth Circuit cited affirmatively to *Wilshire* in determining that "related-to" jurisdiction existed post-confirmation where resolution of the mandamus petition at issue required interpretation of the bankruptcy plan and the bankruptcy court's confirmation order.

*Id*. at \*\*218-20.

Second, the litigation of a significant claim by a liquidating trustee that was expressly part of the "calculus of the parties when negotiating the Plan" is a factor that may be considered in determining jurisdiction. In *Calvert v. Berg (In re Consol. Meridian Funds)*, 511 B.R. 140 (Dist.W.Wash. 2014), the District Court reversed the bankruptcy court's finding that there was no "related-to" jurisdiction over a liquidating trustee's professional negligence and fraud claims against the Chapter 11 debtor's controlling officer and pre-petition accountants/auditors. The confirmed Chapter 11 plan in that case created a liquidating trust and assigned to it, among other things, any claims that the participating investors in the failed investment funds had against the fund's auditors/accountants, and the funds controlling officer. The trustee commenced his action in bankruptcy court, and the defendants successfully moved to dismiss for lack of "related-to" jurisdiction. The District Court reversed, holding that several factors favored a finding of a "close nexus" between the adversary proceeding and the Chapter 11 plan. The District Court noted that the potential claims against the auditor "were specifically mentioned" in the Plan and assigned to the trustee for the purpose of benefitting the investors. It also found that the parties "expressly considered those claims and their value when negotiating the Plan and the trustee has sought to implement and execute the terms of the Plan by pursuing those claims." The District Court also determined that there were potential statute of limitations and standing issues regarding the liquidating trustee's right to assert the claims which would require the presiding court "to discern" the meaning and effect of the Plan. Under these circumstances, the District Court found that there was "related-to" jurisdiction.

Finally, many courts have held that there is "no-related" jurisdiction when its only justification is the litigation of a claim that, if successful, may lead to a greater plan distribution to creditors. *See, e.g.*, *In re Heller Ehrman LLP*, 461 B.R. 606, 610 (Bankr. N.D.Cal. 2011); *ML Servicing Co. v. Greenberg Traurig, LLP*, 2011 U.S. Dist. LEXIS 85066 (D.Az., August 2, 2011).

When reduced to its essence, this adversary proceeding involves nothing more than the liquidating trustee pursuing one of many classes of litigation claims that the Plan assigned to the Trust to pursue on behalf of creditors. Section 13.9 of the Plan listed thirteen categories of litigation claims that were assigned to the Trust, and they are all generically described. In contrast to the scenario presented in *In re Meridian Funds*, the Plan and accompanying disclosure statement did not value the claims at issue, and there is no evidence that the transfer of these claims to the Trust was a significant point of contention or negotiation between the interested parties in the *Verity Health System* bankruptcy. Moreover, if the proposed Plan is a liquidating one, where else can these claims go? Blue Shield/Blue Cross acknowledges the explicit language of Plan § 13.9, but contends that the scope of the assigned health

**VHS Liquidating Trust v. Blue Cross of California, Not Reported in B.R. Rptr. (2021)**

2021 WL 11134503

care plan claims may require a court to interpret the Plan (in particular, whether these claims are possibly "Operating Assets" or "Hospital Purchase Assets" that thus not included in the Claims for Relief assigned to the Trust). Absent some cogent analysis regarding how these other asset categories create a bonafide dispute that requires this court to "interpret" the Plan, Blue Shield/Blue Cross's argument leaves this court wanting. The court should not find "related-to jurisdiction" on a speculative assessment regarding how state law litigation

may unwind. Accordingly, Plaintiffs' motion to remand is granted.

**\*7**  \* \* \* END OF ORDER \* \* \*

**All Citations**

Not Reported in B.R. Rptr., 2021 WL 11134503

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

25-80084-WLH    Doc 18-2    Filed 12/16/25    Entered 12/16/25 16:19:32    Pg 47 of 47